DAVID C. SHONKA
Acting General Counsel

DEANYA T. KUECKELHAN
Regional Director

JASON C. MOON, Tex. Bar No. 24001188
ANNE D. LEJEUNE, Tex. Bar No. 24054286
THOMAS B. CARTER, Tex. Bar No. 03932300
EMILY B. ROBINSON, Tex. Bar No. 24046737
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9371; alejeune@ftc.gov (LeJeune)
(214) 979-9372; tcarter@ftc.gov (Carter)
(214) 979-9386; erobinson@ftc.gov (Robinson)
(214) 953-3079 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br><br>**Plaintiff**<br><br>**v.**<br><br>**Ambrosia Web Design LLC, an Arizona limited liability company, also d/b/a AWD;**<br><br>**Concord Financial Advisors LLC, an Arizona limited liability company;**<br><br>**CAM Services Direct LLC, an Arizona limited liability company;**<br><br>**AFB LLC, an Arizona limited liability company;** | **Case No. CV 2:12-2248-PHX-FJM**<br><br>**AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

**Western GPS LLC, an Arizona limited liability company;**

**Chris Ambrosia, individually and as a manager of Ambrosia Web Design LLC and CAM Services Direct LLC;**

**and**

**LeRoy Castine, a/k/a Lee Castine, individually and as a manager of Ambrosia Web Design LLC, Concord Financial Advisors LLC, AFB LLC, and Western GPS LLC;**

**Defendants**

Plaintiff, the Federal Trade Commission ("FTC"), for its Amended Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

**PLAINTIFF**

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. § 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c) and 6105(b).

**DEFENDANTS**

6.      Defendant Ambrosia Web Design LLC, also doing business as AWD, is an Arizona limited liability company with its principal place of business at 123 E. Baseline Road, Suite D-208, Tempe, Arizona 85283.  Ambrosia Web Design LLC transacts or has transacted business in this district and throughout the United States.

7.      Defendant Concord Financial Advisors LLC is an Arizona limited liability company with its principal place of business at 123 E. Baseline Road, Suite D-208, Tempe, Arizona 85283.   Concord Financial Advisors LLC transacts or has transacted business in this district and throughout the United States.

8.      Defendant CAM Services Direct LLC is an Arizona limited liability company with its principal place of business at 123 E. Baseline Road, Suite D-208, Tempe, Arizona 85283.  CAM Services Direct LLC transacts or has transacted business in this district and throughout the United States.

9.      Defendant AFB LLC is an Arizona limited liability company with its principal place of business at 123 E. Baseline Road, Suite D-208, Tempe, Arizona 85283.

AFB LLC transacts or has transacted business in this district and throughout the United States.

10.     Defendant Western GPS LLC is an Arizona limited liability company with its principal place of business at 123 E. Baseline Road, Suite D-208, Tempe, Arizona 85283.  Western GPS LLC transacts or has transacted business in this district and throughout the United States.

11.     Defendant Chris Ambrosia is the managing member of Ambrosia Web Design LLC and CAM Services Direct LLC.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Chris Ambrosia resides in this district and, in connection with the matters alleged here, transacts or has transacted business in this district and throughout the United States.

12.     Defendant LeRoy Castine, also known as Lee Castine, is a managing member of Concord Financial Advisors LLC, AFB LLC, and Western GPS LLC, and a manager of Ambrosia Web Design LLC.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant LeRoy Castine resides in this district and, in connection with the matters alleged here, transacts or has transacted business in this district and throughout the United States.

13.     Defendants Ambrosia Web Design LLC, Concord Financial Advisors LLC, CAM Services Direct LLC, AFB LLC, and Western GPS LLC (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and abusive acts and practices alleged below.  Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, managers, business functions, representatives, customer service telephone numbers, and office locations, and have corresponded with third parties on each other's behalf.  Because these Corporate Defendants have operated as a common

enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Chris Ambrosia and LeRoy Castine have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

14. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### A. Defendants' Telemarketing Activities

15. From August 2011 to October 2012, when this Court entered a temporary restraining order against them, Defendants engaged in a plan, program, or campaign to induce the purchase of Defendants' credit card interest rate reduction services through telephone calls to consumers throughout the United States. Defendants sold or offered for sale their credit card interest rate reduction services by making telemarketing calls to consumers directly or through other telemarketers.

