JONATHAN E. NUECHTERLEIN
General Counsel

HAROLD E. KIRTZ
Acting Regional Director

JASON C. MOON, Tex. Bar No. 24001188
ANNE D. LEJEUNE, Tex. Bar No. 24054286
EMILY B. ROBINSON, Tex. Bar No. 24046737
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9371; alejeune@ftc.gov (LeJeune)
(214) 979-9386; erobinson@ftc.gov (Robinson)
(214) 953-3079 (Fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**Ambrosia Web Design LLC, an Arizona limited liability company, also d/b/a AWD, _et al._,**<br><br>**Defendants** | **Case No. CV 2:12-2248-PHX-FJM**<br><br>**LODGED: PROPOSED** PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR CIVIL CONTEMPT AND SANCTIONS AGAINST NON-PARTIES TRUST ONE PAYMENT SERVICES INC. AND GLOBAL PAYMENTS DIRECT, INC., WITH INCORPORATED SUPPORTING MEMORANDUM **Attached** |

1  JONATHAN E. NUECHTERLEIN
   General Counsel
2
3  HAROLD E. KIRTZ
   Acting Regional Director
4
5  JASON C. MOON, Tex. Bar No. 24001188
   ANNE D. LEJEUNE, Tex. Bar No. 24054286
6  EMILY B. ROBINSON, Tex. Bar No. 24046737
   Federal Trade Commission
7  1999 Bryan Street, Suite 2150
   Dallas, Texas 75201
8  (214) 979-9378; jmoon@ftc.gov (Moon)
   (214) 979-9371; alejeune@ftc.gov (LeJeune)
9  (214) 979-9386; erobinson@ftc.gov (Robinson)
10 (214) 953-3079 (Fax)
11 Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION
12

13                 **UNITED STATES DISTRICT COURT**
14                **FOR THE DISTRICT OF ARIZONA**

15

16  **FEDERAL TRADE COMMISSION,**            | Case No. CV 2:12-2248-PHX-FJM

17  **Plaintiff**                            | PLAINTIFF FEDERAL TRADE
                                             | COMMISSION'S MOTION FOR
18  **v.**                                   | CIVIL CONTEMPT AND
                                             | SANCTIONS AGAINST NON-
19                                           | PARTIES TRUST ONE PAYMENT
    **Ambrosia Web Design LLC, an Arizona**  | SERVICES INC. AND GLOBAL
20  **limited liability company, also d/b/a AWD,** | PAYMENTS DIRECT, INC., WITH
    ***et al.,***                            | INCORPORATED SUPPORTING
21                                           | MEMORANDUM
22  **Defendants**

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

I.     INTRODUCTION.....................................................................................................1

A.    Factual Background...............................................................................................1

B.    Procedural Background.........................................................................................2

II.    LEGAL STANDARD FOR A FINDING OF CIVIL CONTEMPT .........................7

III.   A FINDING OF CIVIL CONTEMPT IS WARRANTED......................................8

A.    The Payment Processors implicitly acknowledged the Reserve Accounts were subject to the Court's Orders. ...................................................................................9

B.    The Merchant Agreement relied upon by Trust One acknowledges that Western GPS is the owner of the Reserve Accounts. ...........................................................10

C.    This Court has broad equitable powers to see that the purposes of receiverships initiated by a federal agency are carried out. ..........................................................12

D.    The Equities Support Finding Trust One and Global in Contempt. ............................15

       1.    Fraud Indicators Apparent from Western GPS's Merchant Applications ...16

       2.    Fraud Indicators Apparent From the Chargeback History for the Account.16

       3.    Fraud Indicators Apparent from Western GPS's Connection with Other Merchant Accounts that had been Shut Down for Fraud Activity.................17

       4.    Trust One and Global Ignored the Fraud Indicators, and the Court's Orders, for their Own Financial Gain.............................................................................20

E.    The Court Should Recognize that the Reserve Account Funds are Held in a Constructive Trust in favor of the Receivership Estate for the Benefit of All Injured Consumers. ...................................................................................................23

IV.   COERCIVE SANCTIONS SOUGHT BY THE FTC.........................................26

V.    CONCLUSION AND RELEIF SOUGHT BY THE FTC FOR THE CONTEMPT MOTION.................................................................................................................28

1

2

# TABLE OF AUTHORITIES

**Cases**

*Chairs v. Burgess*, 143 F.3d 1432 (11th Cir. 1998) ...................................................... 7

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ........................................................... 7

*Douglass v. First Nat'l Realty Corp.*, 543 F.2d 894 (D.C. Cir. 1976) .............................. 7

*F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009) ........................................... 8

*F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ........................................... 7

*F.T.C. v. Chinery*, 2006 WL 3878416 (D.N.J. Dec. 26, 2006) ...................................... 22

*F.T.C. v. Crittenden*, 823 F. Supp. 699 (C.D. Cal. 1993) ....................................... 23, 24

*F.T.C. v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012) .............................................. 26

*F.T.C. v. EDJ Telcoms*, CV-S-95-1151-LDG (RLH), 1996 U.S. Dist. LEXIS 5976 (D.
  Nev. Apr. 10, 1996) ................................................................................................ 23

*F.T.C. v. First Capital Consumer Membership Servs., Inc.*, 206 F.R.D. 358 (W.D.N.Y.
  2001) ..................................................................................................................... 22

*F.T.C. v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) .......................................... 15

*F.T.C. v. Inc21.com Corp.*, 475 Fed. Appx. 106 (9th Cir. 2012) ................................... 22

*F.T.C. v. Med Resorts Int'l, Inc.*, 199 F.R.D. 601 (N.D. Ill. 2001) ................................. 23

*F.T.C. v. Neiswonger*, No. 4:96CV2225SNLJ, 2009 WL 2998356 (E.D. Mo. Sept. 15,
  2009) ................................................................................................................ 27, 28

*F.T.C. v. Neovi, Inc.*, No. 06–CV–1952 JLS (JMA), 2012 WL 2859987 (S.D. Cal. July
  11, 2012) ......................................................................................................... 26, 27

*F.T.C. v. Network Srvcs Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) .......................... 23, 24

*F.T.C. v. NHS Sys., Inc.*, 708 F. Supp. 2d 456 (E.D. Pa. 2009) ............................... 13, 22

iii

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*F.T.C. v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001)............ 13, 14, 27

*F.T.C. v. Spectrum Res. Grp., Inc.*, 1997 WL 103406 (9th Cir. 1997) ............................ 22

*F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) .................................................... 26

*F.T.C. v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000), *aff'd*, 312 F.3d 259 (7th Cir. 2002)........................................................................................... 23, 24

*F.T.C. v. Think Achievement Corp.*, 144 F.Supp.2d 1029 (N.D. Ind. 2001)...................... 8

*F.T.C. v. Transcontinental Warranty, Inc.*, 2009 WL 5166213 (N.D. Ill. Dec. 22, 2009) ...................................................................................... 14

*F.T.C. v. Trudeau*, 579 F.3d 754 (7th Cir. 2009) ............................................................... 7

*Goluba v. School Dist. of Ripon*, 45 F.3d 1035 (7th Cir. 1995)........................................ 8

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) ............................................................................ 24

*In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361 (9th Cir. 1987) ....................... 7

*In re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573 (9th Cir. 1985)........................ 24, 25

*In re Rose's Estate*, 108 Ariz. 101, 104, 493 P.2d 112 (Ariz. 1972) ............................... 25

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ................................................ 7

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000) ................................................... 26

*Moore v. Crawford*, 130 U.S. 122, 128, 9 S.Ct. 447, 32 L.Ed. 878 (1889) ..................... 24

*S.E.C. v. American Capital Investments, Inc.*, 98 F.3d 1133 (9th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998)................................................................................................. 14

*S.E.C. v. Current Fin. Servs., Inc.*, 798 F. Supp. 802 (D.D.C. 1992) ............................... 8

*S.E.C. v. Hickey*, 322 F.3d 1123 (9th Cir. 2003)........................................................ 8, 26

*S.E.C. v. Reynolds*, 3:08–CV–438–B, 2011 WL 903395 (N.D. Tex. Mar. 16, 2011) ........ 8

*S.E.C. v. Universal Fin.*, 760 F.2d 1034 (9th Cir. 1985)....................................................14