16. During these telemarketing calls with consumers, Defendants claimed they had the ability to substantially reduce consumers' credit card interest rates. Defendants claimed that they could obtain very low interest rates for consumers, even as low as zero percent, and that the reduced interest rate would save consumers a substantial amount of money in interest payments. Defendants promised consumers that they would save a specific amount in interest payments, typically $2500 or more. At the time Defendants made these promises to consumers, Defendants had little or no information about the consumers' creditworthiness or credit history.

17. Defendants promised many consumers a full or partial refund if Defendants were unable to obtain the promised interest rate reductions or dollar savings. In sales presentations to other consumers, Defendants did not make specific promises regarding refunds, but they also did not affirmatively tell these consumers that

Defendants had a no-refund, no-cancellation policy.  When consumers later attempted to obtain refunds, cancel participation, or dispute the charges with their credit card issuers, Defendants often claimed that they had a no-refund, no-cancellation policy.

18.    During the sales presentations, Defendants often claimed to be affiliated with a U.S. government program.  They told consumers there was a federal stimulus program in place to help consumers get out of debt and that Defendants' credit card interest rate reduction services were part of the program.  Defendants told some consumers that they were part of or working with the U.S. government.

19.    Defendants' descriptions of the actual services they provided to get the lower interest rate for consumers were inconsistent.  Sometimes Defendants simply promised to lower consumers' rates without specifying how they would do it.  In other instances, they specifically claimed they would get new, lower interest rate credit cards for consumers and transfer consumers' existing balances to the new cards, without telling consumers whether Defendants were going to issue the new cards or third parties would issue them.  In still other instances, Defendants told consumers that they would negotiate with the issuers of consumers' existing credit cards to obtain a lower interest rate on existing accounts.  Sometimes Defendants claimed to have special relationships with credit card companies, or special methods or experience that enabled them to obtain better interest rates than consumers could obtain on their own.

20.    Defendants often charged an up front, advance fee ranging from $495 to $2495 for their services.  In the initial sales presentation, Defendants asked for consumers' credit card account information, including account numbers.  Defendants often used this information to immediately charge the fee to consumers' existing credit cards, before providing any services.  Defendants sometimes did not tell consumers that they intended to use the account information to immediately charge a fee.  Consumers believed Defendants were requesting the information simply to verify the consumer's debts and perform services.  In some instances, Defendants did not disclose the fee at all, or claimed that there would be no fee.  In other instances, Defendants mentioned the fee,

but told consumers that they would pay the fee at some later point.  In yet other instances, Defendants were simply silent about when they would charge the fee.  Although some consumers understood that their credit cards would be charged immediately, many did not.

21.     After consumers agreed to participate in the program, in many instances Defendants sent forms that required consumers to list all of their credit card account information, as well as other sensitive personal information such as date of birth and Social Security Number.  A Service Agreement was often included in the forms for consumers to sign.  The Service Agreement repeated Defendants' guarantee that they would obtain a certain dollar savings for consumers or provide a full or partial refund.

22.     After consumers agreed to Defendants' services, and Defendants charged their fee, Defendants often did not deliver on their promises.  Consumers often had great difficulty even contacting Defendants to check on their accounts.  If Defendants provided any service at all, they often applied for third-party credit cards on behalf of consumers or initiated a three-way telephone call with consumers' credit card issuers and asked for an interest rate reduction.  Often Defendants did not obtain any interest rate reduction for consumers using these methods.  On the occasions when Defendants did obtain a lower interest rate, the lower rate was often not sufficient to produce the promised savings.

23.     In some instances, consumers tried to cancel their participation in the program immediately.  These consumers often were unable to reach a representative, or they were told by Defendants that there was a no-refund, no-cancellation policy.  When these consumers later disputed the charges with their credit card issuers, Defendants often responded to the disputes by falsely claiming that they disclosed a no-refund, no-cancellation policy to consumers, or that they provided services that they did not provide.

24.     Whether consumers tried to cancel, or asked for refunds because Defendants had failed to provide the promised results, Defendants often did not provide refunds unless consumers complained to law enforcement agencies or the Better Business

Bureau.  Often, Defendants either did not return consumers' calls, promised refunds that never came, or refused the refunds outright.