*S.E.C. v. Wencke*, 622 F.2d 1363 (9th Cir. 1980).................................................................13

*Shuffler v. Heritage Bank*, 720 F.2d 1141 (9th Cir. 1983)....................................................7

*Stone v. City and County of San Francisco* , 968 F.2d 850 (9th Cir. 1992) .......................7

*Turley v. Ethington*, 146 P.3d 1282 (Ariz. App. Div. 2, 2006).........................................25

*U.S. v. Arizona Fuels Corp.*, 739 F.2d 455 (9th Cir. 1984) ...............................................14

*U.S. v. Ayres*, 166 F.3d 991 (9th Cir. 1999) .........................................................................7

*U.S. v. Payment Processing Center, LLC*, 461 F.Supp.2d. 319 (E.D. Pa. 2006)........21, 22

*U.S. v. United Mine Workers of America*, 330 U.S. 258 (1947) ........................................27

*Warfield v. Alaniz*, 453 F.Supp.2d 1118 (D. AZ. 2006).....................................................24

**Statutes**
15 U.S.C. §45(a)......................................................................................................................2

15 U.S.C.A. § 1631*et seq* .....................................................................................................22

Ariz. Rev. Stat. § 47-9203(B)(2) ..........................................................................................11

Article 9 of the Uniform Commercial Code....................................................................10, 11

Ga. Code § 11-9-203(b)(2) (2013) ........................................................................................11

**Other Authorities**
1 Dan B. Dobbs, *Law of Remedies* § 4.3(2), at 590 (2d ed. 1993)...................................24

Visa Int'l Operating Regulations...........................................................................................21

v

## I.      INTRODUCTION

Plaintiff Federal Trade Commission ("FTC") moves this Court for entry of an Order directing non-parties Trust One Payment Services Inc. ("Trust One") and Global Payments Direct, Inc. ("Global")  (hereafter sometimes collectively "Payment Processors") to appear and show cause why they should not be held in civil contempt by this Court for their refusal to comply with the Court's Temporary Restraining Order [#13, "TRO"] and Preliminary Injunction [#78, "PI"][1] (collectively the "Court's Orders").  For the reasons stated below, the FTC requests that the Court find Trust One and Global in civil contempt of this Court's Orders, and order them (1) to comply with the Asset Freeze and the Receiver's demand for the Reserve Accounts, (2) to turn over to the Receiver the value of the Reserve Accounts as of the day the Asset Freeze was served on Trust One and Global, October 24, 2012, within 48 hours of the Court's entry of an Order of Contempt, and (3) upon failure to meet the 48 hours turnover deadline, to pay to the United States through the Clerk of Court $1,000 a day until the full amount of the Reserve Account as of October 24, 2012, is turned over to the Receiver.

### A.      Factual Background

In its TRO and PI, the Court directed the Receiver to take possession of all assets of the corporate defendants, including Defendant Western GPS, LLC, and directed all persons in possession of any such assets to hold and retain them and deliver them to the Receiver.  [#13 at 9-11 at §VI, at 24-25 at §XIX, and #78 at 8-12, 23].  The Court further ordered an Asset Freeze to preserve all Defendants' assets until final disposition of this matter.  [#13 at 8 at § V and #78 at 8 at § V].  Some of the largest assets the Receiver

---

[1] In this motion, Plaintiff FTC references documents filed in the record by docket number and where applicable page numbers as marked by the Pacer/ECF filing system, e.g., #78 at 3.

1

discovered were two Western GPS reserve accounts with account numbers ending in 2429 and 3156 ("Reserve Accounts"), maintained by the Payment Processors and totaling $833,611.09.  Global, a merchant services company that provided credit card processing services to Defendants, maintains the Reserve Account funds in one or more accounts with HSBC Bank USA, NA, sometimes referred to as the "acquiring bank."  Trust One is an Independent Sales Organization[2] ("ISO") that contracted with Global to market Global's processing services and to provide customer service on merchant accounts, including the Western GPS merchant accounts.  Trust One and Global disregarded the Court's Asset Freeze, dissipated most of the Reserve Accounts by processing charge-backs during the Asset Freeze, and have refused to turn over the Reserve Accounts to the Receiver.

**B.     Procedural Background**

The FTC commenced this case by filing its Complaint on October 22, 2012, alleging that the Defendants had engaged in unfair and deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).  [#3].  The FTC further alleged that Defendants had violated the Telemarketing Sales Rule, 16 CFR Part 310. The same day, the FTC filed Plaintiff Federal Trade Commission's Ex Parte Application for TRO with Other Equitable Relief [#4], in which the FTC requested, inter alia, the appointment of a Temporary Receiver over the corporate Defendants, Ambrosia Web Design LLC, CAM Services Direct, LLC, AFB LLC, Concord Financial Advisors LLC, and Western GPS LLC.

The Court granted Plaintiff's Motion for TRO and entered an Ex Parte TRO on October 22, 2012 [#13].  The Court's TRO directed all persons and business entities that

---

[2] An Independent Sales Organization is a third-party company that is contracted by a credit card member bank to procure new merchant relationships.

2

were served with a copy of the TRO and that had custody or control of any of Defendants' assets, to hold and retain the assets.  [#13 at 9-10 §VI].  The Court's TRO further directed the Receiver to take possession of all assets of the receivership Defendants, and directed all persons who had possession of any such assets to deliver them to the Receiver.  [#13 at 8-11 §VI, and #78 at 8-12, 23].  The Court's TRO also imposed an Asset Freeze on all of the Defendants' assets, including specifically "any assets held by or for Defendants … with any credit card processing agent," such as Trust One and Global.   [#13 at 8 at § V].  The Asset Freeze was intended to preserve the ability of the Court to offer equitable redress to consumers, if warranted, at the conclusion of this action.

Both Trust One and Global received notice of the entry of the TRO and its Asset Freeze and receivership provisions in October 2012.  On October 24, 2012, Plaintiff FTC and the Receiver gave notice of the appointment of the Receiver, Temporary Restraining Order, and Asset Freeze to Global.  [APP. 1-2, APP. 28-29][3].  In response to service of the TRO and in compliance with its terms, on October 29, 2012 Global faxed correspondence to the Receiver and the FTC which identified the Reserve Accounts that are the subject of this Motion and their then-current values:  $758,352.82 for the 2429 account, and $75,258.27 for the 3156 account.  [APP. 3-4, and 5-6].  On October 24, 2012, the Receiver's counsel gave notice of the appointment of the Receiver, Temporary Restraining Order, and Asset Freeze to Trust One.  [APP. 7-9; and #93 at 2]  On October 25, 2012, the Receiver's counsel sent a second letter to Trust One specifically requesting

_____

[3] Plaintiff's exhibits in support are attached in Appendix I.  References to the Appendix pages are abbreviated to "APP" followed by the pertinent appendix page numbers. Attached at APP. 160-162 is the Third Declaration of Brent McPeek, FTC Investigator, setting forth the source of the documentary evidence included in the Appendix.

that it immediately freeze the Reserve Accounts at issue (ending in 3156 and 2429), and asking that Trust One provide basic account and balance information of these accounts. [APP. 10-12].  Similarly, Trust One, by October 30, 2012 email to the Receiver's counsel, identified the Reserve Accounts at issue and provided their then-current values: $773,225.83 for the 2429 account, and $82,827.02 for the 3156 account.[4]  [APP. 13-23, at 13, 22, and 23].  The Reserve Accounts were some of the largest receivership assets that the Receiver discovered.  [#25 at 6-7, and #93 at 2].  The Reserve Accounts were funded by monies Defendants collected from consumers through Defendants' telemarketing scam.

The Receiver's counsel sent follow-up letters to both Global and Trust One on November 13, 2012, that reiterated the importance of the Asset Freeze and stated unambiguously that all funds in these accounts were the property of the Receivership and were subject to the Asset Freeze.  [APP. 24-25].  Since these accounts had to be frozen, the Receiver's letters to Trust One and Global made it clear that Trust One and Global could not use any of the reserves in these accounts to fund consumer chargebacks or for any other purpose.  [APP. 24-25].