25.     While telemarketing their services, Defendants, directly or through their agents or intermediaries, made numerous calls to telephone numbers on the National Do Not Call Registry.  In some instances, these calls were made by Defendants using Defendants' company names.  In other instances, Defendants used third-party telemarketers to contact consumers.  The third-party telemarketers often used the name "Card Member Services" while interacting with consumers.  Telemarketers using this name or similar names (e.g. "Card Services") and offering credit card interest rate reduction services have generated hundreds of thousands of Do Not Call complaints from across the United States.

26.     Further, Defendants, directly or through their agents or intermediaries, initiated numerous telemarketing calls using a service that delivers prerecorded voice messages, known as "voice broadcasting" or "robocalling."  The prerecorded messages directed consumers to press a number on their telephones if they were interested in obtaining lower credit card interest rates.  Consumers often received many robocalls before they decided to speak to a representative.  Defendants initiated these robocalls to consumers even though consumers had not agreed in writing to receive these robocalls from Defendants.

**B. Defendants' Credit Card Laundering**

27.     In the transactions described above, Defendants acted directly as "telemarketers" or "sellers," as the terms are defined by the TSR.  As described below, in other transactions and at various times, Defendants engaged in credit card laundering by (a) processing credit card payments for third parties through Defendants' own merchant accounts; and (b) arranging for other merchants to process credit card payments for Defendants through those merchants' merchant accounts.

28. The TSR defines "merchant" as:

> a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution, by processing credit card payments for other persons or entities.

16 C.F.R. § 310.2(s).

29. In order to process credit card charges, companies must have a merchant account with an acquiring institution that has authority from a credit card system to authorize merchants to accept, transmit, or process credit card payments. Defendants obtained merchant accounts with Global Payments Direct, Inc., an acquiring institution, using several different company names. Defendants engaged in credit card laundering by processing through these merchant accounts credit card sales drafts that were not the result of transactions between themselves and the cardholders, but were generated by other telemarketers. This activity was not authorized by the written merchant agreements between Defendants and the acquiring institution. Defendants derived substantial income by retaining a portion of the revenue generated by these other telemarketers' operations as compensation for this unauthorized processing activity.

30. Additionally, during a time period in which Defendants' merchant accounts had been terminated and Defendants were unable to obtain new merchant accounts, Defendants arranged for other merchants to submit Defendants' credit card sales drafts through these other merchant's merchant accounts. These credit card sales drafts were not the result of transactions between these other merchants and cardholders, but were telemarketing transactions between Defendants and cardholders. This activity was not authorized by the written merchant agreements between the other merchants and their acquiring institution.

.

## VIOLATIONS OF THE FTC ACT

31. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

32. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

33. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**COUNT ONE**

**Misrepresenting Material Facts**

34. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, Defendants have represented, directly or indirectly, expressly or by implication, that:

a. Consumers who purchase Defendants' credit card interest rate reduction services will receive a low rate credit card or have their credit card interest rates reduced substantially; and

b. Consumers who purchase Defendants' credit card interest rate reduction services will save thousands of dollars as a result of lowered credit card interest rates.

35. In truth and in fact, in numerous instances the representations set forth in Paragraph 34 of this Complaint were false or not substantiated at the time the representations were made.

36. Therefore, Defendants' representations as set forth in Paragraph 34 above are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT TWO**

**Misrepresenting Refund Policy**

37.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants will provide full or partial refunds if consumers do not receive the guaranteed credit card interest rate reduction or dollar savings.

38.    In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 37 of this Complaint, Defendants do not provide full or partial refunds when consumers do not receive the guaranteed credit card interest rate reduction or dollar savings.

39.    Therefore, Defendants' representation as set forth in Paragraph 37 above is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act,  15 U.S.C. § 45(a).

**COUNT THREE**

**Misrepresenting Affiliation with a Government Entity**

40.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, Defendants have represented, directly or indirectly, expressly or by implication, that they are carrying out a government program or are otherwise affiliated with the United States government.

41.    In truth and in fact, Defendants are not carrying out a government program and are not affiliated with the United States government.

42.    Therefore, Defendants' representations as set forth in Paragraph 40 above are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT FOUR**

**Unauthorized Billing**

43. In numerous instances, Defendants have caused billing information to be submitted for payment without having obtained previously consumers' express informed consent.

44. Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

45. Therefore, Defendants' practice as described in Paragraph 43 above constitutes an unfair act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE TELEMARKETING SALES RULE**

46. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices under the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310.