Subsequently, on March 8, 2013, the Court entered a Preliminary Injunction ("PI"), confirmed the appointment of the Receiver as permanent, and continued the duties of the asset holders and the Asset Freeze.  [#78].  Like the TRO, the PI:  (1) directed all persons and business entities that were served with a copy of the PI and that had custody

---

[4] The FTC does not know the reason for the discrepancies in the accountings by Trust One and Global.  However, perhaps one explanation for the discrepancies in the account balances is that Trust One's accounting was reported as of October 25, 2012; whereas, Global's accounting was current presumably through October 29, 2012.  In any event, the FTC accepts Global's lower accounting values as the accurate values in the two Reserve Accounts.

4

or control of any of Defendants' assets, to hold and retain the assets [#78 at 10-11 §VI]; (2) directed the Receiver to take possession of all assets of the receivership defendants, and directed all persons who had possession of any such assets to deliver them to the Receiver [#78 at 19 §XVI, 23 §XIX]; and (3) continued the Asset Freeze on all of the Defendants' assets, including specifically "any assets held by or for Defendants … with any credit card processing agent," such as Trust One and Global.   [#78 at 8 at § V].

On March 15, 2013, the Receiver's counsel made demand upon Global to immediately transfer to the Receiver all funds in the Reserve Accounts.  [APP. 26-27]. Global Payments forwarded that request to Trust One, but notified the Receiver's office that, unbeknownst to the Receiver, Trust One had unilaterally and without permission applied chargebacks to these accounts during the previous few months, and therefore, the accounts no longer contained the original amounts frozen. [#93 at 3]  In particular, Trust One's act of self-help[5] caused the frozen accounts to be dissipated by more than $740,000, leaving a mere $93,510.26 remaining in the accounts.  [*Id.*]

Consequently, on March 21, 2013, the Receiver's counsel sent another letter to Trust One, reiterating that Trust One was not permitted to apply chargebacks to the frozen Reserve Accounts, and that Trust One was required to transfer the entire frozen amounts of $758,352.82 and $75,258.27 to the Receiver.  [*Id.*, and APP. 35-37]

Notwithstanding this directive, Trust One emailed the Receiver's counsel again informing the Receiver that it only intended to remit $93,510.26 to the Receiver.  [*Id.* and APP. 30-34].  After several email communications between Counsel for the Receiver and Trust One, Trust One retained counsel.  On April 10, 2013, counsel for Trust One sent a

---

[5] *See* discussion in note 14, *infra*, at 22-23.

letter to the Receiver's counsel disagreeing that the Reserve Accounts are receivership

property, rejecting the Receiver's turnover demand, and arguing:

> [T]he [Receiver's] Letter incorrectly assumes that Trust One holds
> "reserve" funds generated by Western GPS, LLC.  Trust One understands
> that Western GPS "reserve" funds are held by Global Payments Direct in a
> general account along with reserve funds from all merchants that utilize its
> services.  Thus, even if there was no other reason to reject the demand in
> the Letter, the simple fact that Trust One does not hold the funds is
> sufficient.

[APP. 38].  Trust One counsel further posited, "Trust One's relationship with Western

GPS is based on and governed by the Merchant Agreement entered into by them. . . . You

should note that [P]aragraphs 15 and 16 expressly state that Merchant (here Western

GPS, LLC) gives Member (here HSBC …) a security interest in all accounts, including

the Reserve Account."  [APP. 39].  Trust One counsel further argued that its "conclusion

that the funds at issue are not the property of the receivership or that the Receiver

otherwise does not have rights to the funds is based on the . . . language of the

Preliminary Injunction and the language of the Merchant Agreement."  [APP. 39].  In

conclusion, Trust One observed that "[it] is not in possession or control over the Western

GPS funds. . . . The Receiver's demand to turn over the funds is unfounded."  [APP. 41].

In response to Trust One's apparent self-help and disregard of the Court's Orders,

and in light of the apparent dissipation of some of the largest Receivership assets, on

April 29, 2013, the Receiver filed its *Interim Report of Receiver Re: Apparent Asset

Freeze Violation by Third Parties* [#93].

Despite formal notices that the Receiver served on the non-party Trust One, and

despite the formal notices that the Receiver and the FTC served on Global, Trust One and

Global violated this Court's Orders by:  (1) refusing to freeze the Reserve Accounts

containing approximately $833,611.09, (2) applying credit card "chargebacks" against

6

1   funds in the Defendant Western GPS's frozen merchant Reserve Accounts, and (3)

2   refusing to turn the Reserve Accounts over to the Receiver upon demand.

3   **II.     LEGAL STANDARD FOR A FINDING OF CIVIL CONTEMPT**

4           The power of contempt is an inherent element of the judicial function.  *Chambers*

5   *v. NASCO, Inc*., 501 U.S. 32, 43-44 (1991).  In a civil contempt proceeding, the "moving

6   party has the burden of showing by clear and convincing evidence that the contemnors

7   violated a specific and definite order of the court."  *F.T.C. v. Affordable Media*, 179 F.3d

8   1228, 1239 (9th Cir. 1999) (quoting *Stone v. City and County of San Francisco* , 968 F.2d

9   850, 856 n.9 (9th Cir. 1992); *see also In re Crystal Palace Gambling Hall, Inc*., 817 F.2d

10  1361, 1365 (9th Cir. 1987) ("If a person disobeys a specific and definite court order, he

11  may properly be adjudged in contempt.") (citing *Shuffler v. Heritage Bank*, 720 F.2d

12  1141, 1146 (9th Cir. 1983)).

13          "Once this prima facie showing of a violation is made, the burden shifts to the

14  alleged contemnor 'to produce evidence explaining his non-compliance' at a 'show

15  cause' hearing."  *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998); *see U.S. v.*

16  *Ayres*, 166 F.3d 991, 994 (9th Cir. 1999) (citing *Chairs*); *Affordable Media*, 179 F.3d at

17  1239 (If a violation is shown, the burden is then on the contemnor to demonstrate why he

18  has been unable to comply with the Order.) (citation omitted).

19          Although the Court must find that the person to be held in contempt had notice of

20  the terms of the Court's Orders, *Douglass v. First Nat'l Realty Corp*., 543 F.2d 894, 897

21  (D.C. Cir. 1976), the Court need not find that the violations were willful or intentional.

22  *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 191 (1949); *see F.T.C. v. Trudeau*,

23  579 F.3d 754, 763 (7th Cir. 2009) (noting that there is no requirement for finding that the

24  violation was willful and that a court "may find a party in civil contempt if that party has

25  not been reasonably diligent and energetic in attempting to accomplish what was

26                                                          7

27

28

ordered."), *quoting Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995). Moreover, the FTC does not need to establish that the Payment Processors knew they were violating the Court's order, only that they did in fact violate it. *S.E.C. v. Reynolds*, 3:08–CV–438–B, 2011 WL 903395 at *5 (N.D. Tex. Mar. 16, 2011); *F.T.C. v. Accusearch, Inc*., 570 F.3d 1187, 1202 (10th Cir. 2009) (proving a violation of an injunction has no scienter requirement).  A civil contempt order for violation of an asset freeze order is a well-established remedy for such a violation.  *See e.g.,  S.E.C. v. Hickey*, 322 F.3d 1123, 1126-28 (9th Cir. 2003) (discussing lower court's contempt order to repay money taken in violation of an asset freeze); *S.E.C. v. Reynolds*, 2011 WL 903395 at *7 (civil contempt ordered due to defendants' violation of the court's asset freeze); *S.E.C. v. Current Fin. Servs., Inc*., 798 F. Supp. 802, 806-09 (D.D.C. 1992) (holding respondents in civil contempt for attempting to circumvent asset freeze order through payments to and by a trust).  A court should impose sanctions to ensure that the court's orders are followed.  *F.T.C. v. Think Achievement Corp*., 144 F. Supp. 2d 1029, 1033 (N.D. Ind. 2001) ("The purposes of a civil contempt order are to 'coerce compliance with the underlying order and/or to compensate the complainant for loss sustained by disobedience.'")