47. As amended, effective September 27, 2010, and October 27, 2010, the TSR addresses the telemarketing of debt relief services. The amendments effective September 27, 2010, among other things, prohibit misrepresentations about material aspects of debt relief services. The amendments effective October 27, 2010, prohibit sellers and telemarketers from charging or collecting an advance fee before renegotiating, settling, reducing, or otherwise altering consumers' debts.

48. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," and Defendants have initiated, or caused telemarketers to initiate, "outbound telephone call[s]" to consumers to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. § 310.2(v), (aa), (cc), and (dd). Defendants also are sellers or telemarketers of "debt relief service[s]," as defined by the TSR, 16 C.F.R. § 310.2(m).

49.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(v).

50.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

51.     As amended, effective September 27, 2010, the TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.  16 C.F.R. § 310.3(a)(2)(x).

52.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies.  16 C.F.R. § 310.3(a)(2)(iv).

53.     The TSR prohibits sellers and telemarketers from failing to disclose, in a clear and conspicuous manner, if the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or if the seller makes a representation about a refund, cancellation, exchange, or repurchase, a statement of all material terms and conditions of such policy. 16 C.F.R. § 310.3(a)(1)(iii).

54.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(a)(2)(vii).

55.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of

success in obtaining or arranging a loan or other extension of credit for a person.
16 C.F.R. § 310.4(a)(4).

56.     As amended, effective October 27, 2010, the TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service unless and until:

a.     the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

b.     the consumer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

c.     to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  16 C.F.R. § 310.4(a)(5)(i).

57.     The TSR prohibits telemarketers and sellers from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the consumer.  16 C.F.R. § 310.4(a)(7).

58.     The TSR, as amended in 2003, established a "do-not-call" registry (the "National Do Not Call Registry" or "Registry"), maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at *www.donotcall.gov*.

59.    Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at *www.donotcall.gov*, or by otherwise contacting law enforcement authorities.

60.    The TSR prohibits sellers and telemarketers from initiating, or causing others to initiate, an outbound telephone call to telephone numbers on the Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).

61.    As amended, effective September 1, 2009, the TSR prohibits initiating, or causing others to initiate, a telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller.  The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to the person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.  16 C.F.R. § 310.4(b)(1)(v)(A).

62.    Defendants Ambrosia Web Design LLC, CAM Services Direct LLC, and Western GPS LLC were "merchants" as defined by the TSR, 16 C.F.R. § 310.2(s), in that they were authorized under a written contract with an acquiring institution to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services.

63.    Except as expressly permitted by the applicable credit card system, the TSR makes it a deceptive telemarketing act or practice for:

a.    A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a

telemarketing credit card transaction between the cardholder and the merchant; or

b. Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant. 16 C.F.R. § 310.3(c).

64. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT FIVE**

**Misrepresenting Material Facts in Violation of the TSR**

65. In numerous instances, in connection with the telemarketing of goods and services, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of such goods and services, including, but not limited to, that:

a. Consumers who purchase Defendants' credit card interest rate reduction services will receive a low rate credit card or have their credit card interest rates reduced substantially; and

b. Consumers who purchase Defendants' credit card interest rate reduction services will save thousands of dollars as a result of lowered credit card interest rates.

66. Defendants' acts and practices, as described in Paragraph 65 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §310.3(a)(2)(iii).

**COUNT SIX**

**Misrepresenting Debt Relief Service in Violation of the TSR**

67. In numerous instances on or after September 27, 2010, in connection with the telemarketing of debt relief services, Defendants have misrepresented, directly or by implication, material aspects of the debt relief services, including, but not limited to, that:

a. Consumers who purchase Defendants' credit card interest rate reduction services will receive a low rate credit card or have their credit card interest rates reduced substantially; and

b. Consumers who purchase Defendants' credit card interest rate reduction services will save thousands of dollars as a result of lowered credit card interest rates.

68. Defendants' acts and practices, as described in Paragraph 67 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

**COUNT SEVEN**

**Misrepresenting Refund Policy in Violation of the TSR**

69. In numerous instances, in the course of telemarketing goods and services, Defendants have misrepresented, directly or by implication, that Defendants will provide full or partial refunds if consumers do not achieve the guaranteed interest rate reductions or interest savings.

70. Defendants' acts and practices, as described in Paragraph 69 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §310.3(a)(2)(iv).

**COUNT EIGHT**

**Failing to Disclose No-Refund, No-Cancellation Policy in Violation of the TSR**

71. In numerous instances, in the course of telemarketing goods and services, Defendants have failed to disclose to consumers that Defendants have a policy of not making refunds or allowing cancellations.