## III.    A FINDING OF CIVIL CONTEMPT IS WARRANTED

The Court's TRO and PI both enjoin all persons who receive copies of those orders from disposing of any assets of the Receivership Defendants, or from interfering with the Receiver's efforts to obtain possession, custody or control of receivership assets. Indeed, the TRO and PI impose an affirmative duty on all such persons to cooperate with the Receiver and to refrain from failing to provide assistance to the Receiver in connection with obtaining possession of such assets.  Here, there is no dispute that Trust One and Global knew that the TRO and the Preliminary Injunction both required any

assets of the Receivership Defendants be frozen and maintained and be delivered to the Receiver on demand.  Rather than comply with the clear directions of the TRO and PI, Trust One and Global have engaged in a pattern of conduct that violated the TRO and PI, was designed to frustrate the Receiver's efforts to fulfill his duties, and blatantly ignored the Receiver's directions not to pay chargebacks from the Reserve Account.  Such conduct is unacceptable, and the Court should order the Payment Processors to comply with the Asset Freeze and turnover provision by paying to the Receiver the amount of money that was contained in the Reserve Accounts as of October 24, 2012, and should further order contempt sanctions.

**A.      The Payment Processors Implicitly Acknowledged the Reserve Accounts were Subject to the Court's Orders**.

Both Trust One and Global received service and notice of the TRO.  In response to service of the TRO and in compliance with its terms, in an October 29, 2012 correspondence faxed to the Receiver and the FTC, Global identified the Reserve Accounts at issue (2429 and 3156) and their then-current values.  [APP. 3-4, and 5-6]. Similarly, Trust One, by an October 30, 2012 email to the Receiver, identified the Reserve Accounts at issue (2429 and 3156) and provided their then-current values. [APP. 13, 22, and 23].  Therefore, as of October 30, 2012, both Payment Processors had implicitly acknowledged that the Reserve Accounts at issue fell within the scope of and were subject to the terms of the Court's TRO.  Despite the Payment Processors' acknowledgement that the Reserve Accounts were subject to the terms of the TRO, including the Asset Freeze and the Court-appointed Receiver's instructions not to pay chargebacks, the Payment Processors processed chargebacks.  The Payment Processors' non-compliance with both the Court's Order and the Receiver's instruction has impeded

the Court's, the Receiver's, and the FTC's ability to equitably redress injured consumers in a proportional manner.

**B.     The Merchant Agreement Relied upon by Trust One Acknowledges that Western GPS is the Owner of the Reserve Accounts**.

In its efforts to justify its dissipation and refusal to turn over Receivership assets, Trust One relies on various provisions of its Merchant Agreement with Western GPS. [APP. 39].  Nevertheless, the terms of the Merchant Agreement actually reinforce the Receiver's claim to the Reserve Accounts.  Both the Merchant Agreement between Trust One and Western GPS and between Global and Western GPS provide in Paragraph 15 that "Merchant [Western GPS]. . . hereby grants Member [HSBC] a security interest in all said accounts [including the Reserve Account]."  [APP. 55 at ¶15; APP. 68 at ¶15].[6] Additionally, Paragraph 16 of the Trust One and Global Merchant Agreements contains similar language:  "Merchant and Merchant's guarantor give Member and Global Direct a security interest in all such accounts…"  [APP. 55 at ¶16; APP. 68 at ¶16].   Under basic principles of Article 9 of the Uniform Commercial Code, Western GPS must be the owner of the Reserve Accounts in order to grant the Member and Global a security interest in the Reserve Accounts, as expressly stated in the Merchant Agreement.  The Merchant Agreement therefore acknowledges Western GPS's ownership of the Reserve Accounts.

---

[6] Trust One's counsel in its April 10, 2013 letter to the Receiver recited the same language.  [APP. 39] ("[P]aragraphs 15 and 16 [of the Merchant Agreement] expressly state that the Merchant (here Western GPS, LLC) gives Member [here HSBC, as the sponsoring financial institution of the Mastercard and Visa networks] a security interest in all accounts, including the Reserve Account.")

1    The rules for the creation of security interests under Article 9 are straightforward.

2   In order to create a security interest enforceable against the debtor, there are three

3   requirements set forth in the Georgia Uniform Commercial Code.[7]  One of the

4   requirements for a security interest to be enforceable against a debtor and third parties

5   with respect to collateral is that "the debtor has rights in the collateral or the power to

6   transfer rights in the collateral to a secured party."  Ga. Code § 11-9-203(b)(2) (2013);

7   same under Arizona law, Ariz. Rev. Stat. § 47-9203(B)(2).  Western GPS could not have

8   granted a secured interest in the account pursuant to the Merchant Agreement unless it

9   had a right to the collateral under either Georgia or Arizona law.  Indeed, Western GPS is

10   the owner of that collateral.

11    The Merchant Agreement also provides specific conditions under which Trust

12   One, Global, and/or HSBC were permitted to make deductions from the Reserve

13   Accounts, and provisions relating to the return of the Reserve Accounts to the merchant

14   once the Merchant Agreement expired.  [APP. 55 at ¶15; APP. 68 at ¶15].  Thus, through

15   contract, Western GPS authorizes third parties to withdraw funds from Western GPS's

16   Reserve Accounts, and authorizes third parties to retain temporarily some portion of the

17   account at the termination of the agreement.[8]  These terms of the Merchant Agreement

18   _____

19   [7] Both Trust One's and Global's Merchant Agreements have a choice of law clause

20   which provide that disputes arising out of the Card Services Agreement shall be governed
    by the laws of the State of Georgia.  [APP. 56 at ¶17; APP. 68-69 at ¶17].  Although

21   Western GPS is located in Arizona, the application of Arizona law creates the same

22   result.  Georgia and Arizona law on the issue are consistent.

23   [8] Specifically, in Paragraph 15 of the Merchant Agreement, the "Merchant [Western

24   GPS] agrees that Global Direct and Member [HSBC] may deduct from the Reserve
    Account any amount owed to such party in accordance with this [Agreement]."

25   Paragraph 15 also provides: "Global may, at its discretion upon termination of this Card
    Services Agreement, require that the Merchant maintain more than five percent (5%) of

26

27

28

11

1    underscore Western GPS's ownership rights in the Reserve Accounts.  Western GPS

2    would not be able to authorize, and third parties would not need Western GPS to

3    authorize, withdrawals from the account or retention of a portion of the account if

4    Western GPS were not the owner of the account.  These provisions would be unnecessary

5    if Western GPS did not own the funds in the Reserve Accounts.  Thus, the Reserve

6    Accounts are the property of Western GPS and were frozen under the TRO and PI Order

7    as assets held for the Defendants by a credit card processing agent.

8         Although Trust One contends that it does not have to comply with the Court's

9    Orders because of its interpretation of certain provisions in its Merchant Agreement with

10   Western GPS, the terms of the Merchant Agreement supports Western GPS's ownership

11   and control of the Reserve Account.  Moreover, since Trust One or Global drafted the

12   Merchant Agreement, and any ambiguities in the agreement should be construed against

13   Trust One and Global.

14

15   **C.    This Court has Broad Equitable Powers to See that the Purposes of
         Receiverships Initiated by a Federal Agency are Carried Out.**

16        Trust One and Global have no independent claim to ownership of the funds in the

17   Reserve Accounts and collected those funds only to the extent that they were acting on

18   behalf of Western GPS, which sold its financial services "product" to customers in return

19   for credit card payments.  Trust One essentially asserts that Western GPS did not own

20   these funds under its Merchant Agreement, and therefore Trust One could sit on these

21

22   gross sales for the 90 day period prior to termination in a Reserve Account."  [APP. 55 at

23   ¶15; APP. 68 at ¶15].  Thus, even the Merchant Agreement provisions where the

24   Merchant authorizes the Payment Processors to deduct from the Reserve Accounts or to
     retain temporarily some portion of the account represent another admission of the

25   Merchant's ownership of the Reserve Account.

26

27

28

funds and deplete them so that it could process any chargebacks that arose after the entry of the TRO and the Asset Freeze.  But federal courts in FTC receivership cases have rejected similar arguments before, recognizing:  (1) that allowing credit card processing companies to retain all of the funds they collect on behalf of the receivership entity would thwart the very purpose of the receivership, and (2) that federal courts have broad authority "to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest."[9]

For these reasons, the FTC moves this Court to hold Trust One and Global in contempt of Court for failure to turn over receivership assets and for dissipation of those assets.  Trust One and Global merely collected these credit card charges for Defendants. In light of the substantial harm to the public that prompted the FTC to initiate this action, this Court should use its broad equitable powers to fashion a remedy that makes certain the public's interest is upheld by ensuring that all receivership assets, or under the present circumstances their equivalent value, are collected.[10]  In addition, this Court has the authority to use its equitable powers to ensure that judicial resources are used in an

---

[9]  *See F.T.C. v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1111 (C.D. Cal. 2001) (finding contempt sanctions warranted where the credit card processing agent refused to turn over the reserve account to the court appointed receiver).   The court further recognized that federal courts possess broad authority "to issue a variety of 'ancillary relief' measures in [enforcement] actions brought by federal agencies. *Id*. at 1100; *S.E.C. v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) (recognizing the "broad equitable powers of federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest."). *See also F.T.C. v. NHS Sys., Inc.*, 708 F. Supp. 2d 456, 464-66, and 471 (E.D. Pa. 2009) (rejecting middleman check processing agent's argument that the funds it held did not belong to the receivership defendant and ordering it to turn over funds to the Receiver under the terms of the TRO).