72. Defendants' acts and practices, as described in Paragraph 71 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(iii).

**COUNT NINE**

**Misrepresenting Affiliation with a Government Entity in Violation of the TSR**

73. In numerous instances, in the course of telemarketing goods and services, Defendants have misrepresented, directly or by implication, that they are carrying out a government program or are otherwise affiliated with the United States government.

74. Defendants' acts or practices, as described in Paragraph 73 above, are deceptive telemarketing practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

**COUNT TEN**

**Charging or Receiving a Fee in Advance of Obtaining a New, Lower Interest Credit Card in Violation of the TSR**

75. In numerous instances, in the course of telemarketing goods and services, Defendants have requested or received payment of a fee or consideration in advance of consumers obtaining or arranging an extension of credit, when Defendants have guaranteed or represented a high likelihood of success in obtaining an extension of credit for such consumers.

76. Defendants' acts or practices, as described in Paragraph 75 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(4).

**COUNT ELEVEN**

**Charging or Receiving a Fee In Advance of Providing Debt Relief Services In Violation of the TSR**

77. In numerous instances on or after October 27, 2010, in the course of telemarketing debt relief services, Defendants have requested or received payment of a fee or consideration for a debt relief service before: (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by

the customer; and (b) the customer has made at least one payment pursuant to that agreement.

78. Defendants' acts or practices, as described in Paragraph 77 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

**COUNT TWELVE**

**Unauthorized Billing in Violation of the TSR**

79. In numerous instances, in the course of telemarketing goods and services, Defendants have caused billing information to be submitted for payment without the express informed consent of the consumer.

80. Defendants' acts or practices, as described in Paragraph 79 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(7).

**COUNT THIRTEEN**

**Violating the National Do Not Call Registry in Violation of the TSR**

81. In numerous instances, in connection with telemarketing, Defendants have engaged, or caused a telemarketer to engage, in initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

**COUNT FOURTEEN**

**Initiating Unlawful Prerecorded Messages On or After September 1, 2009 In Violation of the TSR**

82. In numerous instances on or after September 1, 2009, Defendants have made, or caused others to make, outbound telephone calls that deliver prerecorded messages to induce the purchase of goods or services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

**COUNT FIFTEEN**

**Credit Card Laundering in Violation of the TSR**

83. In numerous instances, and without the express permission of the applicable credit card system, Defendants have:

a. Presented to or deposited into, or caused another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that was not the result of a telemarketing credit card transaction between the cardholder and Defendants; or

b. Employed, solicited, or otherwise caused a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that was not the result of a telemarketing credit card transaction between the cardholder and the merchant.

84. Defendants' acts or practices, as described in Paragraph 83 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(c).

**CONSUMER INJURY**

85. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

86. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

87. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants'

violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

a. award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and the appointment of a receiver;

b. enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

c. award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

d. award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: April 24, 2013

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

DEANYA T. KUECKELHAN
Regional Director

*s/ Jason C. Moon* .
JASON C. MOON, Tex. Bar No. 24001188
ANNE D. LEJEUNE, Tex. Bar No. 24054286

THOMAS B. CARTER, Tex. Bar No. 03932300
EMILY B. ROBINSON, Tex. Bar No. 24046737
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9371; alejeune@ftc.gov (LeJeune)
(214) 979-9372; tcarter@ftc.gov (Carter)
(214) 979-9386; erobinson@ftc.gov (Robinson)
(214) 953-3079 (Fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

CERTIFICATE OF SERVICE

I certify that on April 24, 2013, Plaintiff Federal Trade Commission electronically transmitted the attached Document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Filing to the following CM/ECF registrants:

Brian J. Foster
Katherine V. Foss
Snell & Wilmer
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
Email: bfoster@swlaw.com
kfoss@swlaw.com

Counsel for Defendants:
Ambrosia Web Design
Concord Financial Advisors, LLC
CAM Services Direct, LLC
AFB, LLC
Western GPS LLC
Chris Ambrosia, and
Leroy Castine

Andrew W. Robertson
Colleen Reider
Ballard Spahr, LLP.

55 West Broadway, Suite 1600
San Diego, California 92101
robertsona@ballardspahr.com
reiderc@ballardspahr.com

Counsel for Receiver

Dated: April 24, 2013

*s/ Jason C. Moon* .
Jason C. Moon