[10]  *See Wencke*, 622 F.2d at 1371.

13

efficient way.[11]  To exempt Trust One and Global, third parties whose conduct is governed specifically by the TRO and PI, would create a precedent that could require federal agencies to have to litigate these issues piecemeal - in multiple actions, in multiple forums - ultimately diminishing the size of receivership assets available for injured consumers.[12]

This Court has the authority to order a non-party like Trust One or Global to turn over funds without plenary proceedings.  In a series of opinions, the Ninth Circuit has noted that "the traditional rule is that summary proceedings are appropriate and proper to protect equity receivership assets."  *U.S. v. Arizona Fuels Corp.*, 739 F.2d 455, 458 (9th Cir. 1984); *see also S.E.C. v. American Capital Investments, Inc*., 98 F.3d 1133, 1146 (9th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better*

---

[11]  *Productive Mktg.*, 136 F. Supp. 2d at 1106.  The *Productive Marketing* court determined that permitting ACCPC (a payment processor) to hold the reserve funds that are properly part of the receivership estate would severely hinder the receiver's ability to carry out the purpose of the receivership.  The Court also was concerned that the FTC would need to institute a separate action against the payment processor ACCPC, a third party, that "would result in a multiplicity of actions in different forums, and would increase litigation costs for all parties while diminishing the size of the receivership estate."  (quoting *S.E.C. v. Universal Fin.*, 760 F.2d 1034, 1038 (9th Cir. 1985)).

[12]  Trust One in its April 10, 2013 Letter relies on *F.T.C. v. Transcontinental Warranty, Inc*., 2009 WL 5166213 (N.D. Ill. Dec. 22, 2009).  But that case is distinguishable.  In that case, Transcontinental contracted to sell "vehicle service contracts" to purchasers payable by the purchaser in installments.  Mepco serviced the payment plans, while retaining a fee for itself.  However, unlike in this case, the Receiver in *Transcontinental* was not claiming property held by Mepco in Transcontinental's name.  The Receiver was asserting in its Motion a disputed right to payment under a Dealer Agreement, after Mepco cancelled a payment due to Transcontinental.  *Id*. at *2.  In this case, Trust One has not cancelled payments due to Western GPS; rather, Trust One claims that it is entitled by contract to keep the entire amount of the reserve account in its possession, despite the Court's Orders.

14

1  *Environment*, 523 U.S. 83, 93-94 (1998) ("For the claims of nonparties to property

2  claimed by receivers, summary proceedings satisfy due process so long as there is

3  adequate notice and opportunity to be heard.").

4       Moreover, Section 13(b) of the FTC Act empowers the Court to exercise its

5  inherent equitable powers by granting any ancillary equitable relief necessary to

6  effectuate its grant of authority.  *F.T.C. v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir.

7  1996).  In cases involving deceptive and unfair practices, such as the instant case, "the

8  court's authority to exercise full equitable powers is especially appropriate . . . [because]

9  Section 13(b) plays an important role in enabling the FTC to enforce consumer protection

10  laws." Id. at 470.  The Court has already exercised its equitable power in this matter by

11  entering its TRO and PI Orders, which place a freeze on assets to preserve them for

12  future redress by the Court to injured consumers.

13

14       **D.**     **The Equities Support Finding Trust One and Global in Contempt**.

15       The equities in this case further bolster the FTC's position and warrant the

16  imposition of a contempt finding and sanctions.  Trust One and Global have unclean

17  hands because they knew, or should have known, that Western GPS was an extremely

18  high-risk merchant and was likely involved in deceptive business activities.  [*See* APP.

19  85-86 at ¶¶14-15 (acct. 2429); APP. 98-99 at ¶¶32-33 (acct. 3156)].  Trust One and

20  Global had constructive knowledge of the fraudulent nature of Western GPS's business

21  from:  (1) Western GPS's Merchant Application, [*See*  APP. 95-97 at ¶¶ 29- 30(a) (acct.

22  2429); APP. 98-99 at ¶¶32-33 (acct. 3156)]; (2) the chargeback history for these

23  accounts, [*See* APP. 90 at ¶23, APP. 93 at ¶26, and APP. 97 at ¶30(b) (acct. 2429); and

24  APP. 99-100 at ¶¶35-36 (acct. 3156)]; and (3) Western GPS's connection with other

25  merchant accounts that had been shut down for fraud activity.

26

27

28

### 1.    Fraud Indicators Apparent from Western GPS's Merchant Applications

Western GPS's Merchant applications contained fraud indicators that Trust One and Global ignored.  In fact, according to Lisa Wilhelm, an expert in the "field of risk management for credit card issuing and acquiring" [APP. 79-80 at ¶ 6], "[t]he account application evidenced a preponderance of alarming red flags that posed an unacceptable level of fraud risks that should have led to a decision not to open the account at all." [APP. 96 at ¶30(a) (acct. 2429); *see* APP. 98 at ¶32 (acct. 3156)].  The "patently obvious potential fraud triggers" on the Merchant Applications for the Reserve Accounts are set forth in Paragraph 13(a)-(h) of Ms. Wilhelm's declaration.  [APP. 83 at ¶13].  These fraud indicators should have put Global and Trust One on notice of the nature of Western GPS's business.  [APP. 85 at ¶14 (acct. 2429); APP. 97 at ¶30(b) (acct. 2429); APP. 98-99 at ¶¶32-33 (acct. 3156)].  Moreover, "[t]he terms Trust One and Global Payments imposed on [Western GPS] signify [the Payment Processors'] knowledge of these … fraud risks," including the size of the Reserve Account and the merchant discount rate. [APP. 85 at ¶15].  Despite these fraud indicators, Trust One and Global approved the opening of the Western GPS accounts.

### 2.    Fraud Indicators Apparent From the Chargeback History for the Account

Once the account was opened, Trust One and Global then failed to monitor and take action once further fraud indicators arose, beginning in the first month of operation of Western GPS's merchant accounts.  [APP. 97 at¶ 30(b)].  According to Ms. Wilhelm, "by the second month of operation, this new business and new merchant account already evidenced an unusually large chargeback problem … on a very small number of sales

transactions." [APP. 90 at ¶ 23]. Despite that the "merchant's chargebacks proceeded to double every month," the Payment Processors did not increase their chargeback fees, as would be expected under the "card network operating regulations." [APP. 90-91 at ¶ 23]. Also, the chargeback reason codes and the fraud to sales ratios should have alerted the Payment Processors to the nature of Western GPS's business. [*See* APP. 93, at ¶ 26 (the chargeback reason codes "broadcast[] that Western GPS's primary line of business was deceptive or fraudulent."), and APP. 93-96 at ¶¶ 27-29 (fraud to sales ratios)]. According to the FTC's expert's analysis of the chargeback reason codes, 76.4 percent of chargebacks for account 2429 are categorized as "fraud-related" chargebacks. [APP. 93, at ¶ 28]. Additionally, the fraud to sales ratios for account 2429 exceeded the Mastercard Tier I fraud monitoring triggers every month of Western GPS's operation, and exceeded Mastercard's Tier III fraud monitoring triggers for the last three months of its operation. [*Cf.*, APP. 95, at ¶ 28 to APP. 93-94 at ¶ 27]. Thus, the chargeback history for this business further confirms Trust One's and Global's constructive knowledge of the deceptive and fraudulent nature of Western GPS's business.

### 3. Fraud Indicators Apparent from Western GPS's Connection with Other Merchant Accounts that had been Shut Down for Fraud Activity

In addition to the fraud indicators on the Merchant Applications and evidenced by the chargeback history, Trust One and Global had constructive knowledge that the Western GPS account was connected with other merchant accounts that had been shut down for fraud activity. Emails obtained by the FTC in this case show that Benjamin Amar, an account representative employed by Advanced Processing Solution LLC, a company contracted by Trust One to provide customer service on Defendants' merchant accounts, colluded with Defendant Castine to open up new merchant accounts after the Ambrosia Web Design merchant account was closed because of fraud concerns.

17

As noted by the Receiver in his report, Defendant Ambrosia opened a merchant account with Trust One under the name Ambrosia Web Design ("AWD") for the purpose of Defendants' telemarketing business because his credit was superior to Defendant Castine's [#25 at 6].  Around November 2011, Jim Stavig, the Fraud Policy Director for Citi Cards, asked Trust One or Global about the Ambrosia Web Design merchant account because of, among other things, the account's higher than normal fraud dispute rates. [APP. 127-129].  Trust One forwarded Citibank's inquiry to an account representative named Raul Orue, an employee for another Trust One Contractor, IMP Merchant Solutions, who forwarded the inquiry to Mr. Amar.  [APP. 127].  Mr. Amar evidently contacted AWD for additional information and provided a point-by-point response on behalf of AWD.  [APP. 126-127].  Mr. Amar evidently believed or pretended to believe AWD's responses and objected to freezing the merchant account.  [APP. 126]. Nevertheless, Global closed AWD's merchant account on November 17, 2011, based on Citi Card's inquiry.  [APP. 130].

Although the AWD account was in the name of Defendant Ambrosia, Mr. Amar knew that Defendant Castine was also associated with the account.  On November 29, 2011, Kimberly Garcia, an employee of AFB LLC, Defendant Castine's company, sent an email to Mr. Amar asking how to retrieve the AWD chargeback information.  [APP. 135].  She noted that "Lee" (*i.e.*, Defendant Castine) had mentioned that the difficulty with accessing AWD chargeback information may have been related to the fact that the merchant was no longer active.  [*Id.*].  She copied Defendant Castine on the email.  [*Id.*]. Mr. Amar responded by email, with a copy to Defendant Castine, and referred her to Trust One.  [*Id.*].

On the same day that he corresponded with Ms. Garcia about the AWD chargeback information, Mr. Amar began to assist AFB in formulating new business

18

documents, despite the fact that the AWD account had been terminated for fraud only 12 days before.  [APP. 136-137].  On January 30, 2012, Mr. Amar emailed Defendant Castine an application for a new Trust One account, this time in the name of "W&M." [APP 138]. The actual name used on the Trust One application was "WM&T Enterprises"  [APP. 140].  W&M and WM&T are Florida companies owned by a man named Wayne Norris; Defendants used these companies to launder their credit card charges for a period of time.  [#25 at 16, Receiver's Report].  On February 6, Mr. Amar advised Defendant Castine to remove the word "wealth" from W&M's website, presumably to avoid bank scrutiny.  [APP. 144-145].  Global terminated the WM&T merchant account after discovering that it was associated with credit repair or credit and debt coaching, and a credit card issuer reported WM&T for excessive chargebacks. [APP. 148].  Undeterred, on April 30, 2012, Mr. Amar emailed Wayne Norris and Defendant Castine with an application for an "international solution," presumably an off-shore payment processor.  [APP. 149-150].  Evidently, Defendant Castine did not have to resort to an "international solution," because he applied for and obtained the Trust One/ Global merchant accounts that are the subject of this Motion, under the Western GPS moniker.  The Western GPS account application for account number 2429 noted that "Raul/Ben"[13] were the account representatives [APP. 105; *see* APP. 108; APP. 123 (acct. 3156], and Mr. Amar was involved in administering the account.  [APP. 151-155].

The evidence described above indicates that Trust One's agents (Mr. Amar and likely also Raul Orue of IMP Merchant Solutions) knowingly assisted Defendant Castine in opening new merchant accounts with Trust One after previous Trust One accounts

---

[13]  The name "Raul" (Raul Orue with IMP Merchant Solutions) was also handwritten on the AWD and WM&T applications.  *Cf.*  APP. 105, 107-108 (WM&T app.), and APP. 156 (AWD app.)

were terminated for fraud or chargebacks, and in fact colluded with Defendants' credit card laundering.  While it is presently unclear how much Trust One and Global actually knew about Mr. Amar's and Mr. Orue's activities, at the minimum they wholly failed to supervise their agents or investigate the glaringly obvious connection between Western GPS and the previously terminated merchant accounts.  Combined with Trust One and Global's failure to monitor the chargebacks on the merchant accounts, and the obvious red flags on the applications, the evidence suggests that Trust One and Global turned a blind eye to these accounts because they were highly profitable.

### 4.    Trust One and Global Ignored the Fraud Indicators, and the Court's Orders, for their Own Financial Gain

The Payment Processors chose to conduct business with Western GPS, reaping the financial benefits.  Had Trust One and Global ceased processing for Defendants, the dollar amount of consumer injury averted would greatly exceed the amount in the Reserve Accounts.  Given the amount of avoidable consumer injury stemming from the Payment Processors' complacency and disregard for the nature of Defendants' business, it would be inequitable for Trust One or Global to be permitted to ignore this Court's Order to turn over the full amount of the Reserve Accounts as of the date Trust One and Global received notice of the TRO.  The evidence suggests that Trust One and Global knowingly took the risk of doing business with an extremely high risk and deceptive merchant, and further made a calculated decision to violate the Court's Orders by effectively debiting chargebacks to the Receivership estate rather than to their own funds. Trust One and Global should be required to incur the consequences of their decisions.

The funds in the Reserve Accounts were derived directly from Defendants' unfair and deceptive practices, and the purpose of the Asset Freeze and turnover order was to preserve the funds for the benefit of injured consumers.  Preservation of the Reserve

20

Accounts was critical to ensure the Court's ability to provide some measure of equitable relief to consumer victims at the conclusion of this action. As noted above, the Reserve Accounts were some of the largest assets that the Receiver discovered. Trust One's self-help in issuing chargebacks, instead of preserving and turning over the Reserve Accounts to the Receiver, has thwarted the Receiver's ability to fairly distribute receivership assets to injured consumers.[14]

Instead of seeking leave of Court to process chargebacks through the frozen Reserve Accounts, Trust One and Global disregarded the Asset Freeze and decided to protect their own contractual interests. The Payment Processors processed chargebacks and dissipated the Reserve Accounts to cover their contractual obligations to reimburse third-party banks for chargebacks, which the banks are required by the credit card associations to pay. However, the mere fact that Trust One and Global may have had a contractual claim under the Merchant Agreement does not change the fact that the funds held by Trust One and Global were in fact Receivership property and should have been frozen upon Trust One's and Global's receipt of this Court's TRO and Preliminary Injunction, and turned over to the Receiver on demand.[15] Thus, instead of preserving the

---

[14] Enforcing the PI Order's freeze on the Reserve Accounts would not have adversely affected consumers who sought chargebacks in any way. Federal law and the rules of the credit card associations guarantee that consumers who are eligible for chargebacks will be paid the money they are owed, regardless of any Reserve Accounts. *See, e.g*., 15 U.S.C.A. § 1631 *et seq*. (Truth in Lending Act regulations related to credit card transactions, including limitations of liability); *see generally,* Visa Int'l Operating Regulations pp. 804-923 (Apr. 10, 2011), available at *http://corporate.visa.com/_media/visa-international-operating-regulations.pdf* (dispute resolution guidelines for chargebacks).

[15] In *U.S. v. Payment Processing Center, LLC*, 461 F. Supp. 2d. 319, 322 (E.D. Pa. 2006) (relied upon by the *NHS Systems* court), the court considered a claim by a third-party bank, Wachovia, that it had contractual rights to funds held on behalf of the defendant,

funds in the Reserve Accounts for redress to consumers who were unaware of their chargeback rights, or who were unable to obtain chargebacks, the Payment Processors decided to use the funds as indemnity against their contractual liabilities.  The Payment Processors have therefore benefitted from their disregard of the Court's Orders.  Their self-help in processing chargebacks and dissipating the Reserve Accounts has prejudiced consumers who were not "lucky" enough to have filed a chargeback dispute close in time to when Defendants' business was shut down.  It is ultimately up to the Court, not Trust One or Global, to make the determination of how the Reserve Accounts' funds should be allocated.[16]  Thus, through their contemptuous conduct, Trust One and Global have

---

whose funds had been frozen by a previous order.  The court found that although there was a financial services contract to create contractual chargeback rights, that "contractual claim did not alter the fact that the funds held by Wachovia were in fact Receivership property."  *F.T.C. v. NHS Sys.*, 708 F. Supp. 2d 456, 465 (E.D. Pa. 2009), citing *Payment Processing Center*, 461 F. Supp. 2d at 321.  Thus, whatever contractual rights Trust One may have had would not have trumped the Receiver's authority pursuant to the Court's TRO and Preliminary Injunction to collect receivership assets.  *See NHS Sys.*, 708 F. Supp. 2d at 465.

Moreover, freezing the Reserve Accounts and turning them over to the Receiver would not have destroyed the Payment Processors' contractual claims against the Receivership entity.  *See, e.g., NHS Sys.*, 708 F. Supp. 2d at 467.  It would have allowed possession of these funds so they could have been appropriately distributed by the Receiver.  The Receiver, at the Court's direction, should have been able to broadly and fairly fashion an equitable remedy taking into account all factors and all injured consumers and claimants, and with all the Receivership assets available to him in this process.

[16]  *See, e.g.*, *F.T.C. v. Inc21.com Corp.*, 475 Fed. Appx. 106, 108-109 (9th Cir. 2012) (affirming district court's choice to provide consumer restitution through a pro rata distribution plan);  *F.T.C. v. Spectrum Res. Grp., Inc.*, 1997 WL 103406, at *3 (9th Cir. 1997) (affirming a district court's order mandating consumer redress on a pro-rata basis); *F.T.C. v. Chinery*, 2006 WL 3878416, at *3 (D.N.J. Dec. 26, 2006)  (ordering consumer redress on a pro-rata basis); *F.T.C. v. First Capital Consumer Membership Servs., Inc.*, 206 F.R.D. 358, 363 (W.D.N.Y. 2001)  (discussing pro-rata payments from receivership

1   deprived the Court, the Receiver, and the Plaintiff, of the ability to equitably redress

2   consumer injury.

3

4       **E.**    **The Court Should Recognize that the Reserve Account Funds are Held in a Constructive Trust in favor of the Receivership Estate for the Benefit of All Injured Consumers.**

5

6       In addition to the Merchant Agreement provisions supporting Defendants'

7   ownership of, and the Receiver's right to claim, the Reserve Accounts, the FTC moves

8   this Court, in the exercise of its broad equitable powers and regardless of the terms of the

9   Merchant Agreement, to recognize the existence of a constructive trust over the Reserve

10  Accounts in favor of the Receivership estate for the benefit of all injured consumers.  The

11  Ninth Circuit has affirmed the district court's power to recognize constructive trusts in

12  FTC cases.[17]  In *Network Services Depot*, the Ninth Circuit explained:

13

14

---

15  assets to consumers); *F.T.C. v. Med Resorts Int'l, Inc.*, 199 F.R.D. 601, 607-608 (N.D. Ill.

16  2001) (discussing, with approval, the FTC's proposed remedy of redress fund that pays out to consumers on a pro-rata basis); *F.T.C. v. EDJ Telcoms*, CV-S-95-1151-LDG

17  (RLH), 1996 U.S. Dist. LEXIS 5976 (D. Nev. Apr. 10, 1996) (ordering the FTC or its agent to make pro-rata refunds to consumers).

18

19  [17] *F.T.C. v. Network Srvcs Depot, Inc.*, 617 F.3d 1127, 1141-42 (9th Cir. 2010) (recognizing constructive trust over funds derived from the Defendants' fraudulent

20  activities and paid to attorney representing defendants in the FTC action); s*ee also F.T.C. v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-23 (N.D. Ind. 2000)

21  (recognizing constructive trust over funds derived from the defendants' fraudulent

22  activities, received by the wife of an individual defendant, and frozen in the initial stages of litigation, to preserve the possibility of consumer redress), *aff'd,* 312 F.3d 259 (7th Cir.

23  2002); *F.T.C. v . Crittenden*, 823 F. Supp. 699, 703 (C.D. Cal. 1993) (recognizing

24  constructive trust for injured consumers over defendant's frozen assets and finding IRS tax lien on defendant's property could not affect the property in the constructive trust that

25  belonged to defendant's consumers rather than defendant).

26                          23

27

28

Constructive trust is a form of remedy that is "flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it." *In re N. Am. Coin & Currency, Ltd*., 767 F.2d 1573, 1575 (9th Cir. 1985).  It is a creature of the common law, rather than any federal statute. *Id*.  Thus, while the FTC Act's broad authorization of equitable remedies is the immediate source of the district court's power to fashion relief in this case, we also look to common law principles of equity to determine whether the district court's application of constructive trust constitutes legal error.  At common law, where property has been obtained by fraud, a court in equity "has jurisdiction to reach the property either in the hands of the original wrong-doer, or in the hands of any subsequent holder" and to convey that property to "the one who is truly and equitably entitled to the same." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 251, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Moore v. Crawford*, 130 U.S. 122, 128, 9 S.Ct. 447, 32 L.Ed. 878 (1889)). "Importantly, that a transferee was not 'the original wrongdoer' does not insulate him from liability for restitution." *Id.*

*Network Srvcs Depot, Inc*., 617 F.3d at 1141-42.

The existence of a constructive trust is governed by state law.[18]  Under Arizona law, this Court should recognize a constructive trust, in favor of the Receivership estate for the benefit of consumers, over the entirety of the Reserve Accounts as of the date the TRO was served on the Payment Processors.  "A constructive trust is an equitable remedial device generally used to prevent unjust enrichment.  A constructive trust arises by operation of law when the circumstances under which property was acquired make it inequitable for the one who holds legal title to the property to retain ownership."[19]

---

[18] *See Think Achievement*, 144 F. Supp. 2d 1013, 1020 n.3 (applying Indiana law); *F.T.C. v. Crittenden*, 823 F. Supp. 699, 703 (C.D. Cal. 1993) (applying California law); *see In re North American Coin & Currency, Ltd*., 767 F.2d 1573, 1575 (9th Cir. 1985) (agreeing "that any constructive trust that is given effect must be a creature of Arizona law" but also recognizing that "state law must be applied in a manner consistent with federal . . . law").

[19] *Warfield v. Alaniz*, 453 F.Supp.2d 1118, 1134 (D. Ariz. 2006) (citing Arizona cases) (citations omitted); *see* 1 Dan B. Dobbs, *Law of Remedies* § 4.3(2), at 590 (2d ed. 1993)

"Because imposition of a constructive trust is an equitable remedy, '[t]here is no set or unyielding formula' courts use to impose them.  A court may impose a constructive trust 'whenever title to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress or through any other means which render it unconscionable for the holder of legal title to continue to retain and enjoy its beneficial interests.'"[20]

The circumstances of this case dictate that the Court exercise its equitable power to recognize the existence of a constructive trust over the Reserve Account funds at issue. The funds in the Reserve Accounts were directly derived from the Defendants' fraudulent activities, namely charging consumer's credit cards through misrepresentation.  Because Defendants wrongfully obtained the Reserve Account funds by defrauding consumers, all defrauded consumers are the rightful owners of the Reserve Accounts funds.  The trust in favor of the Receiver was held for the benefit of all consumers, not only the consumers who were issued chargebacks in violation of the Court's Orders and Receiver's instructions.  Once the Payment Processors were served with the TRO, they were aware they were holding the funds on behalf of the Receivership and had no right to dispose of the funds.  Under these circumstances, the Court should order that all funds in the

---

("The constructive trust allows the plaintiff to recover an asset even if he has no legal title to it, so long as that asset is regarded as 'belonging' to him in an equitable sense.").

[20] *Turley v. Ethington*, 146 P.3d 1282, 1285 (Ariz. App. Div. 2, 2006) (internal citations omitted); *In re North American Coin & Currency, Ltd*., 767 F.2d at 1575 ("Arizona law permits the imposition of a constructive trust 'whenever title to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress, or through any other means which render it unconscionable for the holder of legal title to retain and enjoy its beneficial interest.'") (*quoting In re Rose's Estate*, 493 P.2d 112, 115 (Ariz. 1972)).

25

Reserve Account as of October 24, 2012, belonged to the Receivership estate and that amount should now be paid to the Receiver.

## IV.     COERCIVE SANCTIONS SOUGHT BY THE FTC

In order to ensure the Payment Processors' compliance, the FTC respectfully requests that this Court order as a sanction that the Payment Processors turn over to the Receiver, within 48 hours of the contempt order, the full amount of the Reserve Accounts as of October 24, 2012.  Additionally, if the Payment Processors fail to meet this deadline, the FTC asks that the Payment Processor pay to the Receiver $1,000 a day until the full amount of the Reserve Account as of October 24, 2012, is turned over to the Receiver.

"District courts have broad equitable power to order appropriate relief in civil contempt proceedings."  *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).  Courts have similarly broad authority in fashioning effective remedies in FTC cases.  *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009); *see also F.T.C. v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012) (determining that district courts "have comparable broad authority to calculate sanctions in contempt proceedings brought by the FTC" and holding that using consumer loss as a measurement did not constitute an abuse of discretion).

A court may impose civil contempt sanctions for two purposes:  "to coerce Contempt Defendants into compliance with the Court's Final Order, and to require compensation for losses suffered."  *F.T.C. v. Neovi, Inc*., No. 06–CV–1952 JLS (JMA), 2012 WL 2859987, at *12 (S.D. Cal. July 11, 2012); *McGregor v. Chierico*, 206 F.3d 1378, 1385 (11th Cir. 2000) ("District courts are afforded wide discretion in fashioning an equitable remedy for civil contempt.  The sanctions may serve to either (1) coerce the

1  contemnor to comply with a court order, or (2) compensate a party for losses suffered as

2  a result of the contemnor's act.") (internal citations omitted).  When a party's compliance

3  is at issue, a court considers "the character and magnitude of the harm threatened by

4  continued contumacy, and the probable effectiveness of any suggested sanction in

5  bringing about the result desired."  *U.S. v. United Mine Workers of America*, 330 U.S.

6  258, 304 (1947); *see also Neovi, Inc., 2012 WL 2859987, at *11* (ordering coercive

7  sanctions to assure compliance, in addition to compensatory sanctions, because of

8  "Contempt Defendants' complete disregard for the Court's Final Order, coupled with

9  their troubling attempts to mislead the Court and cover up their web of deceit").

10       Coercive sanctions are warranted in the case at hand.  To comply with this Court's

11  Order, the payment processors must already turn over the amount originally in the

12  Reserve Accounts, which will partially compensate consumer injury.  Additional coercive

13  sanctions are necessary to ensure the payment processors' compliance with the Court's

14  order.  Importantly, failing to impose these coercive sanctions will allow the Payment

15  Processors to have violated the Court's order, knowingly and willfully, without

16  consequence.  Such a result is untenable in light of the "character and magnitude of the

17  harm threatened" by a continuing disregard of the Court's order.  *See United Mine*

18  *Workers*, 330 U.S. at 304.  The payment processors' actions jeopardize the FTC's ability

19  to provide redress to the numerous consumers harmed by Defendants.  A two-tiered

20  coercive sanction is appropriate in this case.  *See FTC v. Productive Mktg*., 136

21  F.Supp.2d 1096, 1112-13 (C.D. Cal. 2001) (coercive sanctions to ensure compliance with

22  turn-over order, ordering $50 on the first day of non-compliance with the fine amount

23  doubling each day thereafter); *Neovi, Inc*., 2012 WL 2859987, at *13 (ordering

24  compliance with Final Order within 30 days, and upon failure to meet the deadline,

25  ordering a fine in the amount of $5,000 per day until compliance); *F.T.C. v. Neiswonger*,

26                                        27

27

28

No. 4:96CV2225SNLJ, 2009 WL 2998356, at *4 (E.D. Mo. Sept. 15, 2009) (ordering turnover of assets and upon failure to meet deadline, incarceration until such time the contempt is purged).

## V. CONCLUSION AND RELIEF SOUGHT BY THE FTC FOR THE CONTEMPT MOTION

This Court should determine that the Receiver had the authority pursuant to the Court's TRO and PI to take possession of the Reserve Accounts and that Trust One and Global had notice of the Receivership, Assert Freeze, and the TRO and PI, had no right to withhold the funds or dissipate the funds, and violated the Court's Orders to preserve and turn over the Reserve Accounts.

This Court should grant the FTC's Motion for Contempt, and order Trust One and Global to comply with the TRO and the PI and pay to the Receiver an amount equal to the full balances of the Reserve Accounts at the time the TRO was entered, including any amounts dissipated through chargebacks, within 48 hours of the entry of the Contempt Order. If the Payment Processors fail to meet the payment deadline, the Court should also order as a sanction that Trust One and Global pay to the United States through the Clerk of Court $1,000 a day until the full amount of the Reserve Account as of October 24, 2012, is turned over to the Receiver.

Because of the disregard of the Court's Orders and the refusal to comply with the Receiver's demands, the FTC respectfully requests that this Court hold Trust One and Global responsible for their inequitable business decisions in violation of the Court's Orders. The FTC respectfully requests that this Court order Trust One and Global:

(1) to comply with the Asset Freeze and the Receiver's demand for the Reserve Accounts;

28

(2) to turn over to the Receiver the value of the Reserve Accounts as of the day the Asset Freeze was served on Trust One and Global, October 24, 2012, within 48 hours of the Court's entry of the Contempt Order; and

(3) upon failure to meet the 48-hour turnover deadline, to pay to the United States through the Clerk of Court $1,000 a day until the full amount of the Reserve Accounts as of October 24, 2012, are turned over to the Receiver.

Dated: July 16, 2013

Respectfully submitted,

JONATHAN E. NUECHTERLEIN
General Counsel

HAROLD E. KIRTZ
Acting Regional Director

_s/ Anne D. LeJeune_               .
JASON C. MOON, Tex. Bar No. 24001188
ANNE D. LEJEUNE, Tex. Bar No. 24054286
EMILY B. ROBINSON, Tex. Bar No. 24046737
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9386; erobinson@ftc.gov (Robinson)
(214) 979-9371; alejeune@ftc.gov (LeJeune)
(214) 953-3079 (Fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION


**CERTIFICATE OF SERVICE**

I certify that on July 16, 2013, Plaintiff Federal Trade Commission electronically transmitted the attached Document to the Clerk's Office using the CM/ECF

29

System for filing and transmittal of a Notice of Filing to the following CM/ECF registrants:

Brian J. Foster
Katherine V. Foss
Snell & Wilmer
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
Email: bfoster@swlaw.com
        kfoss@swlaw.com

Counsel for Defendants:
        Ambrosia Web Design
        Concord Financial Advisors, LLC
        CAM Services Direct, LLC
        AFB, LLC
        Western GPS LLC
        Chris Ambrosia, and
         Leroy Castine

Andrew W. Robertson
Colleen Reider
Ballard Spahr, LLP.
55 West Broadway, Suite 1600
San Diego, California 92101
robertsona@ballardspahr.com
reiderc@ballardspahr.com

Counsel for Receiver

        I further certify that on July 16, 2013, Plaintiff Federal Trade Commission electronically transmitted by email and sent by U.S. Mail the attached Document to counsel for the Payment Processors, as follows:

Leslie De Lara Luck
Division General Counsel
Global Payments Legal Department
10 Glenlake Parkway, North
Atlanta, Georgia 30328

30

leslie.luck@globalpay.com

Counsel for Global Payments

Jimmie Pursell
Jennings, Strouss & Salmon, PLC
One East Washington Street, Suite 1900
Phoenix, Arizona 85004-2554
JPursell@jsslaw.com

Counsel for Trust One Payment Services

Dated: July 16, 2013                    _s/ Anne D. LeJeune_____.
                                         Anne D. LeJeune

31