member without notice to Merchant. Merchant acknowledges that the transferable rights of Global Direct and Member hereunder shall include, but shall not be limited to, the authority and right to debit the Merchant's account(s) as described herein.

## 10. WARRANTIES AND REPRESENTATIONS.

Merchant warrants and represents to Global Direct and Member: (a) that each sales transaction delivered hereunder will represent a bona fide sale to a cardholder by Merchant for the amount shown on the sales slip as the total sale and constitutes the binding obligation of the cardholder, free from any claim, demand, defense, setoff or other adverse claim whatsoever; (b) that each sales slip or other evidence of indebtedness will accurately describe the goods and services which have been sold and delivered to the cardholder or in accordance with his instructions; (c) that Merchant will comply fully with all federal, state and local laws, rules and regulations applicable to its business; (d) that Merchant will fulfill completely all of its obligations to the cardholder and will resolve any customer dispute or complaint directly with the cardholder; (e) that the signature on the sales slip will be genuine and authorized by cardholder and not forged or unauthorized; (f) that the sales transaction shall have been consummated and the sales slip prepared in full compliance with the provisions of the Card Acceptance Guide and the operating regulations and rules of the applicable card association or network organization, as amended from time to time; (g) provided that Merchant has not indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, that none of the sales transactions submitted hereunder represent sales by telephone, or mail, or Internet, or where the card is not physically present at the Merchant's location and swiped through Merchant's terminal, unless Merchant is specifically authorized in writing by Global Direct to submit such sales slips for purchase, (h) to the extent Merchant has indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, Merchant shall not submit such a transaction to Global Direct and Member for processing until the goods and/or services are shipped or performed, as applicable, unless otherwise permitted by the card associations or network organizations, (i) that none of the sales transactions submitted hereunder for purchase represent sales to any principal, partner, proprietor, or owner of Merchant, (j) that, without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to cardholder and transaction information security, including without limitation Payment Card Industry (PCI) Data Security Standards, Visa's Cardholder Information Security Program and MasterCard's Site Data Protection Program, and (k) that all of the information contained in this Card Services Agreement (including the Merchant Application) is true and correct. In the event that any of the foregoing warranties or representations is breached, the affected sales slips or other indebtedness may be refused, or prior acceptance revoked and charged back to the Merchant. Furthermore, if Merchant submits for purchase hereunder a sales transaction that is not the result of a sale of Merchant's goods or services offered to the general public or if Merchant submits any sales transactions for purchase hereunder which represents a sale to any principal, partner, proprietor, or owner of Merchant, such sales transaction may be refused or charged back.

Merchant must notify Global Direct if Merchant elects to use the terminal service of American Express, Novus, or any other third-party provider. If Merchant elects to use a third-party terminal provider, that provider becomes Merchant's agent for the delivery of card transactions to Global Direct via the applicable card-processing network. Merchant agrees to assume full responsibility and liability for any failure of such agent to comply with the operating regulations and rules of the applicable card association or network organization, including without limitation any violation, which results in a chargeback to the Merchant. Merchant also agrees that the obligation hereunder to reimburse the Merchant for the value of the card transactions captured by an agent is limited to the value of the transactions (less applicable fees) received by the card-processing network from the agent.

NEITHER MEMBER, NOR GLOBAL DIRECT, NOR ANY SUPPLIER MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY TERMINAL, ANY EQUIPMENT FURNISHED IN CONNECTION THEREWITH, OR ANY OF THE SERVICES FURNISHED HEREUNDER.

## 11. INDEMNITY.

Merchant agrees to satisfy directly with the cardholder any claim or complaint arising in connection with the card sale, regardless of whether such claim or complaint is brought by the cardholder, Global, or another party. Merchant agrees to indemnify and hold Global Direct and Member harmless from and against any and all liabilities, losses, claims, damages, disputes, offsets, claims or counterclaims arising out of or relating to the card sale, including without limitation claims and complaints made by a cardholder or any other person or entity with regard to indebtedness sold by Merchant hereunder or any other Service provided hereunder.

## 12. LIMITATION OF LIABILITY.

Neither Member nor Global Direct shall be liable for failure to provide the Services if such failure is due to any cause or condition beyond such party's reasonable control. Such causes or conditions shall include, but shall not be limited to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, shortages of labor or materials, freight embargoes, unusually severe weather, breakdowns, operational failures, electrical power failures, communication failures, unavoidable delays, the errors or failures of third party systems, or other similar causes beyond such party's control.

The liability of Global Direct and Member for any loss arising out of or relating in any way to this Card Services Agreement, including but not limited to damages arising out of any malfunction of the equipment or the failure of the equipment to operate, the unavailability or malfunction of the Services, personal injury, or property damage, shall, in the aggregate, be limited to actual, direct, and general money damages in an amount not to exceed one (1) month's average charge paid by Merchant hereunder (exclusive of interchange fees, assessments, and any other fees or costs that are imposed by a third party in connection with Merchant's payment processing) for Services during the previous twelve (12) months or such lesser number of months as shall have elapsed subsequent to the effective date of this Card Services Agreement. This shall be the extent of Global Direct's and Member's liability arising out of or relating in any way to this Card Services Agreement, including alleged acts of negligence, breach of contract, or otherwise and regardless of the form in which any legal or equitable action may be brought against Global Direct or Member, whether contract, tort, or otherwise, and the foregoing shall constitute Merchant's exclusive remedy. Under no circumstances shall Global Direct or Member be liable for any lost profits, lost interest, or for special, consequential, punitive or exemplary damages arising out of or relating in any way to this Card Services Agreement, including but not limited to, damages arising out of placement of a Merchant's name on any terminated merchant list for any reason, even if Global Direct or Member has been advised of the possibility of such damages. Under no circumstances shall Global Direct or Member be liable for any settlement amounts pertaining to Switched Transactions; Merchant's recourse therefore shall be to the applicable card issuer.

It is agreed that in no event will Global Direct or Member be liable for any claim, loss, billing error, damage, or expense arising out of or relating in any way to this Card Services Agreement which is not reported in writing to Global Direct by Merchant within 60 days of such failure to perform or, in the event of a billing error, within 90 days of the date of the invoice or applicable statement. Merchant expressly waives any such claim that is not brought within the time periods stated herein.

## 13. TERM AND TERMINATION.

This Card Services Agreement shall remain in full force and effect for an initial term of three (3) years.  This Card Services Agreement shall be automatically extended for successive one (1) year periods on the same terms and conditions expressed herein, or as may be amended, unless Merchant gives written notice of termination as to the entire Card Services Agreement or a portion thereof at least 60 days prior to the expiration of the initial term or any extension or renewals thereof, in which case this Card Services Agreement will terminate at the end of the then-current term. Notwithstanding anything to the contrary set forth herein, in the event Merchant terminates this Card Services Agreement in breach of this Section 13, the following amount(s) shall be immediately due and payable to Global Direct:  the lesser of (a) the maximum amount permitted by state law, and (b) all monthly fees assessed to Merchant under this Card Services Agreement and due to Global Direct for the remainder of the then existing term of the Card Services Agreement, including all minimum monthly fee commitments.  Merchant hereby authorizes Global Direct to accelerate the payment of such applicable amount(s) and to deduct such total amount(s) from Merchant's account referenced in Section

5, or to otherwise withhold the total amount(s) from amounts due to Merchant from Global Direct, immediately on or after the effective date of termination. If the Merchant's account does not contain sufficient funds for the debit or the amount cannot be withheld by Global Direct from amounts due to Merchant, Merchant shall pay Global Direct the amount due within ten (10) days of the date of Global Direct's invoice for same. The payment as described here is not a penalty, but rather is hereby agreed by the parties to be a reasonable amount of liquidated damages to compensate Global Direct for its termination expenses and all other damages under the circumstances in which such amounts would be payable. Such amount(s) shall not be in lieu of but in addition to any payment obligations for Services already provided hereunder (or that Global Direct may continue to provide), which shall be an additional cost, and any and all other damages to which Global Direct may be entitled hereunder. Notwithstanding the foregoing, if Merchant provides Global with written notice within forty-five (45) days of Merchant's execution of this Card Services Agreement that it wishes to terminate this Card Services Agreement immediately, Merchant shall not be responsible for the payment of the above-referenced amount(s), but shall be responsible for compliance with all other terms and conditions set forth in this Card Service Agreement, including but not limited to payment for all fees incurred prior to the termination of this Card Services Agreement.

Notwithstanding the foregoing, Global Direct may terminate this Card Services Agreement or any portion thereof upon written notice to Merchant. Furthermore, Global Direct may terminate this Card Services Agreement at any time without notice upon Merchant's default in performing under any provision of this Card Services Agreement, upon an unauthorized conversion of all or any part of Merchant's activity to mail order, telephone order, Internet order, or to any activity where the card is not physically present and swiped through the Merchant's terminal, upon any failure to follow the Card Acceptance Guide or any operating regulation or rule of a card association or network organization, upon any misrepresentation by Merchant, upon commencement of bankruptcy or insolvency proceedings by or against the Merchant, upon a material change in the Merchant's average ticket or volume as stated in the Merchant Application, or in the event Global Direct reasonably deems itself insecure in continuing this Card Services Agreement.

In the event that Global Direct and Member breach the terms and conditions hereof, the Merchant may, at its option, give written notice to Global Direct and Member of its intention to terminate this Card Services Agreement unless such breach is remedied within thirty (30) days of such notice. Failure to remedy such a breach shall make this Card Services Agreement terminable, at the option of the Merchant, at the end of such thirty (30) day period unless notification is withdrawn.

Any Merchant deposit of sales or credit slips that is accepted by Global Direct and Member or by a designated depository after the effective date of termination will be returned to Merchant and will not be credited (or debited) to merchant's account(s). If the deposit has already been posted to Merchant's account(s), said posting will be reversed and the deposit returned to Merchant. Termination of this Card Services Agreement shall not affect Merchant's obligations which have accrued prior to termination or which relate to any indebtedness purchased hereunder prior to termination, including but not limited to chargebacks even if such chargebacks come in after termination. In the event of termination, all equipment leased from Global Direct (but not from any other leasing agent), including but not limited to imprinters, terminals, and printers; all supplies; Card Acceptance Guides; and operating instructions must be returned immediately to Global Direct at Merchant's expense.

## 14. RETURNED ITEMS/CHARGEBACKS.

If a cardholder disputes any transaction, if a transaction is charged back for any reason by the card issuing institution, or if Global Direct or Member has any reason to believe an indebtedness previously purchased is questionable, not genuine, or is otherwise unacceptable, the amount of such indebtedness may be charged back and deducted from any payment due to Merchant or may be charged against any of Merchant's accounts or the Reserve Account (as defined below). Merchant acknowledges and agrees that it is bound by the rules of the card associations and network organizations with respect to any chargeback. Merchant further acknowledges that it is solely responsible for providing Global Direct and Member with any available information to re-present a chargeback and that, regardless of any information it provides or does not provide Global Direct and Member in connection with a chargeback, or any other reason, Merchant shall be solely responsible for the liability related to such chargeback. A list of some common reasons for chargebacks is contained in the Card Acceptance Guide provided, however, that such list is not exclusive and does not limit the generality of the foregoing. If any such amount is uncollectible through withholding from any payments due hereunder or through charging Merchant's accounts or the Reserve Account, Merchant shall, upon demand by Global Direct, pay Global Direct the full amount of the chargeback. Merchant understands that obtaining an authorization for any sale shall not constitute a guarantee of payment, and such sales slips can be returned or charged back to Merchant like any other item hereunder.

## 15. RESERVE ACCOUNT.

At any time, Global Direct and Member may, at their option, establish a reserve account to secure the performance of Merchant's obligations under this Card Services Agreement to such party ("Reserve Account"). The Reserve Account may be funded, at Global Direct's sole discretion, through any or all of the following: (a) Direct payment by Merchant -- At the request of Global Direct or Member, Merchant will deposit funds in the Reserve Account; (b) The proceeds of indebtedness presented for purchase; or (c) The transfer by Global Direct and Member into the Reserve Account of funds withdrawn from any of the accounts referred to in Section 5 or any other accounts, including certificates of deposit, maintained by Merchant or Merchant's guarantor, if any, with any designated depositary or other financial institution. Merchant and Merchant's guarantor hereby grants Member a security interest in all said accounts and authorizes Global Direct (to the extent authorized by Member) or Member to make such withdrawals at such times and in such amounts as it may deem necessary hereunder. Merchant and Merchant's guarantor hereby instruct said financial institutions to honor any requests made by Global Direct and Member under the terms of this provision. Merchant and Merchant's guarantor will hold harmless the financial institutions and indemnify them for any claims or losses they may suffer as a result of honoring withdrawal requests from Global Direct and Member.

Merchant hereby agrees that Global Direct and Member may deduct from this Reserve Account any amount owed to such party in accordance with this Card Services Agreement. Any funds in the Reserve Account may be held until the later of (a) the expiration of any potentially applicable chargeback rights in respect of purchased indebtedness under the rules and regulations of the card associations or network organizations and (b) the period necessary to secure the performance of Merchant's obligations under this Card Services Agreement, which holding period may extend beyond termination of this Card Services Agreement. Merchant will not receive any interest on funds being held in a Reserve Account. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Card Services Agreement, maintain the sum of at least five percent (5%) of gross sales for the 90 day period prior to termination to be held in a Reserve Account in accordance with the terms of this Card Services Agreement. Global may, at its discretion upon termination of this Card Services Agreement, require that the Merchant maintain more than five percent (5%) of gross sales for the 90 day period prior to termination in a Reserve Account.

## 16. DEFAULT/SECURITY INTEREST.

Upon failure by Merchant to meet any of its obligations under this Card Services Agreement (including funding the Reserve Account), any of the accounts referred to in Section 5 or any other accounts belonging to Merchant or Merchant's guarantor held by any designated depository (or by any other financial institution) may be debited without notice to Merchant, and Merchant and Merchant's guarantor gives Member and Global Direct a security interest in all such accounts for these purposes. The scope of the security interest, and Merchant's and Merchant's guarantor's instructions to its financial institutions to accept withdrawal requests from Global Direct and Member, and Merchant's agreement to hold such institutions harmless and to indemnify them are described above in Section 15.

Merchant also agrees that, in the event of a default by Merchant, Member has a right of setoff and may apply any of Merchant's balances or any other monies due Merchant from Member towards the payment of amounts due from Merchant under the terms of this Card Services Agreement. The rights stated herein are in addition to any other rights Global Direct and Member may have under applicable law.

**APP. 46**

**17. CHOICE OF LAW/ATTORNEY'S FEES/VENUE/JURY TRIAL WAIVER.**

Should it be necessary for Global or Member to defend or enforce any of its rights under this Card Services Agreement in any collection or legal action, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, as a result of such collection or legal action. Without limiting the generality of the foregoing, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by Global and/or Member in enforcing or defending its rights under this Section 17, without regard to whether there has been an adjudication on the merits in any such action. Merchant waives trial by jury with respect to any litigation arising out of or relating to this Card Services Agreement. Global, Member, and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Card Services Agreement, shall be governed by the laws of the State of Georgia, notwithstanding any conflicts of laws rules, and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. Global, Member, and Merchant agree that all actions arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provision of this Card Services Agreement shall be brought in either the courts of the State of Georgia sitting in Fulton County or the United States District Court for the Northern District of Georgia, and expressly agree to the exclusive jurisdiction of such courts.

**18. AMENDMENTS.**

This Card Services Agreement may be amended only in writing signed by Global Direct, Member, and Merchant, except that (a) the Card Acceptance Guide and any and all fees, charges, and/or discounts (including without limitation non-qualified surcharge rates) may be changed immediately, or (b) Global Direct may mail Merchant either a notice describing amendments to this Card Services Agreement or an entirely new agreement, which amendments or new agreement will be binding upon Merchant if it deposits sales or credit slips after the effective date of such amendment or new agreement set forth in Global Direct's notice.

**19. WAIVER.**

No provision of this Card Services Agreement shall be deemed waived by any party unless such waiver is in writing and signed by the party against whom enforcement is sought. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power or privilege under this Card Services Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege under this Card Services Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**20. EXCHANGE OF INFORMATION.**

Merchant authorizes Global Direct to order a credit report on Merchant or any owner, officer, shareholder, partner, proprietor, managing agent or guarantor of Merchant. Merchant hereby authorizes Member or any depository institution to release any financial information concerning Merchant or its accounts to Global Direct. Subsequent credit reports may be ordered in connection with updating, renewing or continuing this Card Services Agreement. Upon the written request of any individual who is the subject of a consumer credit report, Global Direct will provide the name and address of the consumer credit reporting agency furnishing such report, if any. Global Direct may exchange information about Merchant, Merchant's owners, principals, partners, proprietors, officers, shareholders, managing agents and guarantors with Member, other financial institutions and credit card associations, network organizations and any other party. Merchant hereby authorizes Global Direct to disclose information concerning Merchant's activity to any card association, network organizations, or any of their member financial institutions, or any other party without any liability whatsoever to Merchant.

**21. GENERAL.**

If any provision of this Card Services Agreement or portion thereof is held to be unenforceable, such a determination will not affect the remainder of this Card Services Agreement. Paragraph headings are included for convenience only and are not to be used in interpreting this Card Services Agreement.

**22. NOTICES.**

All notices required by this Card Services Agreement shall be in writing and shall be sent by facsimile, by overnight carrier, or by regular or certified mail. All notices sent to Global Direct or Member shall be effective upon actual receipt by the Corporate Secretary of Global Payments Direct, Inc., 10 Glenlake Parkway North Tower, Atlanta, Georgia 30328. Any notices sent to Merchant shall be effective upon the earlier of actual receipt or upon sending such notice to the address provided by Merchant in the Merchant Application or to any other e-mail or physical address to which notices, statements and/or other communications are sent to the Merchant hereunder. The parties hereto may change the name and address of the person to whom notices or other documents required under this Card Services Agreement must be sent at any time by giving written notice to the other party.

**23. MERGER.**

This Card Services Agreement, including these Card Services Terms & Conditions and the Merchant Application, constitutes the entire agreement between Merchant, Global Direct, and Member and supersedes all prior memoranda or agreements relating thereto, whether oral or in writing.

**24. EFFECTIVE DATE.**

This Card Services Agreement shall become effective only upon acceptance by Global Direct and Member, or upon delivery of indebtedness at such locations as designated by Global Direct for purchase, whichever event shall first occur.

**25. DESIGNATION OF DEPOSITORY.**

The financial institution set forth in the Merchant Application is designated by Merchant as a depository institution ("Depository") for its credit card indebtedness. Such financial institution must be a member of an Automated Clearing House Association. Merchant authorizes payment for indebtedness purchased hereunder to be made by placing Depository therefore with instructions to credit Merchant's accounts. Depository, Member, and/or Global Direct may charge any of Merchant's accounts at Depository for any amount due under this Card Services Agreement. Global Direct must approve in writing any proposed changes to the account numbers or to the Depository. Merchant hereby authorizes Depository to release any and all account information to Global Direct as Global Direct may request without any further authorization, approval or notice from or to Merchant.

**26. FINANCIAL ACCOMMODATION.**

The acquisition and processing of sales slips hereunder is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Card Services Agreement cannot be assumed or enforced, and Global Direct and Member shall be excused from performance hereunder.

**27. DEBIT / ATM PROCESSING SERVICES: ADDITIONAL TERMS AND CONDITIONS.**

Debit Sponsor shall act as Merchant's sponsor with respect to the participation of point-of-sale terminals owned, controlled, and/or operated by Merchant (the "Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, CU24, Interlink, Maestro, NYCE, Pulse, Shazam, Star, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor or Global Direct without notice. Merchant may also have access to other debit networks that do not require a sponsor. Global Direct will provide Merchant with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks. Global Direct will provide connection to such Networks, terminal applications, settlement, and reporting activities.

 Merchant will comply with all federal, state, and local laws, rules, regulations, and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules"). Merchant will execute and deliver any application, participation, or membership agreement or other

document necessary to enable Debit Sponsor to act as sponsor for Merchant in each Network. Merchant agrees to utilize the debit card Services in accordance with the Card Services Agreement, its exhibits or attachments, and Global Direct's instructions and specifications (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement), and to provide Global Direct with the necessary data in the proper format to enable Global Direct to properly furnish the Services. Copies of the relevant agreements or operating regulations shall be made available to Merchant upon request.

Merchant shall not in any way indicate that Debit Sponsor endorses Merchant's activities, products, or services. Debit Sponsor and Merchant are and shall remain independent contractors of one another, and neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party. Nothing contained in this Section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and Merchant.

In the event Debit Sponsor's sponsorship of Merchant in any Network is terminated prior to the termination of the Card Services Agreement, Global Direct may assign Debit Sponsor's rights and obligations hereunder to a third party. All provisions in this Section necessary to enforce the rights and obligations of the parties contained in this Section shall survive the termination of Debit Sponsor's debit sponsorship of Merchant under the Card Services Agreement. Debit Sponsor may assign this Agreement to any parent, subsidiary, affiliate, or successor-in-interest.

## 28. MERCHANT ACCEPTANCE OF EBT TRANSACTIONS; ADDITIONAL TERMS AND CONDITIONS.

Merchant agrees to issue Benefits to Recipients in accordance with the procedures specified herein, and in all documentation and user guides provided to Merchant by Global Direct, as amended from time-to-time (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement); and pursuant to the Quest Operating Rules (the "Rules"), as amended from time-to-time, issued by the National Automated Clearing House Association as approved by the Financial Management Service of the U.S. Treasury Department. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed them in the Rules. Merchant will provide each recipient a receipt of each Benefit issuance. Merchant will be solely responsible for Merchant's issuance of Benefits other than in accordance with authorizations. Merchant agrees to comply with all the requirements, laws, rules and regulations pertaining to the delivery of services to Benefit Recipients and Benefit Recipient confidentiality. If Merchant issues FS Benefits under this Card Services Agreement, Merchant represents and warrants to Global Direct that Merchant is an FNS-authorized "Merchant" (as such term is defined in the Rules) and is not currently suspended or disqualified by FNS. Merchant agrees to secure and maintain at its own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of Benefits under this Card Services Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that Merchant will not issue Benefits at any time during which Merchant is not in compliance with the requirements of any applicable law. Merchant agrees to hold Global Direct harmless from any costs of compliance or failure to comply with any such obligation by Merchant. Global Direct may terminate or modify the provision of Services to Merchant if any of Global Direct's agreements with government EBT agencies are terminated for any reason or if any party threatens to terminate services to Global Direct due to some action or inaction on the part of Merchant. If any of these Card Services Terms & Conditions are found to conflict with Federal or State law, regulation or policy of the Rules, these Card Services Terms & Conditions are subject to reasonable amendment by Global Direct, the State or its EBT Service Provider to address such conflict upon ninety (90) days written notice to Merchant, provided that Merchant may, upon written notice, terminate the Card Services Agreement upon receipt of notice of such amendment. Nothing contained herein shall preclude the State from commencing appropriate administrative or legal action against Merchant or for making any referral for such action to any appropriate Federal, State, or local agency. Any references to "State" herein shall mean the State in which Merchant issues Benefits pursuant hereto. If Merchant issues Benefits in more than one State pursuant hereto, then the reference shall mean each such State severally, not jointly.

## 29. DISCOVER PROGRAM MARKS.

Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards ("Discover Program Marks"). Merchant is prohibited from using the Discover Program Marks other than as expressly authorized in writing by Global Direct. Merchant shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to Merchant by Global Direct pursuant to this Card Services Agreement or otherwise approved in advance in writing by Global Direct. Merchant may use the Discover Program Marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by Merchant must be approved in advance by Global Direct in writing. Merchant shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the Discover Program Marks. Merchant recognizes that it has no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks.

## 30. ELECTRONIC SIGNATURES.

Under the Electronic Signatures in Global and National Commerce Act (E-Sign), this Card Services Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when (1) your electronic signature is associated with the Card Services Agreement and related documents, (2) you consent and intend to be bound by the Card Services Agreement and related documents, and (3) the Card Services Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record). This Card Services Agreement and all related electronic documents shall be governed by the provisions of E-Sign.

By pressing Submit, you agree (i) that the Card Services Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Card Services Agreement and related documents, (iii) that you have the ability to print or otherwise store the Card Services Agreement and related documents, and (iv) to authorize us to conduct an investigation of your credit history with various credit reporting and credit bureau agencies for the sole purpose of determining the approval of the applicant for merchant status or equipment leasing. This information is kept strictly confidential and will not be released.

## 31. NON-QUALIFIED SURCHARGES/OTHER FEES.

Merchant pricing appears in the Card Services Fee Schedule of the Merchant Application. T&E merchants (airline, car rental, cruise line, fast food, lodging, restaurant, travel agent, transportation) may have separate rates quoted for consumer and commercial (business) transactions. Transactions that do not clear as priced are subject to non-qualified surcharges (NQS) that are billed back to you on your monthly statement. The most predominant market sectors and applicable non-qualified surcharge rates appear below. Most non-qualified surcharges can be avoided by using a product that supports authorization and market data requirements established by the card associations and that are subject to change from time to time. Some non-qualified surcharges occur on specific types of cards (including without limitation Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card, Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, and "foreign" cards issued outside the United States). Unless your Card Services Fee Schedule specifically addresses commercial cards (i.e., Business Cards, Corporate Cards, Fleet Cards, GSA Cards, Purchase Cards), you will be billed back for the higher cost of acceptance of commercial cards, unless you are primarily a business-to-business supplier with corresponding pricing based on acceptance of commercial cards. The card associations require that information from the original authorization, including a lifecycle identifier, be retained and returned with subsequent authorizations and/or the settled transaction data. The card associations validate this information as part of the clearing and settlement process. If authorization data is not retained and returned at settlement, then the transaction will not clear as priced and will incur NQS. For more information concerning NQS and to view market data, you may wish to check the Global Direct website (www.globalpaymentsinc.com) for best practices information and to license Global Access @dvantage (GA@) for transaction detail review.

The items listed in this Section 31 are not and are not intended to be a comprehensive list of all instances in which non-qualified surcharges may apply. Non-qualified surcharges may apply in additional situations. All non-qualified surcharges include additional fees assessed by the applicable card association and Member or Global Direct.

APP. 48

In addition, Merchant may be assessed additional fees which will be in addition to the fees stated on the Merchant Application, as follows:

Merchant will also be assessed (a) Cross-Border fees and a U.S. Acquirer Support fee for international MasterCard and Maestro transactions. (b) an International Service Assessment fee and International Acquirer fee for international Visa transactions, and (c) an International Processing fee and International Service fee for international Discover transactions. These fees, which are applicable to transactions between Merchant and a non-U.S. MasterCard, Maestro, Visa, or Discover cardholder will be displayed as a separate item on Merchant's monthly statement and may include fees assessed by both the applicable card association and Member or Global Direct.

Merchant will also be assessed per transaction access fees and assessment rates for Visa, MasterCard and Discover transactions, which will be displayed as a separate item on Merchant's monthly statement and Member or Global Direct.

Merchant may also be assessed a PCI DSS Compliance fee, which will appear as a separate item on Merchant's monthly statement. This fee is assessed by Member and Global Direct in connection with Member and Global Direct's efforts to comply with the PCI Data Security Standard and does not ensure Merchant's compliance with the PCI Data Security Standard or any law, rule or regulation related to cardholder data security. The payment of such fee shall not relieve Merchant of its responsibility to comply with all rules and regulations related to cardholder data security, including without limitation the PCI Data Security Standard. Merchant may also be assessed a PCI DSS Non-Compliance fee until they validate compliance or confirm they are using a PA DSS Validated payment application.

Merchant will also be assessed the following fees on Visa transactions: the Visa Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch, the Visa Zero Floor Limit Fee, which will be assessed on settled transactions that were not authorized, and the Visa Zero Dollar Verification fee, which will be assessed on transactions where Merchant requested an address verification response without an authorization. Merchant will also be assessed the MasterCard Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch. Merchant will also be assessed the MasterCard Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch or not  properly reversed within 120 days. These fees will be displayed as separate items on Merchant's monthly statement and may include fees assessed by both the applicable card association and Member or Global Direct.

.

## NON-QUALIFIED SURCHARGES FOR PREDOMINANT MARKET SECTORS

**Retail/Restaurant Electronic Merchant**

If you are a Retail Merchant or a Restaurant Merchant with retail-only pricing (no Business Card Rate) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation retail commercial card transactions in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card and all Commercial Cards, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application

• Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.

• Obtain a single electronic authorization and settle for authorized amounts.

• Obtain a cardholder signature (unless transaction is eligible for No Signature Required [NSR] program).

• Settle and transmit batches same day via your terminal/electronic system.

• The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions unless a Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or, Bar/Tavern (MCC 5513), Beauty/Barber Shop (MCC 7230), or Taxi/Limousines (MCC 4121).

• The electronic authorization amount must be equal to the transaction amount on Discover retail transactions except that Taxi Limousines (MCC 4121) and Beauty/Barber Shop (MCC 7230) merchant transactions may vary up to 20%.     Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or Bar/Tavern (MCC 5513) transactions may vary by more than 20% from the electronic authorization without incurring NQS.

**Restaurant Electronic Merchant**

If you are a Restaurant Merchant MCC 5812 or Fast Food Merchant MCC 5814 and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.

• Obtain a cardholder signature (unless transaction is eligible for NSR program).

• Settle and transmit batches same day via your terminal/electronic system.

**Supermarket Electronic Merchant**

If you are an approved (certified) supermarket merchant and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate(s) quoted for Supermarket Credit Card and Supermarket Check Card. Each transaction not processed as outlined, in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card,  MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite and commercial cards, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a magnetic strip read (card swipe/contactless data capture/electronic imprint) at the time of sale.

• Obtain a single electronic authorization and settle for authorized amounts.

• Obtain a cardholder signature (unless transaction is eligible for NSR program).

• Settle and transmit batches same day via your terminal/electronic system.

• The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions.

**Developing Market Electronic Merchant**

If you qualify as a Developing Market Merchant (as defined by Association guidelines from time to time) and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all the following requirements will be priced at the rates quoted. Any other transaction, including commercial card transactions, Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card ,Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, and non-magnetic stripe read foreign transactions will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application In addition, each

**APP. 49**

Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a single electronic authorization.

• Settle and transmit batches same day via your terminal/electronic system.

• Provide market data as required. See Note.

NOTE: If card is not present and a magnetic stripe read does not occur, then Merchant may be required to comply with "Direct Marketer" market data requirements including AVS request on cardholder billing address at time of authorization. If card is present and cardholder signature is obtained, however the magnetic stripe is damaged, then Merchant may be required to obtain AVS match on cardholder billing address zip code.

**Direct Marketer Electronic Merchant**

If you are a Direct Mail/Telephone Order Merchant (non-magnetic swipe read transactions), and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate quoted. Any other transaction, including all foreign transactions and commercial card transactions in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settle amount).

• Address Verification Request in authorization on cardholder billing address.  For Discover transactions, Merchant must obtain full address verification request on street number and/or 9 digit postal code.

• CID verification for Discover merchants on non-recurring transactions.

• Purchase date (settled date) is ship date.

• Send order number with each transaction.

• Settle and transmit batches same day via your terminal/electronic system.

• Send level 3 data (line item detail, sales tax, customer code) with every eligible commercial card transaction.

NOTE: Card Not Present transactions involving one-time, recurring, or installment bill payment transactions are subject to additional card association requirements which must be complied with to avoid NQS. Electronic commerce transaction requirements are also subject to additional card association requirements which must be complied with to avoid NQS. Please refer to Card Acceptance Guide for additional requirements.

**Purchase Card Electronic Merchant**

If you are a Purchase Card Merchant (non-magnetic swipe read transactions) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets the following requirements will be priced at the rate quoted. Each Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.  Each Visa business and commercial card transaction will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.  Any other transaction that does not meet the following requirements, including without limitation foreign transactions, tax-exempt Visa Commercial transactions, Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card ,Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settled amount).

• Address Verification Request in authorization on cardholder billing address.

• Purchase date (settled date) is ship date.

• Send order number (customer code) with each transaction.

• Send tax amount with every transaction.

• Send Level 3 data (line item detail) with every eligible commercial card transaction.  Sales tax exempt transactions will not be considered to meet these requirements unless they include Level 3 data (line item detail).

• Settle and transmit batches same day via your terminal/electronic system.

**Lodging/Auto Rental Electronic Merchant**

If you are a Lodging or Auto Rental Merchant utilizing a terminal or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation non-magnetic stripe read foreign transactions, and transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a magnetic swipe read (card swipe/electronic imprint) at the time of check-in.

• Obtain additional electronic authorizations or send partial reversals to bring total authorized amount within 15% of settled amount. Authorizations must meet card association requirements.

• Obtain a cardholder signature for final transaction amount.

• Purchase Date is hotel check-out date/auto return date.

• Length of guest stay/rental in initial authorization.

• Hotel Folio/Rental Agreement Number and check-in date/check-out date transmitted with each transaction.

• Additional market data may be required for commercial card transactions to avoid NQS. Lodging merchants who (1) accept credit cards for advance payment; (2) guarantee reservations using a credit card; or (3) provide express check-out services to guests, must comply with additional card association requirements for these services in addition to additional authorization and settlement market data requirements.  Lodging merchants who subject charges to final audit and bill for ancillary/additional charges must comply with additional bank card association requirements for these services in addition to additional authorization and settlement market data requirements to avoid NQS. These transactions may also be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application. Please see Card Acceptance Guide for requirements and best practices for these transactions.

**TouchTone Capture Merchant**

APP. 50

Transactions which utilize our TouchTone Capture system for authorizations and settlement, settle beyond 48 hours, or are not transmitted via the TouchTone Capture system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

**Paper Deposit Merchant**

Non-terminal/electronic paper deposit transactions will be priced at the rate quoted in the Card Services Fee Schedule of the Merchant Application.

**Debit Card Merchant**

Each debit card transaction will be assessed the network's acquirer fee in addition to the debit card per item fee quoted in the Card Services Fee Schedule of the Merchant Application.

**Card Present: / Mag Stripe Failure:**

A magnetic stripe read is also referred to as an electronic imprint. If the magnetic stripe is damaged, then other validation means may be required to protect against counterfeit cards and merchant must obtain a manual imprint. Most products will prompt for cardholder billing zip code and perform an AVS check for a zip code match. CID verification is recommended for Discover key-entered transactions. Key-entered retail transactions are subject to higher interchange and NQS.

The foregoing information regarding NQS is not comprehensive and is subject to change by the card association. Additional or different rates or fees may apply based on the details of a subject transaction.

All questions regarding Card Services should be referred to Trust One Payment Services Inc, 214 Maple Street, Villa Rica, GA  30180 or call: 1-770-947-6000.

Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement and/or notice.

**For Member contact:**
HSBC Bank USA, National Association
Merchant Support Group
P.O. Box 3263
Buffalo, NY 14240
716-841-6360

**Debit sponsorship** provided by Wells Fargo Bank N.A.

APP. 51



## CARD SERVICES TERMS & CONDITIONS

### 1. GENERAL.

The "Card Services Agreement" consists of these Card Services Terms & Conditions and the Merchant Application and is made by and among Merchant (or "you"), Global Payments Direct, Inc. ("Global Direct"), and Member (as defined below). The provisions in the Card Services Agreement are applicable to Merchant if Merchant has signed the appropriate space in the Acceptance of Terms & Conditions/Merchant Authorization section of the Merchant Application. The member bank identified in the Merchant Application ("Member") is a member of Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"). Global Direct is a registered independent sales organization of Visa, a member service provider of MasterCard and a registered acquirer for Discover Financial Services LLC ("Discover"). Any references to the Debit Sponsor shall refer to the debit sponsor identified below.

Merchant and Global Direct agree that the rights and obligations contained in these Card Services Terms and Conditions do not apply to the Member with respect to Discover transactions and Switched Transactions (as defined below). To the extent Merchant accepts Discover cards, the provisions in this Agreement with respect to Discover apply if Merchant does not have a separate agreement with Discover. In such case, Merchant will also be enabled to accept JCB and Diner's Club cards under the Discover network and such transactions will be processed at the same fee rate as Merchant's Discover transactions are processed. To the extent Merchant accepts Discover cards and has a separate agreement with Discover, Discover card transactions shall be processed as Switched Transactions (as defined below).

Under the terms of the Card Services Agreement, Merchant will be furnished with the services and products described herein and in the Merchant Application and selected by Merchant therein (collectively and individually, as applicable, the "Services"). During the term of the Card Services Agreement, Global Direct will be the sole and exclusive provider of all card Services to Merchant. Any Merchant accepted by Global Direct for card processing services agrees to be bound by the Card Services Agreement, including the terms of the Merchant Application and these Card Services Terms & Conditions as may be modified or amended in the future. A MERCHANT'S SUBMISSION OF A TRANSACTION TO GLOBAL DIRECT SHALL BE DEEMED TO SIGNIFY MERCHANT'S ACCEPTANCE OF THE CARD SERVICES AGREEMENT, INCLUDING THE TERMS AND CONDITIONS HEREIN.

Except as expressly stated in the first three paragraphs of Section 13, all terms and conditions of this Card Services Agreement shall survive termination to the extent necessary to protect Global Direct and Member's rights herein.

### 2. SERVICE DESCRIPTIONS.

Credit Card Processing Services: Global Direct's credit card processing services consist of authorization and electronic draft capture of credit card transactions; outclearing of such transactions to the appropriate card associations and/or issuers (e.g., Visa, MasterCard, Diners, Discover); settlement; dispute resolution with cardholders' banks; and transaction-related reporting, statements and products. From time to time under this Card Services Agreement, upon Merchant's request, Global Direct may facilitate the transmission of certain payment card transactions ("Switched Transactions") to the respective card issuers, including but not limited to American Express®, Diners Club® and various fleet, private label and commercial cards. Switched Transactions require Global Direct's prior written approval and are subject to applicable pricing. Global Direct does not purchase the indebtedness associated with Switched Transactions.

EBT Transaction Processing Services: Global Direct offers electronic interfaces to Electronic Benefits Transfer ("EBT") networks for the processing of cash payments or credits to or for the benefit of benefit recipients ("Recipients"). Global Direct will provide settlement and switching services for various Point of Sale transactions initiated through Merchant for the authorization of the issuance of the United States Department of Agriculture, Food and Nutrition Services ("FNS") food stamp benefits ("FS Benefits") and/or government delivered cash assistance benefits ("Cash Benefits," with FS Benefits, "Benefits") to Recipients through the use of a state-issued card ("EBT Card").

Provisions regarding debit card services are set forth in Section 27 below.

With respect to Visa and MasterCard products, Merchant may elect to accept credit cards or debit/prepaid cards or both. Merchant shall so elect on the Merchant Application being completed contemporaneously herewith. Merchant agrees to pay and Merchant's account(s) will be charged pursuant to Section 5 of this Card Services Agreement for any additional fees incurred as a result of Merchant's subsequent acceptance of transactions with any Visa or MasterCard product that it has elected not to accept.

### 3. PROCEDURES.

Merchant will permit holders of valid cards bearing the symbols of the cards authorized to be accepted by Merchant hereunder to charge purchases or leases of goods and services and the debt resulting therefrom shall be purchased hereunder, provided that the transaction complies with the terms of this Card Services Agreement. All indebtedness submitted by Merchant for purchase will be evidenced by an approved sales slip. Merchant will not present for purchase any indebtedness that does not arise out of a transaction between a cardholder and Merchant. Merchant agrees to follow the Card Acceptance Guide which is incorporated into and made part of this Card Services Agreement, and to be bound by the operating regulations and rules of Visa, MasterCard, Discover and any other card association or network organization covered by this Card Services Agreement, as any of the above referenced documents may be modified and amended from time to time. Merchant acknowledges that the Card Acceptance Guide is located on Global Direct's website at www.globalpaymentsinc.com. Without limiting the generality of the foregoing, Merchant agrees to comply with and be bound by, and to cause any third party who provides Merchant with services related to payment processing or facilitates Merchant's ability to accept credit and debit cards and who is not a party to this Card Services Agreement to comply with and be bound by, the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to cardholder and transaction information security, including without limitation, all rules and regulations imposed by the Payment Card Industry (PCI) Security Standards Council (including without limitation the PCI Data Security Standard),Visa's Cardholder Information Security Program, MasterCard's Site Data Protection Program, and Payment Application Best Practices. Merchant also agrees to cooperate at its sole expense with any request for an audit or investigation by Global Direct, Member, a card association or network organization in connection with cardholder and transaction information security. Without limiting the generality of the foregoing, Merchant agrees that it will use information obtained from a cardholder in connection with a card transaction solely for the purpose of processing a transaction with that cardholder or attempting to re-present a chargeback with respect to such transaction. Merchant will indemnify and hold Global Direct and Member harmless from any fines and penalties issued by Visa, MasterCard, Discover or any card association or network organization and any other fees and costs arising out of or relating to the processing of transactions by Global Direct and Member at Merchant's location(s) and will reimburse Global Direct for any losses incurred by Global Direct with respect to any such fines, penalties, fees and costs.

Without limiting the generality of any other provision of this Card Services Agreement, Merchant also agrees that it will comply with all applicable laws, rules and regulations related to both (a) the truncation or masking of cardholder numbers and expiration dates on transaction receipts from transactions processed at Merchant's location(s), including without limitation the Fair and Accurate Credit Transactions Act and applicable state laws ("Truncation Laws") and (b) the collection of personal information from a cardholder in connection with a card transaction, including all applicable state laws ("Laws on Collection of Personal Information"). As between Merchant, on the one hand, and Global Direct and Member, on the other hand, Merchant shall be solely responsible for complying with all Truncation Laws and Laws on Collection of Personal Information and will indemnify and hold Global Direct and Member harmless from any claim, loss or damage resulting from a violation of Truncation Laws or Laws on Collection of Personal Information as a result of transactions processed at Merchant's location(s).

Global Direct may, from time to time, issue written directions (via mail or Internet) regarding procedures to follow and forms to use to carry out this Card Services Agreement. These directions and the terms of the forms are binding as soon as they are issued and shall form part of these Card Services Terms & Conditions. Such operating regulations and rules may be reviewed upon appointment at Global Direct's designated premises and Merchant acknowledges that it has had the opportunity to request a review and/or review such operating regulations and rules in connection with its execution of this Card Services Agreement.

## 4. MARKETING.

Merchant shall adequately display the card issuer service marks and promotional materials supplied by Global Direct. Merchant shall cease to use or display such service marks immediately upon notice from Global Direct or upon termination of this Card Services Agreement.

## 5. PAYMENT, CHARGES AND FEES.

Fees and charges payable by Merchant shall be as set forth in the Merchant Application. Merchant will be paid for indebtedness purchased under this Card Services Agreement by credit to Merchant's account(s). Merchant's account(s) will be credited for the gross amount of the indebtedness deposited less the amount of any credit vouchers deposited. Merchant shall not be entitled to credit for any indebtedness that arises out of a transaction not processed in accordance with the terms of this Card Services Agreement or the rules and regulations of a card association or network organization. Availability of any such funds shall be subject to the procedures of the applicable financial institution. Chargebacks and adjustments will be charged to Merchant's account(s) on a daily basis. Merchant agrees to pay and Merchant's account(s) will be charged for the discount, fees, chargebacks, and other fees and charges described in this Card Services Agreement. Merchant also agrees to pay and Merchant's account(s) will be debited for all fees, arbitration fees, fines, penalties, etc. charged or assessed by the card associations or network organizations on account of or related to Merchant's processing hereunder, including without limitation with regards to any third party who provides Merchant with services related to payment processing or facilitates Merchant's ability to accept credit and debit cards and who is not a party to this Card Services Agreement. If any type of overpayment to Merchant or other error occurs, Merchant's account(s) may be debited or credited, without notice, and if Merchant's account(s) do not contain sufficient funds, Merchant agrees to remit the amount owed directly to Global Direct. Merchant agrees not to, directly or indirectly, prevent, block or otherwise preclude any debit by Global Direct or Member to Merchant's account which is permitted hereunder. Merchant represents and warrants that no one other than Merchant has any claim against such indebtedness except as authorized in writing by Member and Global Direct. Merchant hereby assigns to Member and Global Direct all of its right, title, and interest in and to all indebtedness submitted hereunder and agrees that Member and Global Direct have the sole right to receive payment on any indebtedness purchased hereunder.

## 6. EQUIPMENT AND SUPPLIES/THIRD PARTY SERVICES.

Merchant agrees that it will not acquire any title, copyrights, or any other proprietary right to any advertising material; leased equipment including imprinters, authorization terminals, or printers; software; credit card authenticators; unused forms; and Merchant deposit plastic cards provided by Global Direct in connection with this Card Services Agreement. Merchant will protect all such items from loss, theft, damage or any legal encumbrance and will allow Global Direct and its designated representatives reasonable access to Merchant's premises for their repair, removal, modification, installation and relocation. Merchant acknowledges that any equipment or software provided under this Card Services Agreement is embedded with proprietary technology ("Software"). Merchant shall not obtain title, copyrights or any other proprietary right to any Software. At all time, Global Direct or its suppliers retain all rights to such Software, including but not limited to updates, enhancements and additions. Merchant shall not disclose such Software to any party, convey, copy, license, sublicense, modify, translate, reverse engineer, decompile, disassemble, tamper with, or create any derivative work based on such Software. Merchant's use of such Software shall be limited to that expressly authorized by Global Direct. Global Direct's suppliers are intended third party beneficiaries of this Card Services Agreement to the extent of any terms herein pertaining to such suppliers' ownership rights; such suppliers have the right to rely on and directly enforce such terms against Merchant.

The operating terminals will instruct Merchant in the proper use of the terminals, and Merchant shall use and operate the terminals only in such manner. If Merchant has purchased the maintenance/help desk service hereunder for its terminals, Merchant will promptly notify Global Direct of any equipment malfunction, failure or other incident resulting in the loss of use of the equipment or need for repair or maintenance, whereupon Global Direct will make the necessary arrangements to obtain required maintenance. Merchant is responsible for shipping costs. Merchant shall cooperate with Global Direct in its attempt to diagnose any problem with the terminal. In the event the Merchant's terminal requires additional Software, Merchant is obligated to cooperate and participate in a dial in down line load procedure. With respect to any item of equipment leased to Merchant by Global Direct, Merchant will not be liable for normal wear and tear, provided, however, that Merchant will be liable to Global Direct in the event that any leased item of equipment is lost, destroyed, stolen or rendered inoperative. Merchant will indemnify Global Direct against any loss arising out of damage to or destruction of any item of equipment provided hereunder for any cause whatsoever. Merchant also agrees to hold harmless and indemnify Global Direct for any costs, expenses, and judgments Global Direct may suffer, including reasonable attorney's fees, as a result of Merchant's use of the equipment provided hereunder. Any unused equipment in its original packaging purchased from Global Direct hereunder may be returned to Global Direct at Merchant's expense within sixty (60) days of receipt. Merchant shall receive a refund of any money paid in connection therewith subject to a re-stocking fee of an amount equal to 20 percent of the total purchase price for the returned equipment. No refunds shall be issued for any equipment returned after sixty (60) days.

Merchant acknowledges that some of the services to be provided by Global Direct and Member hereunder may be provided by third parties. Merchant agrees that except for its right to utilize such services in connection with this Card Services Agreement, it acquires no right, title or interest in any such services. Merchant further agrees that it has no contractual relationship with any third party providing services under this Card Services Agreement and that Merchant is not a third party beneficiary of any agreement between Global Direct or Member, as applicable, and such third party. Merchant may not resell the services of any third party providing services under this Card Services Agreement to any other party.

## 7. FINANCIAL INFORMATION.

Merchant agrees to furnish Global Direct and Member such financial statements and information concerning Merchant, its owners, principals, partners, proprietors or its affiliates as Global Direct may from time to time request. Global Direct, or its duly authorized representatives, may examine the books and records of Merchant, including records of all indebtedness previously purchased or presented for purchase. Merchant agrees to retain copies of all paper and electronic sales slips and credit slips submitted to Global Direct for a period of two years from submission, or such longer period of time as may be required by the operating rules or regulations of the card associations or network organizations, by law, or by Global Direct as specifically requested in writing in individual cases.

## 8. CHANGE IN BUSINESS.

Merchant agrees to provide Global Direct and Member sixty (60) days prior written notice of its (a) transfer or sale of any substantial part (ten percent (10%) or more) of its total stock, assets and/or to liquidate; or (b) change to the basic nature of its business, or (c) provided that Merchant has not indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, conversion of all or part of the business to mail order sales, telephone order sales, Internet-based sales or to other sales where the card is not present and swiped through Merchant's terminal. Upon the occurrence of any such event, the terms of this Card Services Agreement may be modified to address issues arising therefrom, including but not limited to requirements of applicable card associations or network organizations.

## 9. TRANSFERABILITY.

This Card Services Agreement is not transferable by Merchant without the written consent of Global Direct and Member. Any attempt by Merchant to assign its rights or to delegate its obligations in violation of this paragraph shall be void. Merchant agrees that the rights and obligations of Global Direct hereunder may be transferred by Global Direct without notice to Merchant. Merchant agrees that the rights and obligations of Member hereunder may be transferred to any other

**APP. 53**

member without notice to Merchant. Merchant acknowledges that the transferable rights of Global Direct and Member hereunder shall include, but shall not be limited to, the authority and right to debit the Merchant's account(s) as described herein.

## 10. WARRANTIES AND REPRESENTATIONS.

Merchant warrants and represents to Global Direct and Member: (a) that each sales transaction delivered hereunder will represent a bona fide sale to a cardholder by Merchant for the amount shown on the sales slip as the total sale and constitutes the binding obligation of the cardholder, free from any claim, demand, defense, setoff or other adverse claim whatsoever; (b) that each sales slip or other evidence of indebtedness will accurately describe the goods and services which have been sold and delivered to the cardholder or in accordance with his instructions; (c) that Merchant will comply fully with all federal, state and local laws, rules and regulations applicable to its business; (d) that Merchant will fulfill completely all of its obligations to the cardholder and will resolve any customer dispute or complaint directly with the cardholder; (e) that the signature on the sales slip will be genuine and authorized by cardholder and not forged or unauthorized; (f) that the sales transaction shall have been consummated and the sales slip prepared in full compliance with the provisions of the Card Acceptance Guide and the operating regulations and rules of the applicable card association or network organization, as amended from time to time; (g) provided that Merchant has not indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, that none of the sales transactions submitted hereunder represent sales by telephone, or mail, or Internet, or where the card is not physically present at the Merchant's location and swiped through Merchant's terminal, unless Merchant is specifically authorized in writing by Global Direct to submit such sales slips for purchase, (h) to the extent Merchant has indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, Merchant shall not submit such a transaction to Global Direct and Member for processing until the goods and/or services are shipped or performed, as applicable, unless otherwise permitted by the card associations or network organizations, (i) that none of the sales transactions submitted hereunder for purchase represent sales to any principal, partner, proprietor, or owner of Merchant, (j) that, without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to cardholder and transaction information security, including without limitation Payment Card Industry (PCI) Data Security Standards, Visa's Cardholder Information Security Program and MasterCard's Site Data Protection Program, and (k) that all of the information contained in this Card Services Agreement (including the Merchant Application) is true and correct. In the event that any of the foregoing warranties or representations is breached, the affected sales slips or other indebtedness may be refused, or prior acceptance revoked and charged back to the Merchant. Furthermore, if Merchant submits for purchase hereunder a sales transaction that is not the result of a sale of Merchant's goods or services offered to the general public or if Merchant submits any sales transactions for purchase hereunder which represents a sale to any principal, partner, proprietor, or owner of Merchant, such sales transaction may be refused or charged back.

Merchant must notify Global Direct if Merchant elects to use the terminal service of American Express, Novus, or any other third-party provider. If Merchant elects to use a third-party terminal provider, that provider becomes Merchant's agent for the delivery of card transactions to Global Direct via the applicable card-processing network. Merchant agrees to assume full responsibility and liability for any failure of such agent to comply with the operating regulations and rules of the applicable card association or network organization, including without limitation any violation, which results in a chargeback to the Merchant. Merchant also agrees that the obligation hereunder to reimburse the Merchant for the value of the card transactions captured by an agent is limited to the value of the transactions (less applicable fees) received by the card-processing network from the agent.

NEITHER MEMBER, NOR GLOBAL DIRECT, NOR ANY SUPPLIER MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY TERMINAL, ANY EQUIPMENT FURNISHED IN CONNECTION THEREWITH, OR ANY OF THE SERVICES FURNISHED HEREUNDER.

## 11. INDEMNITY.

Merchant agrees to satisfy directly with the cardholder any claim or complaint arising in connection with the card sale, regardless of whether such claim or complaint is brought by the cardholder, Global, or another party. Merchant agrees to indemnify and hold Global Direct and Member harmless from and against any and all liabilities, losses, claims, damages, disputes, offsets, claims or counterclaims arising out of or relating to the card sale, including without limitation claims and complaints made by a cardholder or any other person or entity with regard to indebtedness sold by Merchant hereunder or any other Service provided hereunder.

## 12. LIMITATION OF LIABILITY.

Neither Member nor Global Direct shall be liable for failure to provide the Services if such failure is due to any cause or condition beyond such party's reasonable control. Such causes or conditions shall include, but shall not be limited to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, shortages of labor or materials, freight embargoes, unusually severe weather, breakdowns, operational failures, electrical power failures, communication failures, unavoidable delays, the errors or failures of third party systems, or other similar causes beyond such party's control.

The liability of Global Direct and Member for any loss arising out of or relating in any way to this Card Services Agreement, including but not limited to damages arising out of any malfunction of the equipment or the failure of the equipment to operate, the unavailability or malfunction of the Services, personal injury, or property damage, shall, in the aggregate, be limited to actual, direct, and general money damages in an amount not to exceed one (1) month's average charge paid by Merchant hereunder (exclusive of interchange fees, assessments, and any other fees or costs that are imposed by a third party in connection with Merchant's payment processing) for Services during the previous twelve (12) months or such lesser number of months as shall have elapsed subsequent to the effective date of this Card Services Agreement. This shall be the extent of Global Direct's and Member's liability arising out of or relating in any way to this Card Services Agreement, including alleged acts of negligence, breach of contract, or otherwise and regardless of the form in which any legal or equitable action may be brought against Global Direct or Member, whether contract, tort, or otherwise, and the foregoing shall constitute Merchant's exclusive remedy. Under no circumstances shall Global Direct or Member be liable for any lost profits, lost interest, or for special, consequential, punitive or exemplary damages arising out of or relating in any way to this Card Services Agreement, including but not limited to, damages arising out of placement of a Merchant's name on any terminated merchant list for any reason, even if Global Direct or Member has been advised of the possibility of such damages. Under no circumstances shall Global Direct or Member be liable for any settlement amounts pertaining to Switched Transactions; Merchant's recourse therefore shall be to the applicable card issuer.

It is agreed that in no event will Global Direct or Member be liable for any claim, loss, billing error, damage, or expense arising out of or relating in any way to this Card Services Agreement which is not reported in writing to Global Direct by Merchant within 60 days of such failure to perform or, in the event of a billing error, within 90 days of the date of the invoice or applicable statement. Merchant expressly waives any such claim that is not brought within the time periods stated herein.

## 13. TERM AND TERMINATION.

This Card Services Agreement shall remain in full force and effect for an initial term of three (3) years. This Card Services Agreement shall be automatically extended for successive one (1) year periods on the same terms and conditions expressed herein, or as may be amended, unless Merchant gives written notice of termination as to the entire Card Services Agreement or a portion thereof at least 60 days prior to the expiration of the initial term or any extension or renewals thereof, in which case this Card Services Agreement will terminate at the end of the then-current term. Notwithstanding anything to the contrary set forth herein, in the event Merchant terminates this Card Services Agreement in breach of this Section 13, the following amount(s) shall be immediately due and payable to Global Direct: the lesser of (a) the maximum amount permitted by state law, and (b) all monthly fees assessed to Merchant under this Card Services Agreement and due to Global Direct for the remainder of the then existing term of the Card Services Agreement, including all minimum monthly fee commitments. Merchant hereby authorizes Global Direct to accelerate the payment of such applicable amount(s) and to deduct such total amount(s) from Merchant's account referenced in Section

**APP. 54**

5, or to otherwise withhold the total amount(s) from amounts due to Merchant from Global Direct, immediately on or after the effective date of termination. If the Merchant's account does not contain sufficient funds for the debit or the amount cannot be withheld by Global Direct from amounts due to Merchant, Merchant shall pay Global Direct the amount due within ten (10) days of the date of Global Direct's invoice for same. The payment as described here is not a penalty, but rather is hereby agreed by the parties to be a reasonable amount of liquidated damages to compensate Global Direct for its termination expenses and all other damages under the circumstances in which such amounts would be payable. Such amount(s) shall not be in lieu of but in addition to any payment obligations for Services already provided hereunder (or that Global Direct may continue to provide), which shall be an additional cost, and any and all other damages to which Global Direct may be entitled hereunder. Notwithstanding the foregoing, if Merchant provides Global with written notice within forty-five (45) days of Merchant's execution of this Card Services Agreement that it wishes to terminate this Card Services Agreement immediately, Merchant shall not be responsible for the payment of the above-referenced amount(s), but shall be responsible for compliance with all other terms and conditions set forth in this Card Service Agreement, including but not limited to payment for all fees incurred prior to the termination of this Card Services Agreement.

Notwithstanding the foregoing, Global Direct may terminate this Card Services Agreement or any portion thereof upon written notice to Merchant. Furthermore, Global Direct may terminate this Card Services Agreement at any time without notice upon Merchant's default in performing under any provision of this Card Services Agreement, upon an unauthorized conversion of all or any part of Merchant's activity to mail order, telephone order, Internet order, or to any activity where the card is not physically present and swiped through the Merchant's terminal, upon any failure to follow the Card Acceptance Guide or any operating regulation or rule of a card association or network organization, upon any misrepresentation by Merchant, upon commencement of bankruptcy or insolvency proceedings by or against the Merchant, upon a material change in the Merchant's average ticket or volume as stated in the Merchant Application, or in the event Global Direct reasonably deems itself insecure in continuing this Card Services Agreement.

In the event that Global Direct and Member breach the terms and conditions hereof, the Merchant may, at its option, give written notice to Global Direct and Member of its intention to terminate this Card Services Agreement unless such breach is remedied within thirty (30) days of such notice. Failure to remedy such a breach shall make this Card Services Agreement terminable, at the option of the Merchant, at the end of such thirty (30) day period unless notification is withdrawn.

Any Merchant deposit of sales or credit slips that is accepted by Global Direct and Member or by a designated depository after the effective date of termination will be returned to Merchant and will not be credited (or debited) to merchant's account(s). If the deposit has already been posted to Merchant's account(s), said posting will be reversed and the deposit returned to Merchant. Termination of this Card Services Agreement shall not affect Merchant's obligations which have accrued prior to termination or which relate to any indebtedness purchased hereunder prior to termination, including but not limited to chargebacks even if such chargebacks come in after termination. In the event of termination, all equipment leased from Global Direct (but not from any other leasing agent), including but not limited to imprinters, terminals, and printers; all supplies; Card Acceptance Guides; and operating instructions must be returned immediately to Global Direct at Merchant's expense.

## 14. RETURNED ITEMS/CHARGEBACKS.

If a cardholder disputes any transaction, if a transaction is charged back for any reason by the card issuing institution, or if Global Direct or Member has any reason to believe an indebtedness previously purchased is questionable, not genuine, or is otherwise unacceptable, the amount of such indebtedness may be charged back and deducted from any payment due to Merchant or may be charged against any of Merchant's accounts or the Reserve Account (as defined below). Merchant acknowledges and agrees that it is bound by the rules of the card associations and network organizations with respect to any chargeback. Merchant further acknowledges that it is solely responsible for providing Global Direct and Member with any available information to re-present a chargeback and that, regardless of any information it provides or does not provide Global Direct and Member in connection with a chargeback, or any other reason, Merchant shall be solely responsible for the liability related to such chargeback. A list of some common reasons for chargebacks is contained in the Card Acceptance Guide provided, however, that such list is not exclusive and does not limit the generality of the foregoing. If any such amount is uncollectible through withholding from any payments due hereunder or through charging Merchant's accounts or the Reserve Account, Merchant shall, upon demand by Global Direct, pay Global Direct the full amount of the chargeback. Merchant understands that obtaining an authorization for any sale shall not constitute a guarantee of payment, and such sales slips can be returned or charged back to Merchant like any other item hereunder.

## 15. RESERVE ACCOUNT.

At any time, Global Direct and Member may, at their option, establish a reserve account to secure the performance of Merchant's obligations under this Card Services Agreement to such party ("Reserve Account"). The Reserve Account may be funded, at Global Direct's sole discretion, through any or all of the following: (a) Direct payment by Merchant -- At the request of Global Direct or Member, Merchant will deposit funds in the Reserve Account; (b) The proceeds of indebtedness presented for purchase; or (c) The transfer by Global Direct and Member into the Reserve Account of funds withdrawn from any of the accounts referred to in Section 5 or any other accounts, including certificates of deposit, maintained by Merchant or Merchant's guarantor, if any, with any designated depositary or other financial institution. Merchant and Merchant's guarantor hereby grants Member a security interest in all said accounts and authorizes Global Direct (to the extent authorized by Member) or Member to make such withdrawals at such times and in such amounts as it may deem necessary hereunder. Merchant and Merchant's guarantor hereby instruct said financial institutions to honor any requests made by Global Direct and Member under the terms of this provision. Merchant and Merchant's guarantor will hold harmless the financial institutions and indemnify them for any claims or losses they may suffer as a result of honoring withdrawal requests from Global Direct and Member.

Merchant hereby agrees that Global Direct and Member may deduct from this Reserve Account any amount owed to such party in accordance with this Card Services Agreement. Any funds in the Reserve Account may be held until the later of (a) the expiration of any potentially applicable chargeback rights in respect of purchased indebtedness under the rules and regulations of the card associations or network organizations and (b) the period necessary to secure the performance of Merchant's obligations under this Card Services Agreement, which holding period may extend beyond termination of this Card Services Agreement. Merchant will not receive any interest on funds being held in a Reserve Account. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Card Services Agreement, maintain the sum of at least five percent (5%) of gross sales for the 90 day period prior to termination to be held in a Reserve Account in accordance with the terms of this Card Services Agreement. Global may, at its discretion upon termination of this Card Services Agreement, require that the Merchant maintain more than five percent (5%) of gross sales for the 90 day period prior to termination in a Reserve Account.

## 16. DEFAULT/SECURITY INTEREST.

Upon failure by Merchant to meet any of its obligations under this Card Services Agreement (including funding the Reserve Account), any of the accounts referred to in Section 5 or any other accounts belonging to Merchant or Merchant's guarantor held by any designated depository (or by any other financial institution) may be debited without notice to Merchant, and Merchant and Merchant's guarantor gives Member and Global Direct a security interest in all such accounts for these purposes. The scope of the security interest, and Merchant's and Merchant's guarantor's instructions to its financial institutions to accept withdrawal requests from Global Direct and Member, and Merchant's agreement to hold such institutions harmless and to indemnify them are described above in Section 15.

Merchant also agrees that, in the event of a default by Merchant, Member has a right of setoff and may apply any of Merchant's balances or any other monies due Merchant from Member towards the payment of amounts due from Merchant under the terms of this Card Services Agreement. The rights stated herein are in addition to any other rights Global Direct and Member may have under applicable law.

**APP. 55**

**17. CHOICE OF LAW/ATTORNEY'S FEES/VENUE/JURY TRIAL WAIVER.**

Should it be necessary for Global or Member to defend or enforce any of its rights under this Card Services Agreement in any collection or legal action, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, as a result of such collection or legal action. Without limiting the generality of the foregoing, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by Global and/or Member in enforcing or defending its rights under this Section 17, without regard to whether there has been an adjudication on the merits in any such action. Merchant waives trial by jury with respect to any litigation arising out of or relating to this Card Services Agreement. Global, Member, and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Card Services Agreement, shall be governed by the laws of the State of Georgia, notwithstanding any conflicts of laws rules, and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. Global, Member, and Merchant agree that all actions arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provision of this Card Services Agreement shall be brought in either the courts of the State of Georgia sitting in Fulton County or the United States District Court for the Northern District of Georgia, and expressly agree to the exclusive jurisdiction of such courts.

**18. AMENDMENTS.**

This Card Services Agreement may be amended only in writing signed by Global Direct, Member, and Merchant, except that (a) the Card Acceptance Guide and any and all fees, charges, and/or discounts (including without limitation non-qualified surcharge rates) may be changed immediately, or (b) Global Direct may mail Merchant either a notice describing amendments to this Card Services Agreement or an entirely new agreement, which amendments or new agreement will be binding upon Merchant if it deposits sales or credit slips after the effective date of such amendment or new agreement set forth in Global Direct's notice.

**19. WAIVER.**

No provision of this Card Services Agreement shall be deemed waived by any party unless such waiver is in writing and signed by the party against whom enforcement is sought. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power or privilege under this Card Services Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege under this Card Services Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**20. EXCHANGE OF INFORMATION.**

Merchant authorizes Global Direct to order a credit report on Merchant or any owner, officer, shareholder, partner, proprietor, managing agent or guarantor of Merchant. Merchant hereby authorizes Member or any depository institution to release any financial information concerning Merchant or its accounts to Global Direct. Subsequent credit reports may be ordered in connection with updating, renewing or continuing this Card Services Agreement. Upon the written request of any individual who is the subject of a consumer credit report, Global Direct will provide the name and address of the consumer credit reporting agency furnishing such report, if any. Global Direct may exchange information about Merchant, Merchant's owners, principals, partners, proprietors, officers, shareholders, managing agents and guarantors with Member, other financial institutions and credit card associations, network organizations and any other party. Merchant hereby authorizes Global Direct to disclose information concerning Merchant's activity to any card association, network organizations, or any of their member financial institutions, or any other party without any liability whatsoever to Merchant.

**21. GENERAL.**

If any provision of this Card Services Agreement or portion thereof is held to be unenforceable, such a determination will not affect the remainder of this Card Services Agreement. Paragraph headings are included for convenience only and are not to be used in interpreting this Card Services Agreement.

**22. NOTICES.**

All notices required by this Card Services Agreement shall be in writing and shall be sent by facsimile, by overnight carrier, or by regular or certified mail. All notices sent to Global Direct or Member shall be effective upon actual receipt by the Corporate Secretary of Global Payments Direct, Inc., 10 Glenlake Parkway North Tower, Atlanta, Georgia 30328. Any notices sent to Merchant shall be effective upon the earlier of actual receipt or upon sending such notice to the address provided by Merchant in the Merchant Application or to any other e-mail or physical address to which notices, statements and/or other communications are sent to the Merchant hereunder. The parties hereto may change the name and address of the person to whom notices or other documents required under this Card Services Agreement must be sent at any time by giving written notice to the other party.

**23. MERGER.**

This Card Services Agreement, including these Card Services Terms & Conditions and the Merchant Application, constitutes the entire agreement between Merchant, Global Direct, and Member and supersedes all prior memoranda or agreements relating thereto, whether oral or in writing.

**24. EFFECTIVE DATE.**

This Card Services Agreement shall become effective only upon acceptance by Global Direct and Member, or upon delivery of indebtedness at such locations as designated by Global Direct for purchase, whichever event shall first occur.

**25. DESIGNATION OF DEPOSITORY.**

The financial institution set forth in the Merchant Application is designated by Merchant as a depository institution ("Depository") for its credit card indebtedness. Such financial institution must be a member of an Automated Clearing House Association. Merchant authorizes payment for indebtedness purchased hereunder to be made by placing Depository therefore with instructions to credit Merchant's accounts. Depository, Member, and/or Global Direct may charge any of Merchant's accounts at Depository for any amount due under this Card Services Agreement. Global Direct must approve in writing any proposed changes to the account numbers or to the Depository. Merchant hereby authorizes Depository to release any and all account information to Global Direct as Global Direct may request without any further authorization, approval or notice from or to Merchant.

**26. FINANCIAL ACCOMMODATION.**

The acquisition and processing of sales slips hereunder is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Card Services Agreement cannot be assumed or enforced, and Global Direct and Member shall be excused from performance hereunder.

**27. DEBIT / ATM PROCESSING SERVICES: ADDITIONAL TERMS AND CONDITIONS.**

Debit Sponsor shall act as Merchant's sponsor with respect to the participation of point-of-sale terminals owned, controlled, and/or operated by Merchant (the "Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, CU24, Interlink, Maestro, NYCE, Pulse, Shazam, Star, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor or Global Direct without notice. Merchant may also have access to other debit networks that do not require a sponsor. Global Direct will provide Merchant with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks. Global Direct will provide connection to such Networks, terminal applications, settlement, and reporting activities.

Merchant will comply with all federal, state, and local laws, rules, regulations, and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules"). Merchant will execute and deliver any application, participation, or membership agreement or other

**APP. 56**

document necessary to enable Debit Sponsor to act as sponsor for Merchant in each Network. Merchant agrees to utilize the debit card Services in accordance with the Card Services Agreement, its exhibits or attachments, and Global Direct's instructions and specifications (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement), and to provide Global Direct with the necessary data in the proper format to enable Global Direct to properly furnish the Services. Copies of the relevant agreements or operating regulations shall be made available to Merchant upon request.

Merchant shall not in any way indicate that Debit Sponsor endorses Merchant's activities, products, or services. Debit Sponsor and Merchant are and shall remain independent contractors of one another, and neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party. Nothing contained in this Section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and Merchant.

In the event Debit Sponsor's sponsorship of Merchant in any Network is terminated prior to the termination of the Card Services Agreement, Global Direct may assign Debit Sponsor's rights and obligations hereunder to a third party. All provisions in this Section necessary to enforce the rights and obligations of the parties contained in this Section shall survive the termination of Debit Sponsor's debit sponsorship of Merchant under the Card Services Agreement.  Debit Sponsor may assign this Agreement to any parent, subsidiary, affiliate, or successor-in-interest.

## 28. MERCHANT ACCEPTANCE OF EBT TRANSACTIONS: ADDITIONAL TERMS AND CONDITIONS.

Merchant agrees to issue Benefits to Recipients in accordance with the procedures specified herein, and in all documentation and user guides provided to Merchant by Global Direct, as amended from time-to-time (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement); and pursuant to the Quest Operating Rules (the "Rules"), as amended from time-to-time, issued by the National Automated Clearing House Association as approved by the Financial Management Service of the U.S. Treasury Department. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed them in the Rules. Merchant will provide each recipient a receipt of each Benefit issuance. Merchant will be solely responsible for Merchant's issuance of Benefits other than in accordance with authorizations. Merchant agrees to comply with all the requirements, laws, rules and regulations pertaining to the delivery of services to Benefit Recipients and Benefit Recipient confidentiality. If Merchant issues FS Benefits under this Card Services Agreement, Merchant represents and warrants to Global Direct that Merchant is an FNS-authorized "Merchant" (as such term is defined in the Rules) and is not currently suspended or disqualified by FNS. Merchant agrees to secure and maintain at its own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of Benefits under this Card Services Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that Merchant will not issue Benefits at any time during which Merchant is not in compliance with the requirements of any applicable law. Merchant agrees to hold Global Direct harmless from any costs of compliance or failure to comply with any such obligation by Merchant. Global Direct may terminate or modify the provision of Services to Merchant if any of Global Direct's agreements with government EBT agencies are terminated for any reason or if any party threatens to terminate services to Global Direct due to some action or inaction on the part of Merchant. If any of these Card Services Terms & Conditions are found to conflict with Federal or State law, regulation or policy of the Rules, these Card Services Terms & Conditions are subject to reasonable amendment by Global Direct, the State or its EBT Service Provider to address such conflict upon ninety (90) days written notice to Merchant, provided that Merchant may, upon written notice, terminate the Card Services Agreement upon receipt of notice of such amendment. Nothing contained herein shall preclude the State from commencing appropriate administrative or legal action against Merchant or for making any referral for such action to any appropriate Federal, State, or local agency. Any references to "State" herein shall mean the State in which Merchant issues Benefits pursuant hereto. If Merchant issues Benefits in more than one State pursuant hereto, then the reference shall mean each such State severally, not jointly.

## 29. DISCOVER PROGRAM MARKS.

Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards ("Discover Program Marks").  Merchant is prohibited from using the Discover Program Marks other than as expressly authorized in writing by Global Direct. Merchant shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to Merchant by Global Direct pursuant to this Card Services Agreement or otherwise approved in advance in writing by Global Direct. Merchant may use the Discover Program Marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by Merchant must be approved in advance by Global Direct in writing.  Merchant shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the Discover Program Marks.  Merchant recognizes that it has no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks.

## 30. ELECTRONIC SIGNATURES.

Under the Electronic Signatures in Global and National Commerce Act (E-Sign), this Card Services Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when (1) your electronic signature is associated with the Card Services Agreement and related documents, (2) you consent and intend to be bound by the Card Services Agreement and related documents, and (3) the Card Services Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record).  This Card Services Agreement and all related electronic documents shall be governed by the provisions of E-Sign.

By pressing Submit, you agree (i) that the Card Services Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Card Services Agreement and related documents, (iii) that you have the ability to print or otherwise store the Card Services Agreement and related documents, and (iv) to authorize us to conduct an investigation of your credit history with various credit reporting and credit bureau agencies for the sole purpose of determining the approval of the applicant for merchant status or equipment leasing. This information is kept strictly confidential and will not be released.

## 31. NON-QUALIFIED SURCHARGES/OTHER FEES.

Merchant pricing appears in the Card Services Fee Schedule of the Merchant Application. T&E merchants (airline, car rental, cruise line, fast food, lodging, restaurant, travel agent, transportation) may have separate rates quoted for consumer and commercial (business) transactions. Transactions that do not clear as priced are subject to non-qualified surcharges (NQS) that are billed back to you on your monthly statement. The most predominant market sectors and applicable non-qualified surcharge rates appear below. Most non-qualified surcharges can be avoided by using a product that supports authorization and market data requirements established by the card associations and that are subject to change from time to time. Some non-qualified surcharges occur on specific types of cards (including without limitation Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card, Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, and "foreign" cards issued outside the United States). Unless your Card Services Fee Schedule specifically addresses commercial cards (i.e., Business Cards, Corporate Cards, Fleet Cards, GSA Cards, Purchase Cards), you will be billed back for the higher cost of acceptance of commercial cards, unless you are primarily a business-to-business supplier with corresponding pricing based on acceptance of commercial cards. The card associations require that information from the original authorization, including a lifecycle identifier, be retained and returned with subsequent authorizations and/or the settled transaction data. The card associations validate this information as part of the clearing and settlement process. If authorization data is not retained and returned at settlement, then the transaction will not clear as priced and will incur NQS. For more information concerning NQS and to view market data, you may wish to check the Global Direct website (www.globalpaymentsinc.com) for best practices information and to license Global Access @dvantage (GA@) for transaction detail review.

The items listed in this Section 31 are not and are not intended to be a comprehensive list of all instances in which non-qualified surcharges may apply.  Non-qualified surcharges may apply in additional situations.  All non-qualified surcharges include additional fees assessed by the applicable card association and Member or Global Direct.

In addition, Merchant may be assessed additional fees which will be in addition to the fees stated on the Merchant Application, as follows:

Merchant will also be assessed (a) Cross-Border fees and a U.S. Acquirer Support fee for international MasterCard and Maestro transactions. (b) an International Service Assessment fee and International Acquirer fee for international Visa transactions, and (c) an International Processing fee and International Service fee for international Discover transactions. These fees, which are applicable to transactions between Merchant and a non-U.S. MasterCard, Maestro, Visa, or Discover cardholder will be displayed as a separate item on Merchant's monthly statement and may include fees assessed by both the applicable card association and Member or Global Direct.

Merchant will also be assessed per transaction access fees and assessment rates for Visa, MasterCard and Discover transactions, which will be displayed as a separate item on Merchant's monthly statement and Member or Global Direct.

Merchant may also be assessed a PCI DSS Compliance fee, which will appear as a separate item on Merchant's monthly statement. This fee is assessed by Member and Global Direct in connection with Member and Global Direct's efforts to comply with the PCI Data Security Standard and does not ensure Merchant's compliance with the PCI Data Security Standard or any law, rule or regulation related to cardholder data security. The payment of such fee shall not relieve Merchant of its responsibility to comply with all rules and regulations related to cardholder data security, including without limitation the PCI Data Security Standard. Merchant may also be assessed a PCI DSS Non-Compliance fee until they validate compliance or confirm they are using a PA DSS Validated payment application.

Merchant will also be assessed the following fees on Visa transactions: the Visa Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch, the Visa Zero Floor Limit Fee, which will be assessed on settled transactions that were not authorized, and the Visa Zero Dollar Verification fee, which will be assessed on transactions where Merchant requested an address verification response without an authorization. Merchant will also be assessed the MasterCard Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch. . Merchant will also be assessed the MasterCard Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch or not properly reversed within 120 days. These fees will be displayed as separate items on Merchant's monthly statement and may include fees assessed by both the applicable card association and Member or Global Direct.

.

## NON-QUALIFIED SURCHARGES FOR PREDOMINANT MARKET SECTORS

**Retail/Restaurant Electronic Merchant**

If you are a Retail Merchant or a Restaurant Merchant with retail-only pricing (no Business Card Rate) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation retail commercial card transactions in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card and all Commercial Cards, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application

• Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.

• Obtain a single electronic authorization and settle for authorized amounts.

• Obtain a cardholder signature (unless transaction is eligible for No Signature Required [NSR] program).

• Settle and transmit batches same day via your terminal/electronic system.

• The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions unless a Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or, Bar/Tavern (MCC 5513), Beauty/Barber Shop (MCC 7230), or Taxi/Limousines (MCC 4121).

• The electronic authorization amount must be equal to the transaction amount on Discover retail transactions except that Taxi Limousines (MCC 4121) and Beauty/Barber Shop (MCC 7230) merchant transactions may vary up to 20%. Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or Bar/Tavern (MCC 5513) transactions may vary by more than 20% from the electronic authorization without incurring NQS.

**Restaurant Electronic Merchant**

If you are a Restaurant Merchant MCC 5812 or Fast Food Merchant MCC 5814 and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.

• Obtain a cardholder signature (unless transaction is eligible for NSR program).

• Settle and transmit batches same day via your terminal/electronic system.

**Supermarket Electronic Merchant**

If you are an approved (certified) supermarket merchant and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate(s) quoted for Supermarket Credit Card and Supermarket Check Card. Each transaction not processed as outlined, in addition to transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite and commercial cards, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a magnetic strip read (card swipe/contactless data capture/electronic imprint) at the time of sale.

• Obtain a single electronic authorization and settle for authorized amounts.

• Obtain a cardholder signature (unless transaction is eligible for NSR program).

• Settle and transmit batches same day via your terminal/electronic system.

• The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions.

**Developing Market Electronic Merchant**

If you qualify as a Developing Market Merchant (as defined by Association guidelines from time to time) and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all the following requirements will be priced at the rates quoted. Any other transaction, including commercial card transactions, Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card ,Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, and non-magnetic stripe read foreign transactions will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application In addition, each

**APP. 58**

Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.
- Obtain a single electronic authorization.
- Settle and transmit batches same day via your terminal/electronic system.
- Provide market data as required. See Note.

NOTE: If card is not present and a magnetic stripe read does not occur, then Merchant may be required to comply with "Direct Marketer" market data requirements including AVS request on cardholder billing address at time of authorization. If card is present and cardholder signature is obtained, however the magnetic stripe is damaged, then Merchant may be required to obtain AVS match on cardholder billing address zip code.

**Direct Marketer Electronic Merchant**

If you are a Direct Mail/Telephone Order Merchant (non-magnetic swipe read transactions), and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate quoted. Any other transaction, including all foreign transactions and commercial card transactions in addition to transactions using Discover Rewards Card,  Discover Premium Card, Discover Premium Plus Card Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.
- Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settle amount).
- Address Verification Request in authorization on cardholder billing address.  For Discover transactions, Merchant must obtain full address verification request on street number and/or 9 digit postal code.
- CID verification for Discover merchants on non-recurring transactions.
- Purchase date (settled date) is ship date.
- Send order number with each transaction.
- Settle and transmit batches same day via your terminal/electronic system.
- Send level 3 data (line item detail, sales tax, customer code) with every eligible commercial card transaction.

NOTE: Card Not Present transactions involving one-time, recurring, or installment bill payment transactions are subject to additional card association requirements which must be complied with to avoid NQS. Electronic commerce transaction requirements are also subject to additional card association requirements which must be complied with to avoid NQS. Please refer to Card Acceptance Guide for additional requirements.

**Purchase Card Electronic Merchant**

If you are a Purchase Card Merchant (non-magnetic swipe read transactions) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets the following requirements will be priced at the rate quoted. Each Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Each Visa business and commercial card transaction will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.  Any other transaction that does not meet the following requirements, including without limitation foreign transactions, tax-exempt Visa Commercial transactions, Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card ,Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.
- Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settled amount).
- Address Verification Request in authorization on cardholder billing address.
- Purchase date (settled date) is ship date.
- Send order number (customer code) with each transaction.
- Send tax amount with every transaction.
- Send Level 3 data (line item detail) with every eligible commercial card transaction.  Sales tax exempt transactions will not be considered to meet these requirements unless they include Level 3 data (line item detail).
- Settle and transmit batches same day via your terminal/electronic system.

**Lodging/Auto Rental Electronic Merchant**

If you are a Lodging or Auto Rental Merchant utilizing a terminal or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation non-magnetic stripe read foreign transactions, and transactions using Discover Rewards Card, Discover Premium Card, Discover Premium Plus Card Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application.
- Obtain a magnetic swipe read (card swipe/electronic imprint) at the time of check-in.
- Obtain additional electronic authorizations or send partial reversals to bring total authorized amount within 15% of settled amount. Authorizations must meet card association requirements.
- Obtain a cardholder signature for final transaction amount.
- Purchase Date is hotel check-out date/auto return date.
- Length of guest stay/rental in initial authorization.
- Hotel Folio/Rental Agreement Number and check-in date/check-out date transmitted with each transaction.
- Additional market data may be required for commercial card transactions to avoid NQS. Lodging merchants who (1) accept credit cards for advance payment; (2) guarantee reservations using a credit card; or (3) provide express check-out services to guests, must comply with additional card association requirements for these services in addition to additional authorization and settlement market data requirements.  Lodging merchants who subject charges to final audit and bill for ancillary/additional charges must comply with additional bank card association requirements for these services in addition to additional authorization and settlement market data requirements to avoid NQS. These transactions may also be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application. Please see Card Acceptance Guide for requirements and best practices for these transactions.

**TouchTone Capture Merchant**

APP. 59

Transactions which utilize our TouchTone Capture system for authorizations and settlement, settle beyond 48 hours, or are not transmitted via the TouchTone Capture system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

**Paper Deposit Merchant**

Non-terminal/electronic paper deposit transactions will be priced at the rate quoted in the Card Services Fee Schedule of the Merchant Application.

**Debit Card Merchant**

Each debit card transaction will be assessed the network's acquirer fee in addition to the debit card per item fee quoted in the Card Services Fee Schedule of the Merchant Application.

**Card Present: / Mag Stripe Failure:**

A magnetic stripe read is also referred to as an electronic imprint. If the magnetic stripe is damaged, then other validation means may be required to protect against counterfeit cards and merchant must obtain a manual imprint. Most products will prompt for cardholder billing zip code and perform an AVS check for a zip code match. CID verification is recommended for Discover key-entered transactions. Key-entered retail transactions are subject to higher interchange and NQS.

The foregoing information regarding NQS is not comprehensive and is subject to change by the card association. Additional or different rates or fees may apply based on the details of a subject transaction.

All questions regarding Card Services should be referred to Trust One Payment Services Inc, 214 Maple Street, Villa Rica, GA  30180
 or call: 1-770-947-6000.

Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement and/or notice.

**For Member contact:**
HSBC Bank USA, National Association
Merchant Support Group
P.O. Box 3263
Buffalo, NY 14240
716-841-6360

**Debit sponsorship** provided by Wells Fargo Bank N.A.

Rev. 01/12 – TOP

**APP. 60**



## CARD SERVICES TERMS & CONDITIONS
### 1. GENERAL.

The "Card Services Agreement" consists of these Card Services Terms & Conditions and the Merchant Application and is made by and among Merchant (or "you"), Global Payments Direct, Inc. ("Global Direct"), and Member (as defined below). The provisions in the Card Services Agreement are applicable to Merchant if Merchant has signed the appropriate space in the Acceptance of Terms & Conditions/Merchant Authorization section of the Merchant Application. The member bank identified in the Merchant Application ("Member") is a member of Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"). Global Direct is a registered independent sales organization of Visa, a member service provider of MasterCard and a registered acquirer for Discover Financial Services LLC ("Discover"). Any references to the Debit Sponsor shall refer to the debit sponsor identified below.

Merchant and Global Direct agree that the rights and obligations contained in these Card Services Terms and Conditions do not apply to the Member with respect to Discover transactions and Switched Transactions (as defined below). To the extent Merchant accepts Discover cards, the provisions in this Agreement with respect to Discover apply if Merchant does not have a separate agreement with Discover. In such case, Merchant will also be enabled to accept JCB and Diner's Club cards under the Discover network and such transitions will be processed at the same rate as Merchant's Discover transactions are processed. To the extent Merchant accepts Discover cards and has a separate agreement with Discover, Discover card transactions shall be processed as Switched Transactions (as defined below).

Under the terms of the Card Services Agreement, Merchant will be furnished with the services and products described herein and in the Merchant Application and selected by Merchant therein (collectively and individually, as applicable, the "Services"). During the term of the Card Services Agreement, Global Direct will be the sole and exclusive provider of all card Services to Merchant. Any Merchant accepted by Global Direct for card processing services agrees to be bound by the Card Services Agreement, including the terms of the Merchant Application and these Card Services Terms & Conditions as may be modified or amended in the future. A MERCHANT'S SUBMISSION OF A TRANSACTION TO GLOBAL DIRECT SHALL BE DEEMED TO SIGNIFY MERCHANT'S ACCEPTANCE OF THE CARD SERVICES AGREEMENT, INCLUDING THE TERMS AND CONDITIONS HEREIN.

Except as expressly stated in the first three paragraphs of Section 13, all terms and conditions of this Card Services Agreement shall survive termination to the extent necessary to protect Global Direct and Member's rights herein.

### 2. SERVICE DESCRIPTIONS.

Credit Card Processing Services: Global Direct's credit card processing services consist of authorization and electronic draft capture of credit card transactions; outclearing of such transactions to the appropriate card associations and/or issuers (e.g., Visa, MasterCard, Diners, Discover); settlement; dispute resolution with cardholders' banks; and transaction-related reporting, statements and products. From time to time under this Card Services Agreement, upon Merchant's request, Global Direct may facilitate the transmission of certain payment card transactions ("Switched Transactions") to the respective card issuers, including but not limited to American Express®, Diners Club® and various fleet, private label and commercial cards. Switched Transactions require Global Direct's prior written approval and are subject to applicable pricing; Global Direct does not purchase the indebtedness associated with Switched Transactions.

EBT Transaction Processing Services: Global Direct offers electronic interfaces to Electronic Benefits Transfer ("EBT") networks for the processing of cash payments or credits to or for the benefit of benefit recipients ("Recipients"). Global Direct will provide settlement and switching services for various Point of Sale transactions initiated through Merchant for the authorization of the issuance of the United States Department of Agriculture, Food and Nutrition Services ("FNS") food stamp benefits ("FS Benefits") and/or government delivered cash assistance benefits ("Cash Benefits," with FS Benefits, "Benefits") to Recipients through the use of a state-issued card ("EBT Card").

Rev. 05/09-GP

**APP. 61**

Provisions regarding debit card services are set forth in Section 27 below.

With respect to Visa and MasterCard products, Merchant may elect to accept credit cards or debit/prepaid cards or both. Merchant shall so elect on the Merchant Application being completed contemporaneously herewith. Merchant agrees to pay and Merchant's account(s) will be charged pursuant to Section 5 of this Card Services Agreement for any additional fees incurred as a result of Merchant's subsequent acceptance of transactions with any Visa or MasterCard product that it has elected not to accept.

## 3. PROCEDURES.

Merchant will permit holders of valid cards bearing the symbols of the cards authorized to be accepted by Merchant hereunder to charge purchases or leases of goods and services and the debt resulting therefrom shall be purchased hereunder, provided that the transaction complies with the terms of this Card Services Agreement. All indebtedness submitted by Merchant for purchase will be evidenced by an approved sales slip. Merchant will not present for purchase any indebtedness that does not arise out of a transaction between a cardholder and Merchant. Merchant agrees to follow the Card Acceptance Guide which is incorporated into and made part of this Card Services Agreement, and to be bound by the operating regulations and rules of Visa, MasterCard, Discover and any other card association or network organization covered by this Card Services Agreement, as any of the above referenced documents may be modified and amended from time to time.  Merchant acknowledges that the Card Acceptance Guide is located on Global Direct's website at www.globalpaymentsinc.com.  Without limiting the generality of the foregoing, Merchant agrees to comply with and be bound by, and to cause any third party who provides Merchant with services related to payment processing or facilitates Merchant's ability to accept credit and debit cards and who is not a party to this Card Services Agreement to comply with and be bound by, the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to cardholder and transaction information security, including without limitation, all rules and regulations imposed by the Payment Card Industry (PCI) Security Standards Council (including without limitation the PCI Data Security Standard),Visa's Cardholder Information Security Program, MasterCard's Site Data Protection Program, and Payment Application Best Practices.  Merchant also agrees to cooperate at its sole expense with any request for an audit or investigation by Global Direct, Member, a card association or network organization in connection with cardholder and transaction information security.  Without limiting the generality of the foregoing, Merchant agrees that it will use information obtained from a cardholder in connection with a card transaction solely for the purpose of processing a transaction with that cardholder or attempting to re-present a chargeback with respect to such transaction.  Merchant will indemnify and hold Global Direct and Member harmless from any fines and penalties issued by Visa, MasterCard, Discover or any card association or network organization and any other fees and costs arising out of or relating to the processing of transactions by Global Direct and Member at Merchant's location(s) and will reimburse Global Direct for any losses incurred by Global Direct with respect to any such fines, penalties, fees and costs.

Merchant also agrees that it will comply with all applicable laws, rules and regulations related to the truncation or masking of cardholder numbers and expiration dates on transaction receipts from transactions processed at Merchant's location(s), including without limitation the Fair and Accurate Credit Transactions Act and applicable state laws ("Truncation Laws").  As between Merchant, on the one hand, and Global Direct and Member, on the other hand, Merchant shall be solely responsible for complying with all Truncation Laws and will indemnify and hold Global Direct and Member harmless from any claim, loss or damage resulting from a violation of Truncation Laws as a result of transactions processed at Merchant's location(s).

Global Direct may, from time to time, issue written directions (via mail or Internet) regarding procedures to follow and forms to use to carry out this Card Services Agreement.  These directions and the terms of the forms are binding as soon as they are issued and shall form part of these Card Services Terms & Conditions.  Such operating regulations and rules may be reviewed upon appointment at Global Direct's designated premises and Merchant acknowledges that it has had the opportunity to request a review and/or review such operating regulations and rules in connection with its execution of this Card Services Agreement.

## 4. MARKETING.

Rev. 05/09-GP

**APP. 62**

Merchant shall adequately display the card issuer service marks and promotional materials supplied by Global Direct. Merchant shall cease to use or display such service marks immediately upon notice from Global Direct or upon termination of this Card Services Agreement.

## 5. PAYMENT, CHARGES AND FEES.

Fees and charges payable by Merchant shall be as set forth in the Merchant Application. Merchant will be paid for indebtedness purchased under this Card Services Agreement by credit to Merchant's account(s). Merchant's account(s) will be credited for the gross amount of the indebtedness deposited less the amount of any credit vouchers deposited.  Merchant shall not be entitled to credit for any indebtedness that arises out of a transaction not processed in accordance with the terms of this Card Services Agreement or the rules and regulations of a card association or network organization.  Availability of any such funds shall be subject to the procedures of the applicable financial institution. Chargebacks and adjustments will be charged to Merchant's account(s) on a daily basis. Merchant agrees to pay and Merchant's account(s) will be charged for the discount, fees, chargebacks, and other fees and charges described in this Card Services Agreement. Merchant also agrees to pay and Merchant's account(s) will be debited for all fees, arbitration fees, fines, penalties, etc. charged or assessed by the card associations or network organizations on account of or related to Merchant's processing hereunder, including without limitation with regards to any third party who provides Merchant with services related to payment processing or facilitates Merchant's ability to accept credit and debit cards and who is not a party to this Card Services Agreement.  If any type of overpayment to Merchant or other error occurs, Merchant's account(s) may be debited or credited, without notice, and if Merchant's account(s) do not contain sufficient funds, Merchant agrees to remit the amount owed directly to Global Direct. Merchant agrees not to, directly or indirectly, prevent, block or otherwise preclude any debit by Global Direct or Member to Merchant's account which is permitted hereunder.  Merchant represents and warrants that no one other than Merchant has any claim against such indebtedness except as authorized in writing by Member and Global Direct. Merchant hereby assigns to Member and Global Direct all of its right, title, and interest in and to all indebtedness submitted hereunder and agrees that Member and Global Direct have the sole right to receive payment on any indebtedness purchased hereunder.

## 6. EQUIPMENT AND SUPPLIES/THIRD PARTY SERVICES.

Merchant agrees that it will not acquire any title, copyrights, or any other proprietary right to any advertising material; leased equipment including imprinters, authorization terminals, or printers; software; credit card authenticators; unused forms; and Merchant deposit plastic cards provided by Global Direct in connection with this Card Services Agreement.  Merchant will protect all such items from loss, theft, damage or any legal encumbrance and will allow Global Direct and its designated representatives reasonable access to Merchant's premises for their repair, removal, modification, installation and relocation. Merchant acknowledges that any equipment or software provided under this Card Services Agreement is embedded with proprietary technology ("Software"). Merchant shall not obtain title, copyrights or any other proprietary right to any Software. At all time, Global Direct or its suppliers retain all rights to such Software, including but not limited to updates, enhancements and additions. Merchant shall not disclose such Software to any party, convey, copy, license, sublicense, modify, translate, reverse engineer, decompile, disassemble, tamper with, or create any derivative work based on such Software. Merchant's use of such Software shall be limited to that expressly authorized by Global Direct. Global Direct's suppliers are intended third party beneficiaries of this Card Services Agreement to the extent of any terms herein pertaining to such suppliers' ownership rights; such suppliers have the right to rely on and directly enforce such terms against Merchant.

The operating instructions will instruct Merchant in the proper use of the terminals, and Merchant shall use and operate the terminals only in such manner. If Merchant has purchased the maintenance/help desk service hereunder for its terminals, Merchant will promptly notify Global Direct of any equipment malfunction, failure or other incident resulting in the loss of use of the equipment or need for repair or maintenance, whereupon Global Direct will make the necessary arrangements to obtain required maintenance. Merchant is responsible for shipping costs. Merchant shall cooperate with Global Direct in its attempt to diagnose any problem with the terminal. In the event the Merchant's terminal requires additional Software, Merchant is obligated to cooperate and participate in a dial in down line load procedure. With respect to any item of equipment leased to Merchant by Global Direct, Merchant will not be liable for normal wear and tear, provided, however, that Merchant will be liable to Global Direct in the event that any leased item of

Rev. 05/09-GP

**APP. 63**

equipment is lost, destroyed, stolen or rendered inoperative. Merchant will indemnify Global Direct against any loss arising out of damage to or destruction of any item of equipment provided hereunder for any cause whatsoever. Merchant also agrees to hold harmless and indemnify Global Direct for any costs, expenses, and judgments Global Direct may suffer, including reasonable attorney's fees, as a result of Merchant's use of the equipment provided hereunder. Any unused equipment in its original packaging purchased from Global Direct hereunder may be returned to Global Direct at Merchant's expense within sixty (60) days of receipt. Merchant shall receive a refund of any money paid in connection therewith subject to a re-stocking fee of an amount equal to 20 percent of the total purchase price for the returned equipment. No refunds shall be issued for any equipment returned after sixty (60) days.

Merchant acknowledges that some of the services to be provided by Global Direct and Member hereunder may be provided by third parties.  Merchant agrees that except for its right to utilize such services in connection with this Card Services Agreement, it acquires no right, title or interest in any such services. Merchant further agrees that it has no contractual relationship with any third party providing services under this Card Services Agreement and that Merchant is not a third party beneficiary of any agreement between Global Direct or Member, as applicable, and such third party.  Merchant may not resell the services of any third party providing services under this Card Services Agreement to any other party.

## 7. FINANCIAL INFORMATION.

Merchant agrees to furnish Global Direct and Member such financial statements and information concerning Merchant, its owners, principals, partners, proprietors or its affiliates as Global Direct may from time to time request. Global Direct, or its duly authorized representatives, may examine the books and records of Merchant, including records of all indebtedness previously purchased or presented for purchase. Merchant agrees to retain copies of all paper and electronic sales slips and credit slips submitted to Global Direct for a period of two years from submission, or such longer period of time as may be required by the operating rules or regulations of the card associations or network organizations, by law, or by Global Direct as specifically requested in writing in individual cases.

## 8. CHANGE IN BUSINESS.

Merchant agrees to provide Global Direct and Member sixty (60) days prior written notice of its (a) transfer or sale of any substantial part (ten percent (10%) or more) of its total stock, assets and/or to liquidate; or (b) change to the basic nature of its business, or (c) provided that Merchant has not indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, conversion of all or part of the business to mail order sales, telephone order sales, Internet-based sales or to other sales where the card is not present and swiped through Merchant's terminal. Upon the occurrence of any such event, the terms of this Card Services Agreement may be modified to address issues arising therefrom, including but not limited to requirements of applicable card associations or network organizations.

## 9. TRANSFERABILITY.

This Card Services Agreement is not transferable by Merchant without the written consent of Global Direct and Member. Any attempt by Merchant to assign its rights or to delegate its obligations in violation of this paragraph shall be void. Merchant agrees that the rights and obligations of Global Direct hereunder may be transferred by Global Direct without notice to Merchant. Merchant agrees that the rights and obligations of Member hereunder may be transferred to any other member without notice to Merchant. Merchant acknowledges that the transferable rights of Global Direct and Member hereunder shall include, but shall not be limited to, the authority and right to debit the Merchant's account(s) as described herein.

## 10. WARRANTIES AND REPRESENTATIONS.

Merchant warrants and represents to Global Direct and Member: (a) that each sales transaction delivered hereunder will represent a bona fide sale to a cardholder by Merchant for the amount shown on the sales slip as the total sale and constitutes the binding obligation of the cardholder, free from any claim, demand, defense, setoff or other adverse claim whatsoever; (b) that each sales slip or other evidence of indebtedness will accurately describe the goods and services which have been sold and delivered to the cardholder or in accordance with his instructions; (c) that Merchant will comply fully with all federal, state and local laws, rules and regulations applicable to its business; (d) that Merchant will fulfill completely all of its obligations

Rev. 05/09-GP

**APP. 64**

to the cardholder and will resolve any customer dispute or complaint directly with the cardholder; (e) that the signature on the sales slip will be genuine and authorized by cardholder and not forged or unauthorized; (f) that the sales transaction shall have been consummated and the sales slip prepared in full compliance with the provisions of the Card Acceptance Guide and the operating regulations and rules of the applicable card association or network organization, as amended from time to time; (g) provided that Merchant has not indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, that none of the sales transactions submitted hereunder represent sales by telephone, or mail, or Internet, or where the card is not physically present at the Merchant's location and swiped through Merchant's terminal, unless Merchant is specifically authorized in writing by Global Direct to submit such sales slips for purchase, (h) to the extent Merchant has indicated on the Merchant Application that it accepts mail order, telephone order, or internet-based transactions, Merchant shall not submit such a transaction to Global Direct  and Member for processing until the goods and/or services are shipped or performed, as applicable, unless otherwise permitted by the card associations or network organizations, (i) that none of the sales transactions submitted hereunder for purchase represent sales to any principal, partner, proprietor, or owner of Merchant, (j) that, without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to cardholder and transaction information security, including without limitation Payment Card Industry (PCI) Data Security Standards, Visa's Cardholder Information Security Program and MasterCard's Site Data Protection Program, and (k) that all of the information contained in this Card Services Agreement (including the Merchant Application) is true and correct. In the event that any of the foregoing warranties or representations is breached, the affected sales slips or other indebtedness may be refused, or prior acceptance revoked and charged back to the Merchant. Furthermore, if Merchant submits for purchase hereunder a sales transaction that is not the result of a sale of Merchant's goods or services offered to the general public or if Merchant submits any sales transactions for purchase hereunder which represents a sale to any principal, partner, proprietor, or owner of Merchant, such sales transaction may be refused or charged back.

Merchant must notify Global Direct if Merchant elects to use the terminal service of American Express, Novus, or any other third-party provider. If Merchant elects to use a third-party terminal provider, that provider becomes Merchant's agent for the delivery of card transactions to Global Direct via the applicable card-processing network. Merchant agrees to assume full responsibility and liability for any failure of such agent to comply with the operating regulations and rules of the applicable card association or network organization, including without limitation any violation, which results in a chargeback to the Merchant. Merchant also agrees that the obligation hereunder to reimburse the Merchant for the value of the card transactions captured by an agent is limited to the value of the transactions (less applicable fees) received by the card-processing network from the agent.

NEITHER MEMBER, NOR GLOBAL DIRECT, NOR ANY SUPPLIER MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY TERMINAL, ANY EQUIPMENT FURNISHED IN CONNECTION THEREWITH, OR ANY OF THE SERVICES FURNISHED HEREUNDER.

## 11. INDEMNITY.

Merchant agrees to satisfy directly with the cardholder any claim or complaint arising in connection with the card sale, regardless of whether such claim or complaint is brought by the cardholder, Global, or another party. Merchant agrees to indemnify and hold Global Direct and Member harmless from and against any and all liabilities, losses, claims, damages, disputes, offsets, claims or counterclaims arising out of or relating to the card sale, including without limitation claims and complaints made by a cardholder or any other person or entity with regard to indebtedness sold by Merchant hereunder or any other Service provided hereunder.

## 12. LIMITATION OF LIABILITY.

Neither Member nor Global Direct shall be liable for failure to provide the Services if such failure is due to any cause or condition beyond such party's reasonable control. Such causes or conditions shall include, but shall not be limited to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, shortages of labor or materials,

Rev. 05/09-GP

**APP. 65**

freight embargoes, unusually severe weather, breakdowns, operational failures, electrical power failures, communication failures, unavoidable delays, the errors or failures of third party systems, or other similar causes beyond such party's control.

The liability of Global Direct and Member for any loss arising out of or relating in any way to this Card Services Agreement, including but not limited to damages arising out of any malfunction of the equipment or the failure of the equipment to operate, the unavailability or malfunction of the Services, personal injury, or property damage, shall, in the aggregate, be limited to actual, direct, and general money damages in an amount not to exceed one (1) month's average charge paid by Merchant hereunder (exclusive of interchange fees, assessments, and any other fees or costs that are imposed by a third party in connection with Merchant's payment processing) for Services during the previous twelve (12) months or such lesser number of months as shall have elapsed subsequent to the effective date of this Card Services Agreement. This shall be the extent of Global Direct's and Member's liability arising out of or relating in any way to this Card Services Agreement, including alleged acts of negligence, breach of contract, or otherwise and regardless of the form in which any legal or equitable action may be brought against Global Direct or Member, whether contract, tort, or otherwise, and the foregoing shall constitute Merchant's exclusive remedy. Under no circumstances shall Global Direct or Member be liable for any lost profits, lost interest, or for special, consequential, punitive or exemplary damages arising out of or relating in any way to this Card Services Agreement, including but not limited to, damages arising out of placement of a Merchant's name on any terminated merchant list for any reason, even if Global Direct or Member has been advised of the possibility of such damages. Under no circumstances shall Global Direct or Member be liable for any settlement amounts pertaining to Switched Transactions; Merchant's recourse therefore shall be to the applicable card issuer.

It is agreed that in no event will Global Direct or Member be liable for any claim, loss, billing error, damage, or expense arising out of or relating in any way to this Card Services Agreement which is not reported in writing to Global Direct by Merchant within 60 days of such failure to perform or, in the event of a billing error, within 90 days of the date of the invoice or applicable statement. Merchant expressly waives any such claim that is not brought within the time periods stated herein.

## 13. TERM AND TERMINATION.

This Card Services Agreement shall remain in full force and effect for an initial term of three (3) years.  This Card Services Agreement shall be automatically extended for successive one (1) year periods on the same terms and conditions expressed herein, or as may be amended, unless Merchant gives written notice of termination as to the entire Card Services Agreement or a portion thereof at least 60 days prior to the expiration of the initial term or any extension or renewals thereof, in which case this Card Services Agreement will terminate at the end of the then-current term. Notwithstanding anything to the contrary set forth herein, in the event Merchant terminates this Card Services Agreement in breach of this Section 13, the following amount(s) shall be immediately due and payable to Global Direct:  the lesser of (a) the maximum amount permitted by state law, and (b) all monthly fees assessed to Merchant under this Card Services Agreement and due to Global Direct for the remainder of the then existing term of the Card Services Agreement, including all minimum monthly fee commitments.  Merchant hereby authorizes Global Direct to accelerate the payment of such applicable amount(s) and to deduct such total amount(s) from Merchant's account referenced in Section 5, or to otherwise withhold the total amount(s) from amounts due to Merchant from Global Direct, immediately on or after the effective date of termination. If the Merchant's account does not contain sufficient funds for the debit or the amount cannot be withheld by Global Direct from amounts due to Merchant, Merchant shall pay Global Direct the amount due within ten (10) days of the date of Global Direct's invoice for same. The payment as described here is not a penalty, but rather is hereby agreed by the parties to be a reasonable amount of liquidated damages to compensate Global Direct for its termination expenses and all other damages under the circumstances in which such amounts would be payable. Such amount(s) shall not be in lieu of but in addition to any payment obligations for Services already provided hereunder (or that Global Direct may continue to provide), which shall be an additional cost, and any and all other damages to which Global Direct may be entitled hereunder.  Notwithstanding the foregoing, if Merchant provides Global with written notice within forty-five (45) days of Merchant's execution of this Card Services Agreement that it wishes to terminate this Card Services Agreement immediately, Merchant

Rev. 05/09-GP

**APP. 66**

shall not be responsible for the payment of the above-referenced amount(s), but shall be responsible for compliance with all other terms and conditions set forth in this Card Service Agreement, including but not limited to payment for all fees incurred prior to the termination of this Card Services Agreement.

Notwithstanding the foregoing, Global Direct may terminate this Card Services Agreement or any portion thereof upon written notice to Merchant. Furthermore, Global Direct may terminate this Card Services Agreement at any time without notice upon Merchant's default in performing under any provision of this Card Services Agreement, upon an unauthorized conversion of all or any part of Merchant's activity to mail order, telephone order, Internet order, or to any activity where the card is not physically present and swiped through the Merchant's terminal, upon any failure to follow the Card Acceptance Guide or any operating regulation or rule of a card association or network organization, upon any misrepresentation by Merchant, upon commencement of bankruptcy or insolvency proceedings by or against the Merchant, upon a material change in the Merchant's average ticket or volume as stated in the Merchant Application, or in the event Global Direct reasonably deems itself insecure in continuing this Card Services Agreement.

In the event that Global Direct and Member breach the terms and conditions hereof, the Merchant may, at its option, give written notice to Global Direct and Member of its intention to terminate this Card Services Agreement unless such breach is remedied within thirty (30) days of such notice. Failure to remedy such a breach shall make this Card Services Agreement terminable, at the option of the Merchant, at the end of such thirty (30) day period unless notification is withdrawn.

Any Merchant deposit of sales or credit slips that is accepted by Global Direct and Member or by a designated depository after the effective date of termination will be returned to Merchant and will not be credited (or debited) to merchant's account(s). If the deposit has already been posted to Merchant's account(s), said posting will be reversed and the deposit returned to Merchant. Termination of this Card Services Agreement shall not affect Merchant's obligations which have accrued prior to termination or which relate to any indebtedness purchased hereunder prior to termination, including but not limited to chargebacks even if such chargebacks come in after termination. In the event of termination, all equipment leased from Global Direct (but not from any other leasing agent), including but not limited to imprinters, terminals, and printers; all supplies; Card Acceptance Guides; and operating instructions must be returned immediately to Global Direct at Merchant's expense.

## 14. RETURNED ITEMS/CHARGEBACKS.

If a cardholder disputes any transaction, if a transaction is charged back for any reason by the card issuing institution, or if Global Direct or Member has any reason to believe an indebtedness previously purchased is questionable, not genuine, or is otherwise unacceptable, the amount of such indebtedness may be charged back and deducted from any payment due to Merchant or may be charged against any of Merchant's accounts or the Reserve Account (as defined below).  Merchant acknowledges and agrees that it is bound by the rules of the card associations and network organizations with respect to any chargeback.  Merchant further acknowledges that it is solely responsible for providing Global Direct and Member with any available information to re-present a chargeback and that, regardless of any information it provides or does not provide Global Direct and Member in connection with a chargeback, or any other reason, Merchant shall be solely responsible for the liability related to such chargeback.  A list of some common reasons for chargebacks is contained in the Card Acceptance Guide provided, however, that such list is not exclusive and does not limit the generality of the foregoing.  If any such amount is uncollectible through withholding from any payments due hereunder or through charging Merchant's accounts or the Reserve Account, Merchant shall, upon demand by Global Direct, pay Global Direct the full amount of the chargeback. Merchant understands that obtaining an authorization for any sale shall not constitute a guarantee of payment, and such sales slips can be returned or charged back to Merchant like any other item hereunder.

## 15. RESERVE ACCOUNT.

At any time, Global Direct and Member may, at their option, establish a reserve account to secure the performance of Merchant's obligations under this Card Services Agreement to such party ("Reserve Account"). The Reserve Account may be funded, at Global Direct's sole discretion, through any or all of the following: (a) Direct payment by Merchant -- At the request of Global Direct or Member, Merchant will deposit funds in the Reserve Account; (b) The proceeds of indebtedness presented for purchase; or (c) The

Rev. 05/09-GP

**APP. 67**

transfer by Global Direct and Member into the Reserve Account of funds withdrawn from any of the accounts referred to in Section 5 or any other accounts, including certificates of deposit, maintained by Merchant or Merchant's guarantor, if any, with any designated depositary or other financial institution. Merchant and Merchant's guarantor hereby grants Member a security interest in all said accounts and authorizes Global Direct (to the extent authorized by Member) or Member to make such withdrawals at such times and in such amounts as it may deem necessary hereunder. Merchant and Merchant's guarantor hereby instruct said financial institutions to honor any requests made by Global Direct and Member under the terms of this provision. Merchant and Merchant's guarantor will hold harmless the financial institutions and indemnify them for any claims or losses they may suffer as a result of honoring withdrawal requests from Global Direct and Member.

Merchant hereby agrees that Global Direct and Member may deduct from this Reserve Account any amount owed to such party in accordance with this Card Services Agreement. Any funds in the Reserve Account may be held until the later of (a) the expiration of any potentially applicable chargeback rights in respect of purchased indebtedness under the rules and regulations of the card associations or network organizations and (b) the period necessary to secure the performance of Merchant's obligations under this Card Services Agreement, which holding period may extend beyond termination of this Card Services Agreement. Merchant will not receive any interest on funds being held in a Reserve Account.  Without limiting the generality of the foregoing, Merchant shall, upon termination of this Card Services Agreement, maintain the sum of at least five percent (5%) of gross sales for the 90 day period prior to termination to be held in a Reserve Account in accordance with the terms of this Card Services Agreement. Global may, at its discretion upon termination of this Card Services Agreement, require that the Merchant maintain more than five percent (5%) of gross sales for the 90 day period prior to termination in a Reserve Account.

Upon the later of (a) the expiration of any potentially applicable chargeback rights in respect of purchased indebtedness under the rules and regulations of the card associations or network organizations and (b) the period necessary to secure the performance of Merchant's obligations under this Card Services Agreement, Global Direct shall attempt to return an amount equal to the remaining funds in the Reserve Account, if any, to Merchant.  To the extent Global Direct is unable to remit an amount equal to such remaining funds to the account identified in Section 25 and Merchant makes no claim in writing to Global Direct with respect to its right to receive payment of such remaining funds, then, one (1) years following termination of this Card Services Agreement, Merchant shall be deemed to have waived all of its right to receive payment of such remaining funds and Global Direct shall be entitled to retain an amount equal to such remaining funds as additional consideration for the Services.

## 16. DEFAULT/SECURITY INTEREST.

Upon failure by Merchant to meet any of its obligations under this Card Services Agreement (including funding the Reserve Account), any of the accounts referred to in Section 5 or any other accounts belonging to Merchant or Merchant's guarantor held by any designated depository (or by any other financial institution) may be debited without notice to Merchant, and Merchant and Merchant's guarantor gives Member and Global Direct a security interest in all such accounts for these purposes. The scope of the security interest, and Merchant's and Merchant's guarantor's instructions to its financial institutions to accept withdrawal requests from Global Direct and Member, and Merchant's agreement to hold such institutions harmless and to indemnify them are described above in Section 15.

Merchant also agrees that, in the event of a default by Merchant, Member has a right of setoff and may apply any of Merchant's balances or any other monies due Merchant from Member towards the payment of amounts due from Merchant under the terms of this Card Services Agreement. The rights stated herein are in addition to any other rights Global Direct and Member may have under applicable law.

## 17. CHOICE OF LAW/ATTORNEY'S FEES/VENUE/JURY TRIAL WAIVER.

Should it be necessary for Global or Member to defend or enforce any of its rights under this Card Services Agreement in any collection or legal action, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, as a result of such collection or legal action.  Without limiting the generality of the foregoing, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by Global

Rev. 05/09-GP

**APP. 68**

and/or Member in enforcing or defending its rights under this Section 17, without regard to whether there has been an adjudication on the merits in any such action. Merchant waives trial by jury with respect to any litigation arising out of or relating to this Card Services Agreement. Global, Member, and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Card Services Agreement, shall be governed by the laws of the State of Georgia, notwithstanding any conflicts of laws rules, and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. Global, Member, and Merchant agree that all actions arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provision of this Card Services Agreement shall be brought in either the courts of the State of Georgia sitting in Fulton County or the United States District Court for the Northern District of Georgia, and expressly agree to the exclusive jurisdiction of such courts.

## 18. AMENDMENTS.

This Card Services Agreement may be amended only in writing signed by Global Direct, Member, and Merchant, except that (a) the Card Acceptance Guide and any and all fees, charges, and/or discounts (including without limitation non-qualified surcharge rates) may be changed immediately, or (b) Global Direct may mail Merchant either a notice describing amendments to this Card Services Agreement or an entirely new agreement, which amendments or new agreement will be binding upon Merchant if it deposits sales or credit slips after the effective date of such amendment or new agreement set forth in Global Direct's notice.

## 19. WAIVER.

No provision of this Card Services Agreement shall be deemed waived by any party unless such waiver is in writing and signed by the party against whom enforcement is sought. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power or privilege under this Card Services Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege under this Card Services Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

## 20. EXCHANGE OF INFORMATION.

Merchant authorizes Global Direct to order a credit report on Merchant or any owner, officer, shareholder, partner, proprietor, managing agent or guarantor of Merchant. Merchant hereby authorizes Member or any depository institution to release any financial information concerning Merchant or its accounts to Global Direct. Subsequent credit reports may be ordered in connection with updating, renewing or continuing this Card Services Agreement. Upon the written request of any individual who is the subject of a consumer credit report, Global Direct will provide the name and address of the consumer credit reporting agency furnishing such report, if any. Global Direct may exchange information about Merchant, Merchant's owners, principals, partners, proprietors, officers, shareholders, managing agents and guarantors with Member, other financial institutions and credit card associations, network organizations and any other party. Merchant hereby authorizes Global Direct to disclose information concerning Merchant's activity to any card association, network organizations, or any of their member financial institutions, or any other party without any liability whatsoever to Merchant.

## 21. GENERAL.

If any provision of this Card Services Agreement or portion thereof is held to be unenforceable, such a determination will not affect the remainder of this Card Services Agreement. Paragraph headings are included for convenience only and are not to be used in interpreting this Card Services Agreement.

## 22. NOTICES.

All notices required by this Card Services Agreement shall be in writing and shall be sent by facsimile, by overnight carrier, or by regular or certified mail. All notices sent to Global Direct or Member shall be effective upon actual receipt by the Corporate Secretary of Global Payments Direct, Inc., 10 Glenlake

Rev. 05/09-GP

**APP. 69**

Parkway North Tower, Atlanta, Georgia 30328. Any notices sent to Merchant shall be effective upon the earlier of actual receipt or upon sending such notice to the address provided by Merchant in the Merchant Application or to any other e-mail or physical address to which notices, statements and/or other communications are sent to the Merchant hereunder. The parties hereto may change the name and address of the person to whom notices or other documents required under this Card Services Agreement must be sent at any time by giving written notice to the other party.

## 23. MERGER.

This Card Services Agreement, including these Card Services Terms & Conditions and the Merchant Application, constitutes the entire agreement between Merchant, Global Direct, and Member and supersedes all prior memoranda or agreements relating thereto, whether oral or in writing.

## 24. EFFECTIVE DATE.

This Card Services Agreement shall become effective only upon acceptance by Global Direct and Member, or upon delivery of indebtedness at such locations as designated by Global Direct for purchase, whichever event shall first occur.

## 25. DESIGNATION OF DEPOSITORY.

The financial institution set forth in the Merchant Application is designated by Merchant as a depository institution ("Depository") for its credit card indebtedness. Such financial institution must be a member of an Automated Clearing House Association. Merchant authorizes payment for indebtedness purchased hereunder to be made by paying Depository therefore with instructions to credit Merchant's accounts. Depository, Member, and/or Global Direct may charge any of Merchant's accounts at Depository for any amount due under this Card Services Agreement. Global Direct must approve in writing any proposed changes to the account numbers or to the Depository.  Merchant hereby authorizes Depository to release any and all account information to Global Direct as Global Direct may request without any further authorization, approval or notice from or to Merchant.

## 26. FINANCIAL ACCOMMODATION.

The acquisition and processing of sales slips hereunder is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Card Services Agreement cannot be assumed or enforced, and Global Direct and Member shall be excused from performance hereunder.

## 27. DEBIT / ATM PROCESSING SERVICES: ADDITIONAL TERMS AND CONDITIONS.

Debit Sponsor shall act as Merchant's sponsor with respect to the participation of point-of-sale terminals owned, controlled, and/or operated by Merchant (the "Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, CU24, Interlink, Maestro, NYCE, Pulse, Shazam, Star, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor or Global Direct without notice. Merchant may also have access to other debit networks that do not require a sponsor. Global Direct will provide Merchant with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks. Global Direct will provide connection to such Networks, terminal applications, settlement, and reporting activities.

 Merchant will comply with all federal, state, and local laws, rules, regulations, and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules"). Merchant will execute and deliver any application, participation, or membership agreement or other document necessary to enable Debit Sponsor to act as sponsor for Merchant in each Network. Merchant agrees to utilize the debit card Services in accordance with the Card Services Agreement, its exhibits or attachments, and Global Direct's instructions and specifications (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement), and to provide Global Direct with the necessary data in the proper format to enable Global Direct to properly furnish the Services. Copies of the relevant agreements or operating regulations shall be made available to Merchant upon request.

Merchant shall not in any way indicate that Debit Sponsor endorses Merchant's activities, products, or services. Debit Sponsor and Merchant are and shall remain independent contractors of one another, and

14}

Rev. 05/09-GP

**APP. 70**

neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party. Nothing contained in this Section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and Merchant.

In the event that Debit Sponsor's sponsorship of Merchant in any Network is terminated prior to the termination of the Card Services Agreement, Global Direct may assign Debit Sponsor's rights and obligations hereunder to a third party. All provisions in this Section necessary to enforce the rights and obligations of the parties contained in this Section shall survive the termination of Debit Sponsor's debit sponsorship of Merchant under the Card Services Agreement. Debit Sponsor may assign this Agreement to any parent, subsidiary, affiliate, or successor-in-interest.

## 28. MERCHANT ACCEPTANCE OF EBT TRANSACTIONS: ADDITIONAL TERMS AND CONDITIONS.

Merchant agrees to issue Benefits to Recipients in accordance with the procedures specified herein, and in all documentation and user guides provided to Merchant by Global Direct, as amended from time-to-time (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement); and pursuant to the Quest Operating Rules (the "Rules"), as amended from time-to-time, issued by the National Automated Clearing House Association as approved by the Financial Management Service of the U.S. Treasury Department. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed them in the Rules. Merchant will provide each recipient a receipt of each Benefit issuance. Merchant will be solely responsible for Merchant's issuance of Benefits other than in accordance with authorizations. Merchant agrees to comply with all the requirements, laws, rules and regulations pertaining to the delivery of services to Benefit Recipients and Benefit Recipient confidentiality. If Merchant issues FS Benefits under this Card Services Agreement, Merchant represents and warrants to Global Direct that Merchant is an FNS-authorized "Merchant" (as such term is defined in the Rules) and is not currently suspended or disqualified by FNS. Merchant agrees to secure and maintain at its own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of Benefits under this Card Services Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that Merchant will not issue Benefits at any time during which Merchant is not in compliance with the requirements of any applicable law. Merchant agrees to hold Global Direct harmless from any costs of compliance or failure to comply with any such obligation by Merchant. Global Direct may terminate or modify the provision of Services to Merchant if any of Global Direct's agreements with government EBT agencies are terminated for any reason or if any party threatens to terminate services to Global Direct due to some action or inaction on the part of Merchant. If any of these Card Services Terms & Conditions are found to conflict with Federal or State law, regulation or policy of the Rules, these Card Services Terms & Conditions are subject to reasonable amendment by Global Direct, the State or its EBT Service Provider to address such conflict upon ninety (90) days written notice to Merchant, provided that Merchant may, upon written notice, terminate the Card Services Agreement upon receipt of notice of such amendment. Nothing contained herein shall preclude the State from commencing appropriate administrative or legal action against Merchant or for making any referral for such action to any appropriate Federal, State, or local agency. Any references to "State" herein shall mean the State in which Merchant issues Benefits pursuant hereto. If Merchant issues Benefits in more than one State pursuant hereto, then the reference shall mean each such State severally, not jointly.

## 29. DISCOVER PROGRAM MARKS.

Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards ("Discover Program Marks"). Merchant is prohibited from using the Discover Program Marks other than as expressly authorized in writing by Global Direct. Merchant shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to Merchant by Global Direct pursuant to this Card Services Agreement or otherwise approved in advance in writing by Global Direct. Merchant may use the Discover Program Marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and

Rev. 05/09-GP

**APP. 71**

marketing materials; provided that all such uses by Merchant must be approved in advance by Global Direct in writing.  Merchant shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the Discover Program Marks.  Merchant recognizes that it has no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks.

## 30. ELECTRONIC SIGNATURES.

Under the Electronic Signatures in Global and National Commerce Act (E-Sign), this Card Services Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when (1) your electronic signature is associated with the Card Services Agreement and related documents, (2) you consent and intend to be bound by the Card Services Agreement and related documents, and (3) the Card Services Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record).  This Card Services Agreement and all related electronic documents shall be governed by the provisions of E-Sign.

By pressing Submit, you agree (i) that the Card Services Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Card Services Agreement and related documents, (iii) that you have the ability to print or otherwise store the Card Services Agreement  and related documents, and (iv) to authorize us to conduct an investigation of your credit history with various credit reporting and credit bureau agencies for the sole purpose of determining the approval of the applicant for merchant status or equipment leasing. This information is kept strictly confidential and will not be released.

## 31.  NON-QUALIFIED SURCHARGES/OTHER FEES.

Merchant pricing appears in the Card Services Fee Schedule of the Merchant Application. T&E merchants (airline, car rental, cruise line, fast food, lodging, restaurant, travel agent, transportation) may have separate rates quoted for consumer and commercial (business) transactions. Transactions that do not clear as priced are subject to non-qualified surcharges (NQS) that are billed back to you on your monthly statement. The most predominant market sectors and applicable non-qualified surcharge rates appear below. Most non-qualified surcharges can be avoided by using a product that supports authorization and market data requirements established by the card associations and that are subject to change from time to time. Some non-qualified surcharges occur on specific types of cards (including without limitation Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card, Discover Rewards Card, and "foreign" cards issued outside the United States). Unless your Card Services Fee Schedule specifically addresses commercial cards (i.e., Business Cards, Corporate Cards, Fleet Cards, GSA Cards, Purchase Cards), you will be billed back for the higher cost of acceptance of commercial cards, unless you are primarily a business-to-business supplier with corresponding pricing based on acceptance of commercial cards. The card associations require that information from the original authorization, including a lifecycle identifier, be retained and returned with subsequent authorizations and/or the settled transaction data. The card associations validate this information as part of the clearing and settlement process. If authorization data is not retained and returned at settlement, then the transaction will not clear as priced and will incur NQS. For more information concerning NQS and to view market data, you may wish to check the Global Direct website (www.globalpaymentsinc.com) for best practices information and to license Global Access @dvantage (GA@) for transaction detail review.

The items listed in this Section 31 are not and are not intended to be a comprehensive list of all instances in which non-qualified surcharges may apply.  Non-qualified surcharges may apply in additional situations.  All non-qualified surcharges include additional fees assessed by the applicable card association and Member or Global Direct.

In addition, Merchant may be assessed additional fees which will be in addition to the fees stated on the Merchant Application as follows: Merchant will also be assessed (a) Cross-Border fees and a U.S. Acquirer Support fee for international MasterCard and Maestro transactions, (b) an International Service Assessment

Rev. 05/09-GP

**APP. 72**

fee and International Acquirer fee for international Visa transactions, and (c) an International Processing fee and International Service fee for international Discover transactions.  These fees, which are applicable to transactions between Merchant and a non-U.S. MasterCard, Maestro, Visa, or Discover cardholder, will be displayed as a separate item on Merchant's monthly statement and may include fees assessed by both the applicable card association and Member or Global Direct.

Merchant will also be assessed per transaction access fee for Visa, MasterCard and Discover transactions, which will be displayed as a separate item on Merchant's monthly statement and may include fees by both the applicable card association and Member or Global Direct.

Merchant may also be assessed a PCI fee, which will appear as a separate item on Merchant's monthly statement. This fee is assessed by Member and Global Direct in connection with Member and Global Direct's efforts to comply with the PCI Data Security Standard and does not ensure Merchant's compliance with the PCI Data Security Standard or any law, rule or regulation related to cardholder data security.  The payment of such fee shall not relieve Merchant of its responsibility to comply with all rules and regulations related to cardholder data security, including without limitation the PCI Data Security Standard.

Merchant will also be assessed the following fees on Visa transactions: the Visa Misuse of Authorization System fee, which will be assessed on authorizations that are approved but never settled with the Merchant's daily batch, the Visa Zero Floor Limit Fee, which will be assessed on settled transactions that were not authorized, and the Visa Dollar Verification fee, which will be assessed on transactions where Merchant requested an address verification response without an authorization. These fees will be displayed as separate items on Merchant's monthly statement and may include fees assessed by both the applicable card association and Member or Global Direct.


## NON-QUALIFIED SURCHARGES FOR PREDOMINANT MARKET SECTORS

**Retail/Restaurant Electronic Merchant**

If you are a Retail Merchant or a Restaurant Merchant with retail-only pricing (no Business Card Rate) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation retail commercial card transactions in addition to transactions using Discover Rewards Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card and all Commercial Cards, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application

• Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.

• Obtain a single electronic authorization and settle for authorized amounts.

• Obtain a cardholder signature (unless transaction is eligible for No Signature Required [NSR] program).

• Settle and transmit batches same day via your terminal/electronic system.

• The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions unless a Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or, Bar/Tavern (MCC 5513), Beauty/Barber Shop (MCC 7230), or Taxi/Limousines (MCC 4121).

• The electronic authorization amount must be equal to the transaction amount on Discover retail transactions except that Taxi Limousines (MCC 4121) and Beauty/Barber Shop (MCC 7230) merchant transactions may vary up to 20%.      Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or Bar/Tavern (MCC 5513) transactions may vary by more than 20% from the electronic authorization without incurring NQS.

**Restaurant Electronic Merchant**

If you are a Restaurant Merchant MCC 5812 or Fast Food Merchant MCC 5814 and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, in addition to transactions using Discover Rewards Card, Visa

Rev. 05/09-GP

**APP. 73**

Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.

• Obtain a cardholder signature (unless transaction is eligible for NSR program).

• Settle and transmit batches same day via your terminal/electronic system.

**Supermarket Electronic Merchant**

If you are an approved (certified) supermarket merchant and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate(s) quoted for Supermarket Credit Card and Supermarket Check Card. Each transaction not processed as outlined, in addition to transactions using Discover Rewards Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite and commercial cards, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a magnetic strip read (card swipe/contactless data capture/electronic imprint) at the time of sale.

• Obtain a single electronic authorization and settle for authorized amounts.

• Obtain a cardholder signature (unless transaction is eligible for NSR program).

• Settle and transmit batches same day via your terminal/electronic system.

• The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions.

**Developing Market Electronic Merchant**

If you qualify as a Developing Market Merchant (as defined by Association guidelines from time to time) and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all the following requirements will be priced at the rates quoted. Any other transaction, including commercial card transactions, Discover Rewards Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, and non-magnetic stripe read foreign transactions will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application  In addition, each Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

• Obtain a single electronic authorization.

• Settle and transmit batches same day via your terminal/electronic system.

• Provide market data as required. See Note.

NOTE: If card is not present and a magnetic stripe read does not occur, then Merchant may be required to comply with "Direct Marketer" market data requirements including AVS request on cardholder billing address at time of authorization. If card is present and cardholder signature is obtained, however the magnetic stripe is damaged, then Merchant may be required to obtain AVS match on cardholder billing address zip code.

**Direct Marketer Electronic Merchant**

If you are a Direct Mail/Telephone Order Merchant (non-magnetic swipe read transactions), and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate quoted. Any other transaction, including all foreign transactions and commercial card transactions in addition to transactions using Discover Rewards Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant

Rev. 05/09-GP

**APP. 74**

Application.
- Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settle amount).
- Address Verification Request in authorization on cardholder billing address.  For Discover transactions, Merchant must obtain full address verification request on street number and/or 9 digit postal code.
- CID verification for Discover merchants on non-recurring transactions.
- Purchase date (settled date) is ship date.
- Send order number with each transaction.
- Settle and transmit batches same day via your terminal/electronic system.
- Send level 3 data (line item detail, sales tax, customer code) with every eligible commercial card transaction.

NOTE: Card Not Present transactions involving one-time, recurring, or installment bill payment transactions are subject to additional card association requirements which must be complied with to avoid NQS. Electronic commerce transaction requirements are also subject to additional card association requirements which must be complied with to avoid NQS. Please refer to Card Acceptance Guide for additional requirements.

**Purchase Card Electronic Merchant**

If you are a Purchase Card Merchant (non-magnetic swipe read transactions) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets the following requirements will be priced at the rate quoted. Each Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application. Each Visa business and commercial card transaction will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.  Any other transaction that does not meet the following requirements, including without limitation foreign transactions, tax-exempt Visa Commercial transactions, Discover Rewards Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.
- Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settled amount).
- Address Verification Request in authorization on cardholder billing address.
- Purchase date (settled date) is ship date.
- Send order number (customer code) with each transaction.
- Send tax amount with every transaction.
- Send Level 3 data (line item detail) with every eligible commercial card transaction.  Sales tax exempt transactions will not be considered to meet these requirements unless they include Level 3 data (line item detail).
- Settle and transmit batches same day via your terminal/electronic system.

**Lodging/Auto Rental Electronic Merchant**

If you are a Lodging or Auto Rental Merchant utilizing a terminal or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation non-magnetic stripe read foreign transactions, and transactions using Discover Rewards Card, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application.
- Obtain a magnetic swipe read (card swipe/electronic imprint) at the time of check-in.

Rev. 05/09-GP

**APP. 75**

- Obtain additional electronic authorizations or send partial reversals to bring total authorized amount within 15% of settled amount. Authorizations must meet card association requirements.
- Obtain a cardholder signature for final transaction amount.
- Purchase Date is hotel check-out date/auto return date.
- Length of guest stay/rental in initial authorization.
- Hotel Folio/Rental Agreement Number and check-in date/check-out date transmitted with each transaction.
- Additional market data may be required for commercial card transactions to avoid NQS. Lodging merchants who (1) accept credit cards for advance payment; (2) guarantee reservations using a credit card; or (3) provide express check-out services to guests, must comply with additional card association requirements for these services in addition to additional authorization and settlement market data requirements.  Lodging merchants who subject charges to final audit and bill for ancillary/additional charges must comply with additional bank card association requirements for these services in addition to additional authorization and settlement market data requirements to avoid NQS. These transactions may also be subject to the rate quoted plus the non-qualified rate quoted in the Merchant Application. Please see Card Acceptance Guide for requirements and best practices for these transactions.

**TouchTone Capture Merchant**

Transactions which utilize our TouchTone Capture system for authorizations and settlement, settle beyond 48 hours, or are not transmitted via the TouchTone Capture system, will be priced at the rate quoted plus the non-qualified rate quoted in the Merchant Application.

**Paper Deposit Merchant**

Non-terminal/electronic paper deposit transactions will be priced at the rate quoted in the Card Services Fee Schedule of the Merchant Application.

**Debit Card Merchant**

Each debit card transaction will be assessed the network's acquirer fee in addition to the debit card per item fee quoted in the Card Services Fee Schedule of the Merchant Application.

**Card Present: / Mag Stripe Failure:**

A magnetic stripe read is also referred to as an electronic imprint. If the magnetic stripe is damaged, then other validation means may be required to protect against counterfeit cards and merchant must obtain a manual imprint. Most products will prompt for cardholder billing zip code and perform an AVS check for a zip code match.  CID verification is recommended for Discover key-entered transactions.  Key-entered retail transactions are subject to higher interchange and NQS.

The foregoing information regarding NQS is not comprehensive and is subject to change by the card association. Additional or different rates or fees may apply based on the details of a subject transaction.

All questions regarding Card Services should be referred to Global Payments, Customer Service Center, 10705 Red Run Blvd., Owings Mills, Maryland 21117, or call: 1-800-367-2638.

Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement and/or notice.


**For Member contact:**

HSBC Bank USA, National Association

Merchant Support Group

P.O. Box 3263

Buffalo, NY 14240

716-841-6360


**Debit sponsorship** provided by Wells Fargo Bank N.A.

Rev. 05/09-GP

**APP. 76**



Rev. 05/09-GP

**APP. 77**

## DECLARATION OF LISA T. WILHELM
### PURSUANT TO 28 U.S.C. 1746

I, Lisa T. Wilhelm, hereby declare as follows:

QUALIFICATIONS AND EXPERIENCE

1.      My name is Lisa T. Wilhelm.  I am a United States citizen.  I am Founder and

Managing Partner of Global Payments Experts llc. (GPE) founded in 1998 (first as

Wilhelm Associates, and rebranded as Global Payments Experts llc. in 2003), a

U.S.-based payments industry niche consulting firm specializing in small business

and consumer risk management, payments products,  marketing, and operations

serving clients worldwide. Representative GPE U.S.-based clients include Bank of

America, Capital One, Citigroup, First Data Corporation, GE Capital, JPMorgan

Chase, U.S. Bank, Visa Inc., Wachovia, Washington Mutual, and Wells Fargo.

2.      I have over 20 years of executive and 14 years of consulting experience in

risk/reward optimization and value creation; small business banking and credit

management; card and other payments products; credit/fraud risk life cycle

management; credit scoring; and risk-based marketing, segmentation, and pricing.

As SVP of Wells Fargo, I pioneered the industry's first successful transfer of

credit scoring and credit card business model principles to Retail consumer and

small business deposit portfolios, products, and channels. I also conceived and

launched over 40 new fraud detection and prevention programs, including

predictive decision and AI technology solutions.

3.   Prior to entering the consulting industry, I was a 20 year executive of Wells Fargo Bank from 1979 until 1998, where I served as Senior Vice President and Division head of risk management and Vice President of credit cards, debit cards, and liability accounts for consumer and small business portfolios, among other senior roles. My responsibilities included managing card fraud/purchasing disputes and chargebacks, fraud prevention and investigations, customer service, and collections/recoveries operations. I was also responsible for developing and managing small business and consumer product credit/fraud risk scoring models, strategies, policies, and processes for the bank's operations and delivery channels.

4.   These responsibilities included new account screening, portfolio management and monitoring, early warning systems of credit and fraud risks, and compliance with federal and state regulations/laws governing non-mortgage loan, card, and deposit product sets (including merchant accounts). I also represented Wells Fargo on a range of Visa and MasterCard operating committees and ad-hoc industry committees, and ensured compliance with the card network's operating regulations, including issuer and acquirer obligations and reporting requirements governing chargebacks and fraud. Since starting GPE, I have consulted with and advised a number of issuing and acquiring banks, processors, Visa Inc., Visa Europe, and merchants on these issues as well.

5.   I have personal knowledge of the facts stated in this report, and if called as a witness, I could and would competently testify to the facts stated herein.

6.   Based on my experience, training, education, and expertise, as demonstrated in my

2

biography attached hereto as **Wilhelm Attachment A**, I consider myself an expert in the field of risk management for credit card issuing and acquiring. My expertise and direct experience includes the credit card industry, chargebacks, fraud, and merchant new account risk screening and monitoring as it relates to banks and their agent processors.

OBJECTIVES

7.   Federal Trade Commission ("FTC") staff in Dallas asked me to analyze the application, account terms, account performance (specifically as it relates to chargebacks), and risk profile of two Western GPS LLC merchant accounts with account numbers ending in X2429 and X3156, and, based on my analysis and findings, provide my opinion and insights on the following:

   a.   What, if any, detectable red flag warning signals of emerging (or escalating) merchant fraud or deceptive, unscrupulous merchant activity were visible during the life of either account?

   b.   If there were detectable warnings, what, if any, actions could and should the processors have taken to increase monitoring and act on those risks, up to and including terminating the merchant account, to reduce, control, and prevent further potential or actual fraud and harm to consumers as well as losses?

FTC staff provided me with the Western GPS LLC merchant account applications, account terms and disclosures, merchant account statements, and the Global Payments chargeback listing report with chargeback reason codes to conduct the

3

**APP. 80**

analysis on both accounts. I also referenced selected portions of the Visa and MasterCard operating Regulations as they relate to chargebacks, fraud, merchant risks and monitoring, and processor roles.

DOCUMENTS ANALYZED, DESIGN, AND METHODOLOGY

8.      In connection with my analysis, I reviewed two Western GPS LLC merchant accounts applications. The date of application on the first account, ending in X2429, opened by "Raul" on behalf of Trust One Payment Services, was March 13, 2012. The second account application, ending in X3156, was also dated March 13, 2012, and also opened by "Raul," but credit card sales through this account did not start until September 2012. I am attaching the two hereto as **Wilhelm Attachments B and C.**

9.      I also reviewed monthly merchant statements for both accounts.  The statements for Account X2429 show credit card sales and chargebacks from April 2012 until October 2012.  The statements for Account X3156 shows credit card sales and chargebacks from September 2012 until October 2012.  After October 2012, sales ceased on both accounts, and the statements after that month show only chargebacks and associated fees.  The last statements that were available for this analysis were from April 2013. The merchant account statements, provided in text form, contain all credit card sales (counts and dollar amounts), merchant deposits, chargebacks (counts and dollar amounts), and all associated fees for each month.

10.     The Global Payments chargeback reports, provided in PDF form, list each chargeback processed, the date it was loaded into the processor's system

4

(presumed to be the date the chargeback was received by the processor from the issuer), the chargeback reason code (proscribed by Visa, MasterCard, and Discover operating regulations), and the amount of the chargeback. These fields were the focus of the analysis in these files.[1]

11.   I also reviewed an internal Global Payments email dated March 25, 2013, referencing MasterCard's notification to Global Payments that Western GPS had been identified as a Tier 3 merchant under the card network's Global Merchant Audit Program.

12.   I designed the merchant account statement and chargeback analysis to: (i) aggregate sales and chargeback monthly transactions, dollar amounts, and fees; (ii) calculate ratios for chargebacks to sales, fraud chargebacks to sales, chargeback growth, and sales growth; and (iii) compare them to Visa and MasterCard acceptable and excessive activity (higher or high risk) operating standards for merchants and their processors.  I reviewed the applications and supporting documentation from a two-fold point of view – for evidence of compliance with new merchant account risk screening due diligence standards established by MasterCard, Visa, and Discover for Payment Service Providers, and for general reasonable and customary due diligence for opening new merchant accounts. In addition, I reviewed selected current and 2012 Visa, MasterCard, and

---

[1] The file also contained other fields related to the chargeback considered for inclusion in the analysis effort - card brand type and the original sale date and amount – that were excluded because the effort to extract and manipulate the information in usable form outweighed the incremental value it would add to meeting the analysis objectives.

processor operating regulations and standards for merchant risk reviews, chargeback codes, and merchant reserve accounts; current industry standards for merchant reserve accounts; and current merchant account pricing averages for non-present card merchants.

MERCHANT ACCOUNT X2429 – APPLICATION REVIEW FINDINGS

13.    There were a number of patently obvious potential fraud triggers on this application (**Wilhelm Attachment B**) that, in the aggregate, should, at the very least, have triggered additional merchant scrutiny and investigation, namely:

    a.   The account was for a newly established business as of February 2012;

    b.   The business was in a residence with no storefront;

    c.   The applicant claimed $4,800,000 in annual sales (in the first year of business) with an average ticket of $995 selling "tablets/software;"

    d.   The merchant category classification (MCC) listed by the applicant is code 7299, the description of which is "Miscellaneous Personal Services Not Elsewhere Classified." This code is part of a family of personal services MCCs that include beauty and health spas, massage parlors, and babysitting, types of businesses that bear no relationship to the selling of tablets/software;

    e.   There is no evidence in the application support paperwork of review of a business plan or financials that supports the claimed level of sales, of verification of the authenticity of a supplier relationship to supply the goods claimed (tablets/software), or of any reference checking of any kind on the

6

business, the business owner, or suppliers (standard due diligence pertaining to new accounts for a new business claiming almost $5 million in sales in the first year);

f.   There is no documentation, such as photographs or a descriptive report, that there was a visual inspection made of the business premises to validate the tablets/software inventory existed to support the claimed annual sales since the applicant stated he did not use a fulfillment house to fill orders. Given the numerous other red flags in the application, this action step would have been both prudent and particularly indicated. Although the application does contain an assertion by the Trust One sales agent that the premises was inspected and the merchant was at that address, this statement is suspect given the lack of documentation;

g.   There was a major address discrepancy between the business owner's application address and his credit report's addresses, which show 3 addresses for Mr. Castine in 2011 and 2012, none of which were the address on the application;

h.   There is no evidence in the application that the processor ran the business owner or Western GPS LLC against the Visa/MasterCard MATCH file, which is a black list of merchants and merchant principals terminated for cause due to fraud, excessive chargeback activity, or other violations of merchant agreements. Visa and MasterCard operating regulations require all processors to match merchant applications against this file and to document

7

the inquiry. If the applicant matches the black list, the card networks require

processors to contact the reporting entity to investigate and assess the

circumstances. If the listing was not in error, processors rarely open the

merchant account;

    i.   The credit report of Mr. Castine, the business owner, ████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

14.   The presence of the fraud indicators discussed above, ███████████

███████████████████, signaled ██████████████████ an unusually

high potential for fraud.  Even setting ████████████████████████

████, the numerous red flags and unexplained discrepancies on this merchant

account application should have raised concerns about the legitimacy of the

applicant's claimed business.

15.   The terms Trust One and Global Payments imposed on the merchant signify

knowledge of these ██████████ fraud risks. Trust One and Global Payments

established the size of the required rolling reserve account at ████████████

██████████; typical reserve accounts even for high risk merchants are in the five

to 15 percent range, and almost never cap out above 20 percent, ████████████

████████████████████████████ Also, Trust One and

Global Payments established a merchant discount rate of ████████████ for

all transactions, which was applied to April 2012 sales, then lowered it to ████

**APP. 85**

██████████████████████ from May 2012 forward. The initial and

████████████ merchant discount rates are unusually high – in fact I do not recall ever seeing a discount rate that high applied to all transactions in the United States. The current average merchant discount rate for card-not-present merchants is 2.3 to 2.5 percent,[2] and a quick sampling of merchant processors specializing in designated high risk industries (which includes, among others, pornography, sex, credit repair, credit counseling, and debt settlement businesses) shows they are currently offering rates of 2.5 to 3.2 percent, with the upper end being uncommon.

16.   Prudent practice and card regulations mandate due diligence to scrutinize red flags when screening new merchant accounts. This due diligence includes, but is not limited to, investigating and resolving glaring business information discrepancies, validating the authenticity of the applicant's business, and substantiating the business's ability to generate a high revenue it claims through financial and business plans, reference checking, and third party verification. There is no documentary evidence in the application and supporting documents provided to me that such due diligence took place.  I reserve the right to supplement my analysis on this issue should additional documents become available.

 MERCHANT ACCOUNT X2429 – CHARGEBACK ANALYSIS FINDINGS

17.   Visa, MasterCard, and Discover operating regulations essentially deem merchant chargebacks in the current month that exceed more than one percent of sales from

---

[2] http://www.cardfellow.com/blog/average-fees-for-credit-card-processing/ accessed June 24, 2013

9

**APP. 86**

the previous month (the CTR, or chargeback-to-transaction ratio) plus a minimum number of chargebacks as excessive (e.g. one percent CTR plus 50 chargebacks for MasterCard; one percent CTR plus 100 chargebacks for Visa). The excessive activity triggers apply to each respective card brand, irrespective of the number of chargebacks a merchant may have had on other card brands. There are a myriad of other card network chargeback and suspect fraud transaction triggers that can move a merchant more quickly into a highly suspect merchant category tier subject to restrictions, audits, fines, and termination (e.g. for Visa, a 2.5 percent CTR and 30 chargebacks with at least 50 sales transactions, or 100 chargebacks regardless of sales transactions). Each Payment Service Provider also has its own proprietary daily, weekly, and monthly excessive or unusual activity trigger reporting to monitor merchants, which can cover all card brands accepted by a merchant location or impose stricter minimum exception triggers than the card networks, to manage and control chargeback risks.

18. For purposes of this portion of the analysis, I focused the analysis on what I consider the single most important metric, the CTR ratio. I did not attempt to replicate the myriad of card network and processor exception reporting hierarchies within this analysis. By way of comparison, the industry averages for CTR across 18 different industries range from 0.01 percent (restaurants) to a high of 0.20 percent (Internet), with apparel, airlines, auto repair, and retail stores all hovering

around 0.04 percent.[3]   The one percent CTR threshold is already set well above the industry averages. While the one percent CTR as a single metric is more simplistic than the real world, CTR, especially when calculated on both a transaction count and dollar basis, is a leading edge indicator of potential suspect merchant activity and the point at which cardholder problems at that merchant multiply.

19.   Once a merchant has hit the minimum card network excessive chargeback trigger report, the card networks impose progressive formal reporting and action steps on acquirers and their Payment Service Providers for each successive month the merchant remains on a minimum or higher risk tier trigger report. Appearing on the report for successive months also advances the merchant from a monitoring tier to a high risk, highly suspect tier requiring proscribed action steps by processors which escalate significantly after month three. Key required steps include an investigation of the merchant's business practices that led it to exceed the standards; a physical inspection of the merchant's site and audit of the merchant's web site; and a remedial documented action plan to reduce the CTRs. Failure to comply with these reporting and action steps results in escalating fees, fines, and assessments. Ultimately, the final step is merchant termination, usually by no later than 10 months after the merchant first appeared on the exception report; termination may occur much sooner depending on what the processor investigation of the merchant shows. If the payment processor's investigation of

---

[3] Optimized Payments Consulting, based on an analysis of 3 billion transactions across 18 industries in 2012.

the merchant reveals illegal or fraudulent activity, it must also take steps to minimize losses and to initiate criminal and civil proceedings against the merchant, if applicable. All of these steps, and more, are required; they are not just "recommended" steps.

20.    As shown in the chart below, between April 2012 and October 2012, Western GPS processed 4,016 credit card sales totaling $4.3 million through the account ending in X2429, at which time sales ended.  I ended my chargeback analysis in October

| MERCHANT ACCOUNT X2429 | | | | | | |
|---|---|---|---|---|---|---|
| Monthly Statement | Credit Card Sales Counts | Credit Card Sales Dollars | Chargeback Counts | Chargeback Dollars | CTR: Counts[1] | CTR: Dollars[2] |
| 12-Apr | 44 | 50,188 | 1 | 1,995 | n/a | n/a |
| 12-May | 434 | 502,029 | 18 | 19,768 | 41% | 39% |
| 12-Jun | 409 | 489,299 | 42 | 49,549 | 10% | 10% |
| 12-Jul | 656 | 674,805 | 51 | 55,620 | 12% | 11% |
| 12-Aug | 863 | 906,151 | 111 | 123,789 | 17% | 18% |
| 12-Sep | 777 | 852,699 | 106 | 108,772 | 12% | 12% |
| 12-Oct | 833 | 852,176 | 173 | 179,014 | 22% | 21% |
| CUMULATIVE TOTALS | 4,016 | 4,327,347 | 502 | 538,506 | 17% | 17% |
| 1. CTR Chargeback to Transaction Ratio - Counts: | | | | | | |
|     Chargeback counts in the current month divided by sales counts from the previous month | | | | | | |
| 2. CTR Chargeback to Transaction Ratio - Dollars | | | | | | |
|     Chargeback counts in the current month divided by sales counts from the previous month | | | | | | |

2012, even though chargebacks against the account's sales continued to post through April 2013. The FTC's action against the merchant became public in late October, which likely influenced the number and types of disputes consumers filed resulting in chargebacks from November 2012 until April 2013.

21.    Between April 2012 and October 2012, chargebacks on this merchant account totaled 502 for $538,506, resulting in a cumulative chargeback-to-transaction ratio

of 17 percent for both sales transactions and dollar volume, far exceeding the one percent CTR excessive chargeback thresholds. In the second month of operation, the CTRs were 41 percent of transactions and 39 percent of sales volume.  This account maintained CTR rates of 10 percent or more, whether measured on transactions or sales, from April until October.

22.    I also analyzed the chargeback growth rate over previous month relative to the sales growth rate over the previous month for the seven months between April 2012 and October 2012. For that period, chargeback counts grew at an average compounded monthly growth rate of 109 percent per month; dollars grew at a rate of 90 percent a month. In contrast, credit card sales grew on average at a rate of 52 percent per month; sales dollars grew at a rate of 50 percent per month. Essentially, chargebacks grew at roughly twice the rate of credit card sales during the life of the active account, and, on average, doubled every month.

23.    What I conclude from this part of the chargeback analysis is that by the second month of operation, this new business and new merchant account already evidenced an unusually large chargeback problem (40 percent CTRs) on a very small number of sales transactions. Although the CTR fell to ten percent in June, it was still elevated at 900 percent above the CTR one percent trigger level. The merchant's chargebacks proceeded to double every month at an alarming rate with apparent impunity, rising from June's already elevated ten percent to 21-22 percent by October 2012. In addition, per chargeback fees remained at █ throughout the life of the account, indirect evidence of non-action on the trend by

13

Trust One and Global Payments. Under the card network operating regulations, during successive months of non-compliance, per chargeback fees should rise first to $100, and then to $200 in months four to ten.

24. The second part of the chargeback analysis examines why consumers were disputing Western GPS LLC transactions that resulted in chargebacks to ascertain what those trends could have or should have suggested about Western GPS LLC's business practices during the April to October 2012 period. For this analysis, I used the chargeback reason codes contained in the Global Payments chargeback report.[4] The file contained 497 chargebacks totaling $536,881 dollars for the period, for an overall average chargeback of $1,065, closely matching the merchant statement file chargeback totals discussed in paragraphs 21 even though the file pulls came from different sources at different times.

25. For purposes of this analysis, the 36 chargeback codes on chargebacks in the file were summarized into five major categories on the basis of Visa and MasterCard chargeback reason code descriptions and meanings as follows:

   a. Fraud or high fraud potential: used when the consumer disputes the transaction as fraud or not authorized;

   b. Defective not as described, deceptive, or not delivered: used when the

---

4  My analysis of this file contains a small amount of 'noise" due to the need to convert it from a PDF format to an Excel format for analysis and the requirement for manual manipulation to be able to aggregate the chargeback counts along with their 36 different chargeback reason codes used in the report into monthly buckets. I deemed the additional effort to also aggregate the dollar amounts of each chargeback into monthly buckets as not sufficiently valuable to the analysis to be worthwhile.  Despite these caveats, I have a high confidence level the results and findings described below are accurate within a plus or minus two percent margin of error.

consumer disputes the transaction because the merchant delivered less or no product or service as promised (a high volume of which is a leading indicator that the merchant is likely engaging in false or misleading representations of its products or services and/or deceptive marketing);

c. Transaction not recognized by the cardholder: used when the consumer disputes the transaction because he or she does not remember or recognize the merchant name associated with the transaction (these may be resolved once additional information is provided, or the dispute may then turn into a fraud or defective service dispute at that point);

d. Cancelled recurring transaction: used when the consumer disputes a recurring transaction showing up on the statement after he or she cancelled it, indicating that a merchant did not cancel per a consumer instruction or a contract dispute with the merchant;

e. Processing-related: this group of chargebacks aggregates a disparate group of consumer disputes that are symptomatic of merchant processing errors but may also be indicative of a broader pattern of fraud or deceptive services. The category covers transactions where the settlement amount is higher than the authorized amount; duplicate transactions; credit not processed (the consumer cancelled the product or service, or did not receive a promised full or partial credit); and disputes not classified by any other reason code (unknown dispute reason).

26.    While all chargebacks are by their nature negative events, some clearly signal a

pattern of fraud and deceptive services when seen in repeated, growing, or high

volumes. For this reason, I aggregated categories (a) and (b) in paragraph 25 into a

"fraud-related" subtotal. The chart below shows the findings from the chargeback

reason code analysis for the period.  By far the largest two categories are

Deceptive, Not as Described or Delivered, at 56.5 percent, and Fraud or High

Fraud Potential, at 19.8 percent of the chargebacks, comprising 76.4 percent of the

chargebacks. The chargeback profile for this business broadcasts that Western

GPS's primary line of business was deceptive or fraudulent. These two chargeback

categories also fueled escalating chargeback growth rates that essentially doubled

every month.

| CHARGEBACK REASON CODE ANALYSIS ACCOUNT X2429 | Chargeback Number | % Total |
|---|---|---|
| Fraud or High Fraud Potential | 99 | 19.8% |
| Defective Not As Described or Delivered | 281 | 56.5% |
| **SUBTOTAL FRAUD-RELATED CHARGEBACKS** | **380** | **76.4%** |
| Transaction Not Recognized By Cardholder | 23 | 4.6% |
| Cancelled Recurring Transactions | 6 | 1.2% |
| Processing Related | 89 | 17.9% |
| **TOTAL CHARGEBACKS APRIL 2012-OCTOBER 2012** | **497** | **100.0%** |
| Note: percentages may not add up due to rounding | | |

27.    The third and last component of the chargeback analysis specifically examines the

fraud-related chargeback sub-category to derive estimated monthly fraud-to-sales

ratios. This ratio, unlike the CTR ratio, divides the current month fraud

**APP. 93**

chargebacks by the current month sales dollars. As with chargebacks, under card network operating regulations, excessive fraud-to-sales and other fraud activity triggers on the card networks' respective card brands prompt a series of required acquirer and processor merchant monitoring, audit, fees, fines, and merchant termination steps when improvement does not occur. For MasterCard, at least three fraud transactions and $3,000 in fraud and a fraud-to-sales ratio of between 3-4.99 percent in a given month triggers Tier 1 monitoring. Once a merchant reaches five fraud transactions and $5,000 in fraud and a fraud-to-sales ratio of eight percent or more (Tier 3 high fraud), the processor has 30 days to either terminate the merchant or demonstrate extenuating circumstances as to why the merchant merits an exception to termination and additional time to rectify the problem.  Visa uses a sophisticated multi-tiered ongoing measurement program to identify abnormal levels of merchant suspect transactions and chargebacks, and distributes reports of identified suspect merchants to processors on a daily, weekly, and monthly basis for proscribed actions up to and including merchant termination.

28. To calculate an estimated monthly fraud-to-sales ratio during the sales life of the account (April 2012 through October 2012), I worked with the two known pieces of information – the number of fraud chargebacks per month and sales dollars per month – and derived the third. For fraud chargeback dollars per month, I multiplied number of chargebacks by the average chargeback ($1,065) during the period for each month, enabling the production of a reasonably representative,

albeit imperfect monthly fraud-to-sales ratio across all card brands as shown

below. In comparing the fraud chargeback number and fraud-to-sales ratio

progression to MasterCard's fraud excessive activity triggers, it is reasonable to

posit that, even assuming no more than 30 percent of chargebacks were due to

MasterCard transactions, the Western GPS account may have hit the Tier 1

excessive fraud trigger report for the first time as early as May 2012. Likewise, the

merchant might easily have surpassed Visa's 2.5 percent CTR and 30 chargebacks

| FRAUD-TO-SALES RATIO MERCHANT ACCOUNT X2429 | | | | |
|---|---|---|---|---|
| Month | Fraud-Related Chargebacks Number | Chargeback Dollars (Estimated)[1] | Sales in Same Month | Dollar Fraud/ Sales Ratio (Estimated) |
| Apr-12 | 3 | 3,196 | 50,188 | 6.37% |
| May-12 | 18 | 19,174 | 502,029 | 3.82% |
| Jun-12 | 32 | 34,088 | 489,299 | 6.97% |
| Jul-12 | 37 | 39,414 | 674,805 | 5.84% |
| Aug-12 | 84 | 89,480 | 906,151 | 9.87% |
| Sep-12 | 88 | 93,741 | 852,699 | 10.99% |
| Oct-12 | 118 | 125,698 | 852,176 | 14.75% |
| TOTAL | 380 | 404,791 | 4,327,347 | 9.35% |

[1] Based on the average chargeback of $1,065 Apr-Oct 2012 X # of chargebacks

with at least 50 sales transactions excessive chargeback trigger by August of 2012

on the basis of fraud chargebacks only, irrespective of any other fraud activity

trigger reporting Visa had in place.

29.    The FTC also provided me with an internal Global Payments email dated March

25, 2013, showing that MasterCard identified Western GPS as a Tier 3 high fraud

merchant (defined in paragraph 27) under the Global Merchant Audit Program
(GMAP) based on fraud transactions in September 2012. The MasterCard
notification stated that the merchant had 51 fraudulent MasterCard transactions
totaling $51,850 in fraud in September 2012, resulting in a fraud-to-sales ratio of
13.33 percent on $388,776 monthly sales volume (this represents 46 percent of
Western GPS LLC's credit card sales that month). This action occurred five
months after the FTC's action against Western GPS. I was not provided with any
other evidence that would confirm Western GPS's appearance on any earlier
trigger reporting by the card networks or by Trust One or Global Payments
proprietary excessive activity reporting. That said, my analysis shows the
account's chargeback profile began exhibiting a clear and escalating pattern of
merchant engagement in fraud as early as the second month of operation. Based on
my analysis and knowledge, this pattern indicates a strong likelihood the account
appeared on at least one, if not more, earlier card network and/or proprietary Trust
One or Global Payments trigger reports.

MERCHANT ACCOUNT X2429 – CONCLUSIONS

30.     Based on my experience and assessment of the Western GPS LLC merchant
        account X2429 application and the subsequent performance from multiple
        chargeback perspectives, I conclude the following:

        a.  The account application evidenced a preponderance of alarming red flags
            that signaled an unacceptable level of fraud risk and should have led to a
            decision not to open the account at all. Either there was a breakdown in the

**APP. 96**

industry-standard due diligence process, or there was no due diligence done.

b.   Having decided to open the account despite the high risks, Trust One and Global Payments should have had aggressive hands-on monitoring and oversight of this merchant in place on day one, irrespective of any formal card network-driven or proprietary internal report triggers, rules, standards, etc. Once again, Trust One and Global failed to exercise due diligence in monitoring this account as chargebacks escalated, which should have alerted them to likely merchant fraud as early as the second month of operation, especially in light of the fraud indicators on the application. The warning signs were not subtle and should have been obvious to anyone monitoring this account. Trust One and Global had opportunities early during the life of this account to observe the problem and take action to stop further merchant fraud. In my professional opinion, Trust One and Global should have terminated this merchant account long before the FTC action.

MERCHANT ACCOUNT X3156 – APPLICATION REVIEW FINDINGS

31.    I also reviewed the second application for the account ending in X3156 dated March 13, 2012. My findings after reviewing this account will be brief. The account application **(Wilhelm Attachment C)** is an identical copy of the X2429 application except for the top left section listing the merchant information.  It has all the same red flags as account X2429 application, as described in paragraph 13 (except 13j). There are a few differences and details to point out:

a.   Because they are dated the same, I don't know when the account was

20

actually opened, only that sales started to process through it in September 2013. The same Trust One sales agent, Raul, opened both accounts.

b. The second page, the detailed fee schedule, was not included in the X2429 application, but I know from the analysis of the X2429 merchant account statements that both accounts had the same high fee terms as well as the █ ████████ rolling reserve requirement.

c. This application does not include the owner's credit report, the Articles on Organization, the IRS EIN number notification, or a sample invoice. Therefore, the credit report address discrepancy red flag described in paragraph 13j is the only one I was not able to confirm on this account.

d. The PCI security section on the fourth page is filled out; it was not on X2429.

e. The application directs merchant deposits to the same Compass Bank account as the X2429 application.

32.   I could not discern a valid business reason for opening a second account from the information available to me. From my perspective, it appears Western GPS LLC opened it as a hedge against the inevitable card network shut down of the X2429 account.

33.   My findings on this application almost exactly mirror the X2429 account, as stated in paragraphs 14, 15, and 16 with one additional observation. Due diligence requires that the performance of prior merchant accounts be examined when opening a new merchant account.  Given the clear pattern of chargeback history

21

indicative of fraudulent business practices readily observable on the X2429

account plus the same unresolved application red flags, there is no question, in my

professional opinion, that Trust One and Global Payments failed to exercise due

diligence by opening (or activating) this second account.

## MERCHANT ACCOUNT X3156 – CHARGEBACK ANALYSIS FINDINGS

34.    As shown in the two charts below, while this account had only two months of

sales - September and October 2012 - the October CTRs were already 26 percent

of transactions and 28 percent of sales volume and six out of the 13 October

chargebacks, or 46 percent, were fraud-related.

| MERCHANT ACCOUNT X3156 | | | | | | |
|---|---|---|---|---|---|---|
| Monthly Statement | Credit Card Sales Counts | Credit Card Sales Dollars | Chargeback Counts | Chargeback Dollars | CTR: Counts | CTR: Dollars |
| 12-Sep | 50 | 47,329 | 0 | 0 | n/a | n/a |
| 12-Oct | 380 | 350,195 | 13 | 13,071 | 26% | 28% |
| 1. CTR Chargeback to Transaction Ratio - Counts: | | | | | | |
| Chargeback counts in the current month divided by sales counts from the previous month | | | | | | |
| 2. CTR Chargeback to Transaction Ratio - Dollars | | | | | | |
| Chargeback counts in the current month divided by sales counts from the previous month | | | | | | |

| CHARGEBACK REASON CODE ANALYSIS ACCOUNT X3156 | Chargeback Number | % Total |
|---|---|---|
| Fraud or High Fraud Potential | 3 | 23.1% |
| Defective Not As Described or Delivered | 3 | 23.1% |
| SUBTOTAL FRAUD-RELATED CHARGEBACKS | 6 | 46.2% |
| Transaction Not Recognized By Cardholder | 2 | 15.4% |
| Processing Related | 5 | 38.5% |
| TOTAL CHARGEBACKS APRIL 2012-OCTOBER 2012 | 13 | 100.0% |
| Note: percentages may not add up due to rounding | | |

35.    This account got a fast start on chargebacks by the second month of operation,

demonstrating the value of "experience." On the first Western GPS LLC account X2429, October chargeback counts totaled 22 percent of sales transactions and 21 percent of sales dollars, so this second account had a multiplier effect on the scale of deception Western GPS LLC was now able to conduct.

36.     In my professional opinion, this account was set to keep pace with the first account in chargeback growth and fraud, a result that was entirely predictable and entirely avoidable had the account not been opened.

37.     I reserve the right to supplement my testimony and this report in response to any further information provided by the parties, or in light of additional documents or testimony provided during discovery in this case, at trial, or otherwise, which may be brought to my attention after the date of my signature below.

38.     I am willing to travel within the United States or internationally to testify in any court action concerning the above stated facts.


I declare, under penalty of perjury, that the foregoing statement is true and correct.

Executed on July 8, 2013

*Lisa T. Wilhelm*
Lisa T. Wilhelm
Managing Partner
Global Payments Experts llc.

23



**ATTACHMENT A**
# Lisa T. Wilhelm
## Founder and Managing Partner



Lisa Wilhelm is Founder and Managing Partner of Global Payments Experts llc. (GPE), a U.S.-based payments industry niche consulting firm specializing in small business and consumer risk management, payments products, marketing, and operations serving clients worldwide since 1998. GPE's unique blend of deep domain expertise, experience, proven results, and unparalleled access to global payments best practices has brought $100s of millions in recurring annual earnings improvements to over 50 of the world's top financial institutions and payments industry leaders in diverse country markets across the U.S., Latin America, Asia, and Europe.

Ms. Wilhelm has 20 years of executive and 14 years of consulting experience specializing in risk/reward optimization and value creation; small business banking and credit management; card, mobile, and online payments products and innovation; credit and fraud risk life cycle management; innovative credit scoring; risk-based marketing, segmentation, and pricing; and starting and scaling new companies and lines of business. As SVP of Wells Fargo, Ms. Wilhelm pioneered the industry's first successful transfer of credit scoring and credit card business model principles to Retail consumer and small business deposit portfolios, products, and channels. She also conceived and launched over 40 new fraud detection and prevention programs, including predictive decision and AI technology solutions. As a founder and Board Director for Primary Payments Systems, Inc. (a U.S. shared bank risk information bureau), her intellectual capital and thought leadership catalyzed the creation of a high value products engine that fueled company growth from 0 to 70 percent national market share in 5 years.

At Wells Fargo, the 4th largest U.S. bank by assets and 1st in small business lending, Ms. Wilhelm originated and managed the Risk Management Division responsible for payment risk management strategies, the overdraft lending P&L, and operations in all physical and remote channels for 11 million Retail accounts. She delivered over $500 million in recurring annual direct expense savings, and revenue to expense ratio improvements on multiple fronts, bolstered by a successful track record innovating, delivering, and scaling products, services, and operations. Ms. Wilhelm's continuous improvement of and competitive advantage in differentiation between good and bad customers and likely prospects from unlikely ones enabled Wells Fargo to bring risk-differentiated value to customers at all points of transaction, account/card acquisition, and product cross-sell.

Ms. Wilhelm reengineered, centralized, and managed collections; recoveries; fraud investigations and customer dispute management; loss analysis, accounting, and reporting; and loss prevention operations and strategies for Wells Fargo's consumer and small business Retail loan and deposit portfolios and item processing support operations. She also led the design and integration of innovative, multi-media risk reduction communications and incentive-based training programs for sales and service employees in all distribution channels. Finally, she reinvented her Division's processes and operations through the massively complex First Interstate merger.

Before originating the Risk Management Division in 1990, Ms. Wilhelm managed authorizations, fraud risk management, customer disputes, and accounting for Wells Fargo's credit card portfolio, including directing a large-scale project to bring authorizations and payment processing in house from an outside processor. For seven years, she also managed Wells Fargo's debit card portfolio (the 2nd largest U.S. debit card issuer) and ATM/POS networks, including launching and managing the PLUS, Interlink, and STAR shared payments networks, customer service, and other debit card operations.

Well-known in the financial services industry for establishing Wells Fargo's reputation as the leader in the payment risk field, Ms. Wilhelm serves on the Board of Directors of iPeopleFINANCE, served on the Advisory Board to Cydelity, has appeared on NBC DateLine and CNN, and has been widely quoted in news media and industry trade journals. A lifetime advocate of human rights and free market economies, Ms. Wilhelm travels and consults extensively in Eastern Europe, Central Asia, the Caucasus, and Russia, and is a volunteer with the FSVC. She also served as International Co-Chair for Aid to Soviet Dissident Women and Children from 1986 to 1991 and was the editor, research associate, and photographer for *Hitler's Death Camps: the Sanity of Madness*, a Holocaust book published in 1981. Ms. Wilhelm is an alumnus of the CBA Graduate School of Retail Bank Management at the University of Virginia, the University of Maine, La Sorbonne in France, and the Goethe Institute in Germany. She lives in Marin County, California.

Global Payments Experts llc.          May 2013          Office  +1 (415) 927-7746
10 Hickory Avenue                                      Mobile +1 (415) 806-3948
Corte Madera, California 94925                         email: lisa@globalpayexperts.com

APP. 101



### Global Payments Experts llc. (GPE)

With deep domain expertise bolstered by decades of direct experience in the payments and financial services industries, GPE provides risk management, marketing, business strategy, and product development consulting to deliver superior profitability results. GPE experts have brought risk/reward optimization and material new value creation to over 50 of the world's top financial institution and payment industry leaders in the U.S., Asia, Latin America, and Europe.

### Our Results-Driven Expertise

**Marketing and Sales**
- Small business banking and credit management business models
- New market, channel, and strategy development
- Customized acquisition models and campaign design
- Creative sales strategies and tactics
- Profitable reward, loyalty, and retention programs

**Product Development**
- Comprehensive competition and customer market analyses
- Breakthrough consumer and small business product innovation and launches
- Information-based value proposition testing and implementation
- Actionable product lifecycle economic measurement and management

**Risk, Portfolio, Technology & Operations Management**
- Revenue/expense portfolio optimization
- Enterprise-wide credit, fraud, and operational risk management
- Pioneering, predictive credit risk model design and credit life-cycle strategies
- Effective risk-based marketing, segmentation, and pricing strategies
- Enterprise-wide payments networks, technology, and operations

**Strategic Alliances**
- Diverse partnership sourcing, development, and contract negotiations
- Innovative co-branding and sales distribution strategies

### Our Experience

Global Payments Experts llc. professionals have worked with the world's top financial and payment industry leaders, start ups, and young companies that are scaling up. Our clients include:

| | |
|---|---|
| ABN AMRO Bank | Citigroup |
| American Express | Capital One |
| Banamex | CSAA |
| Banco Azteca | Davivienda |
| Banco Caja Social y Colmena | First Caribbean International Bank |

Global Payments Experts llc. May 2013 Office  +1 (415) 927-7746
10 Hickory Avenue Mobile  +1 (415) 806-3948
Corte Madera, California 94925 email: lisa@globalpayexperts.com

APP. 102



| | |
|---|---|
| Banco de Bogotá | First Data Corporation |
| Banco de Chile | HSBC |
| Banco de Crédito e Inversiones | GE Capital |
| Bancolombia | ICICI Bank Limited |
| Banco Industrial | JPMorgan Chase |
| Bancoomeva | Kookmin Bank |
| Banco Popular | Mitsui Card |
| Banesco | Mizuho Bank, Ltd. |
| Bank of America | Standard Chartered Bank |
| Bank of Tokyo-Mitsubishi UFJ | Sumitomo |
| Banorte | The Doctors Company |
| Barclays Bank | Visa, Inc. |
| BB&T | Wachovia |
| Bradesco | Washington Mutual |
| Caixa | Wells Fargo Bank |
| Chinatrust Commercial Bank | U.S. Bank |

### *Our Team*

- **Deep domain expertise bolstered by direct experience.** Our experts are seasoned executives averaging over 20 years managing all aspects of Retail banking, risk management, and payments at some of the world's leading financial institutions and payments companies.

- **Specialized value creation and implementation competencies.** Our experts are recognized leaders in:
    - Small business banking and credit business management
    - New market, channel, product, and company development
    - Consumer and small business credit /debit payment products, portfolio life cycle management, credit and fraud risk management, and scoring
    - Innovative credit scoring model design, business strategies, and economics
    - Enterprise-wide operations, fraud, and online risk management and analytics
    - Payments networks and processing
    - Customer acquisition and retention
    - Risk-based marketing, segmentation, and pricing strategies
    - Business model and strategy creation

- **Unparalleled access to leading-edge global payment risk industry best practices.** Our experts incorporate current global risk best practices, strategies, insights, and success tactics to address client opportunities or solve their most pressing issues.

- **A facilitative, minimally disruptive consulting engagement approach.** Our bank and payments veteran experts know how to collaborate in the most demanding of organizations with competing priorities.

**Global Payments Experts llc.**                    **May 2013**                    Office  +1 (415) 927-7746
**10 Hickory Avenue**                                                              Mobile  +1 (415) 806-3948
**Corte Madera, California 94925**                                         email: lisa@globalpayexperts.com

**APP. 103**



**Lisa T. Wilhelm**

## Chronology of Business Experience

| 2003 to Present | **Global Payments Experts llc. (GPE)**<br>Founder and Managing Partner |
| 2012 to 2013 | **iPeopleFINANCE**<br>Board of Directors |
| 2007 to Present | **WOWRewards**<br>CEO and Founder |
| 2005 to 2006 | **Cydelity**<br>Advisory Board |
| 1998 to 2003 | **Wilhelm Associates** (predecessor firm to GPE)<br>Principal and Owner |
| 1994 to 1998 | **Primary Payments Systems, Inc. (now Early Warning, LLC)**<br>Board of Directors (Founding Board Director) |
| 1979 to 1998 | **Wells Fargo Bank, San Francisco, CA** |
| 1994 to 1998 | Senior Vice President and Division Manager, Risk Management |
| 1990 to 1994 | Vice President and Division Manager, Risk Management |
| 1989 to 1990 | Vice President and District Manager, Credit Card Division |
| 1983 to 1989 | Vice President and Manager, Express Banking Division |
| 1980 to 1983 | Assistant Vice President and Manager, Personnel Operations |
| 1979 to 1980 | Communications Officer, Personnel Communications |
| 1979 to 1987 | **Marin Citizens for Energy Planning**<br>Board of Directors (VP of Board and Chair, Strategic<br>Planning and For-Profit Venture Committees) |
| 1978 to 1979 | **Robert Haber Incorporated, San Francisco, CA**<br>Pension Plan Consultant |
| 1975 to 1977 | **University of Maine, Portland, ME**<br>Budget Administrator, College of Arts and Sciences |
| 1970 to 1973 | **ESSO Hotel, Mons, Belgium**<br>Hotel Reception Manager (full and part-time during this period) |

## Education

| 1989 | Graduate, School of Retail Bank Management<br>Consumer Banking Association, University of Virginia |
| 1977 | University of Maine, Portland, ME<br>MA, Degree Candidate (Thesis)<br>Educational Administration/Counseling |
| 1976 | University of Maine, Portland, ME<br>BA, Liberal Studies |
| 1973 | Goethe Institute, Germany<br>Certificate of German Language |
| 1972 | La Sorbonne, Paris, France<br>Diplôme de Langue et Civilisation Françaises |

Global Payments Experts llc.                    May 2013                    Office  +1 (415) 927-7746<br>10 Hickory Avenue                                                        Mobile  +1 (415) 806-3948<br>Corte Madera, California 94925                                    email: lisa@globalpayexperts.com

**APP. 104**

**ATTACHMENT B**   *TOP102 559*                2429

# TrustOne
PAYMENT SERVICES



214 Maple Street
Villa Rica, GA 30180
(770) 947-6000 Office
(770) 947-6004 Fax
www.trustonepaymentservices.com

Type of Account (Check one):
☐ Direct Account
☐ Agent Bank Account

Name of Bank: _____   Branch: _____

Rep Name: *Dave*

Rep Number: *229I*   *006*    *Raul/Ben*

Control Number _____

## Merchant Application

### Business Information
Merchant's DBA Name/Outlet Name:
*WESTERN GPS LLC*

Physical Street Address (No P.O. Box):

City, State, Zip:

DBA Phone:
( )   -   ext.   Fax: ( )   -

Contact Name at this Address:

Email:

Customer Service Phone # (Required for MOTO and Internet merchants only):
(800) 530-1093

Merchant's Legal Name:
Western GPS LLC

Legal Address:
1935 E Redmon Dr

City, State, Zip:
Tempe, AZ 85283

Corp. Phone:
(800) 530-1093   ext.   Fax: ( )   -

Contact Name at this Address:
Lee Castine

Email:
westerngpsllc@gmail.com   Website Address (Required for Internet merchants):

Is any owner, officer, director, employee, or agent a current or former official in the executive, administrative, military, or judicial branch of any government (elected or not); an official of a political party; an executive of a government-owned commercial enterprise; a family member of any of the foregoing officials; or a close personal or professional associate of any of the foregoing officials?  ☐ Yes  ☒ No If "yes," please attach details.

### Merchant Profile
Type of Ownership: ☐ Sole Proprietor  ☐ Partnership  ☐ Corporation  ☒ LLC
☐ Professional Assoc.  ☐ Tax Exempt Org (501C)  ☐ Other___
Type of Goods or Services Sold:
TABLET WITH ADDED SOFTWARE

Years in business under current ownership:
0

Do you currently accept Visa/ MasterCard/ Discover?  ☐ YES  ☒ NO

Does merchant accept transactions before the customer receives product or service? ☒ YES  ☐ NO

How long does customer wait before product is received? 1 WEEK
% of cost that is prepayment? 100   Duration of extended service or benefit (in weeks): 12

Does merchant offer warranties, dues, subscriptions, memberships or other extended services?  ☐ YES  ☒ NO
Annual Visa/MC/Discover Sales: $4,800,000   Average Ticket: $995.00   Total Visa/MC/Discover Sales (multiple locations only): $____

SIC Code:
7299

Federal Tax ID#

### Visa/MasterCard/Discover Information
Market Type:
☐ Retail         ☐ Supermarket
☐ Restaurant     ☐ Emerging Market
☐ Lodging        ☐ Public Sector
☒ MO/TO          ☐ Auto Rental
☐ P-card         ☐ Cash Advance
☒ E-commerce     ☐ Other:

| Sales Profile (Must Equal 100%) | |
|---|---|
| Card Swiped | % |
| Manually Keyed with Imprint | % |
| Mail Order/ Telephone/Internet | 100% |
| % of sales in this category? 100 | |
| **Total** | **100%** |

### Member Bank (Acquirer) Information:
HSBC Bank USA, National Association
Merchant Support Group  P. O. Box 3263
Buffalo, New York 14240
716-841-6360

**Important Member Bank (Acquirer) Responsibilities**
1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant.
2. A Visa Member must be a principal (signer) to the Merchant Agreement.
3. The Visa Member is responsible for and must provide settlement funds to the merchant.
4. The Visa Member is responsible for all funds held in reserve that are derived from settlement.
5. The Visa Member is responsible for educating merchants on pertinent Visa International Operating Regulations with which merchants must comply.

**Important Merchant Responsibilities**
1. Ensure compliance with cardholder data security and storage requirements.
2. Maintain fraud and chargebacks below thresholds.
3. Review and understand the terms of the Merchant Agreement.
4. Comply with Visa International Operating Regulations.

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the Visa member (acquirer) is the ultimate authority should the merchant have any problems.

Merchant's Signature: _____   Date _____

Merchant's Printed Name & Title _____

For questions regarding Card Services, contact: Trust One Payment Services Inc, 214 Maple Street, Villa Rica, GA 30180
or call: 1-770-947-6000

Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement end/or notice.

Merchant Initials *LL*
Rev. 01/12 – TOP

**APP. 105**



**TrustOne**
PAYMENT SERVICES

214 Maple Street
Villa Rica, GA 30180
(770) 947-6000 Office
(770) 947-6004 Fax
www.trustonepaymentservices.com

Type of Account (Check one):
☐ Direct Account
☐ Agent Bank Account

Control Number _____

Name of Bank: _____     Branch: _____

Rep Name: _____

Rep Number: _____

## Merchant Application

### Business Information

Merchant's DBA Name/Outlet Name:

Physical Street Address (No P.O. Box):

City, State, Zip:

DBA Phone:
( )   -   ext.     Fax: ( )   -

Contact Name at this Address:

Email:

Customer Service Phone # (Required for MOTO and Internet merchants only):
(800) 530-1093

Merchant's Legal Name:
Western GPS LLC

Legal Address:
1935 E Redmon Dr

City, State, Zip:
Tempe, AZ 85283

Corp. Phone:
(800) 530-1093     ext.     Fax: ( )   -

Contact Name at this Address:
Lee Castine

Email:
westerngpsllc@gmail.com

Website Address (Required for Internet merchants):

Is any owner, officer, director, employee, or agent a current or former official in the executive, legislative, administrative, military, or judicial branch of any government (elected or not); an official of a political party; an executive of a government-owned commercial enterprise; a family member of any of the foregoing officials; or a close personal or professional associate of any of the foregoing officials?   ☐ Yes   ☒ No   If "yes," please attach details.

### Merchant Profile

### Visa/MasterCard/Discover Information

Type of Ownership: ☐ Sole Proprietor   ☐ Partnership ☐ Corporation ☒ LLC
☐ Professional Assoc.   ☐ Tax Exempt Org (501C)   ☐ Other_____

Type of Goods or Services Sold:
TABLET WITH ADDED SOFTWARE

SIC Code:

Years in business under current ownership:
0

Federal Tax ID#

Do you currently accept Visa/ MasterCard/ Discover?   ☐ YES   ☒ NO

Does merchant accept transactions before the customer receives product or service?   ☒ YES   ☐ NO

How long does customer wait before product is received?  1 WEEK

% of cost that is prepayment?  100     Duration of extended service or benefit (in weeks?)  12

Does merchant offer warranties, dues, subscriptions, memberships or other extended services?   ☐ YES ☒ NO

Annual Visa/MC/Discover Sales: $4,800,000     Average Ticket: $995.00     Total Visa/MC/Discover Sales (multiple locations only): $_____

| Market Type: | | Sales Profile (Must Equal 100%) | |
|---|---|---|---|
| ☐ Retail | ☐ Supermarket | Card Swiped | % |
| ☐ Restaurant | ☐ Emerging Market | | |
| ☐ Lodging | ☐ Public Sector | Manually Keyed with Imprint | % |
| ☐ MO/TO | ☐ Auto Rental | | |
| ☐ P-card | ☐ Cash Advance | Mail Order/ Telephone/Internet | 100% |
| ☒ E-commerce | ☐ Other: | Total = | 100% |

% of sales in this category?  100

### Member Bank (Acquirer) Information:

HSBC Bank USA, National Association
Merchant Support Group  P. O. Box 3263
Buffalo, New York 14240
716-841-6360

| Important Member Bank (Acquirer) Responsibilities | Important Merchant Responsibilities |
|---|---|
| 1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant. | 1. Ensure compliance with cardholder data security and storage requirements. |
| 2. A Visa Member must be a principal (signer) to the Merchant Agreement. | 2. Maintain fraud and chargebacks below thresholds. |
| 3. The Visa Member is responsible for and must provide settlement funds to the merchant. | 3. Review and understand the terms of the Merchant Agreement. |
| 4. The Visa Member is responsible for all funds held in reserve that are derived from settlement. | 4. Comply with Visa International Operating Regulations. |
| 5. The Visa Member is responsible for educating merchants on pertinent Visa International Operating Regulations with which merchants must comply. | |

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands the important obligations of each party and that the Visa member (acquirer) is the ultimate authority should the merchant have any problems.

Merchant's Signature: _____     Date 4-5-12

Merchant's Printed Name & Title Lee Castine / Owner

For questions regarding Card Services, contact:   Trust One Payment Services Inc, 214 Maple Street, Villa Rica, GA 30180
or call: 1-770-947-6000

Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement and/or notice.

Merchant Initials  LC
Rev. 01/12 – TOP

APP. 106

## Personal Guaranty

I/We hereby guarantee to Global Direct and Member, their successors and assigns, the full, prompt, and complete performance of Merchant and all of Merchant's obligations under the Card Services Agreement, including but not limited to all monetary obligations arising out of Merchant's performance or non-performance under the Card Services Agreement, whether arising before or after termination of the Card Services Agreement. This guaranty shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit, or variation of terms of the Card Services Agreement made by or agreed to by Global Direct, Member, and/or Merchant. I/We hereby waive any notice of acceptance of this guaranty, notice of nonpayment or nonperformance of any provision of the Card Services Agreement by Merchant, and all other notices or demands regarding the Card Services Agreement. I/We agree to promptly provide to Global Direct and Member any information requested by any of them from time to time concerning my/our financial condition(s), business history, business relationships, and employment information. I/We agree that Global Direct and Global Direct (on behalf of Member) may order a consumer credit report on me, Merchant and each of Merchant's officers, partners, and/or owners, as well as subsequent consumer credit reports, which may be required or used in conjunction with the maintenance, updating, renewal or extension of the services provided hereunder, or in conjunction with reviewing, taking collection action on, or other legitimate business purposes associated with the Merchant account. I/We have read, understand, and agree to be bound by the Card Services Terms & Conditions provided to Merchant and those terms and conditions contained in this Merchant Application.

Signature of Guarantor (please sign below)                              Name (printed):

X _~~signature~~_____ , an Individual        Lee Castine

Signature of Guarantor (please sign below)                              Name (printed):

X _____ , an Individual        _____

## Owner/Officer Information (Please complete for every person who ultimately owns or controls the operation or on whose behalf the transactions authorized under this agreement will be conducted.)

| Name: Lee Castine | Title: Owner | Date of Birth (mm/dd/yyyy): | Social Security #: ▮▮▮▮ | Home Phone #: ▮▮▮▮▮▮ |
| Home Address: ▮▮▮▮▮▮ | | City: ▮▮▮▮ | State: | Zip Code: ▮▮▮ | Years There: | Own/Rent? |
| Former Address (if less than 1 year at current address): | | City: | State: | Zip Code: | Years There: | Own/Rent? |

| Name: | Title: | Date of Birth (mm/dd/yyyy): | Social Security #: | Home Phone #: ( ) - |
| Home Address: | | City: | State: | Zip Code: | Years There: | Own/Rent? |
| Former Address (if less than 1 year at current address): | | City: | State: | Zip Code: | Years There: | Own/Rent? |

## Bank Information (Attach Voided Check or Bank Letter):

| | Routing Number | DDA/Checking Account # | Deposit | Discount | Chargebacks | Equipment | Supplies | Misc. Fees |
|---|---|---|---|---|---|---|---|---|
| Bank 1 | ▮▮▮▮▮▮ | | ☒ | ☒ | ☒ | ☒ | ☒ | ☐ |
| Bank 2 | | | | | | | | |
| Bank 3 | | | | | | | | |
| Bank 4 | | | | | | | | |

## Merchant Site Survey Report (To be Completed by Sales Representative)

Merchant Location: ☐ Retail Location with Store Front    ☐ Office Building    ☒ Residence    ☐ Other: _____

Surrounding Area: ☐ Commercial    ☐ Industrial    ☒ Residential

Does the amount of inventory and merchandise on shelves and floor appear consistent with the type of business?    ☐ YES    ☐ NO

If no, explain: _____

Does the Merchant use a Fulfillment House?    ☐ YES    ☒ NO    If yes, was the Fulfillment House Inspected?    ☐ YES    ☐ NO

The Merchant:    ☒ Owns    ☐ Leases the business premises

Further comments by inspector (must complete): _____

I hereby verify that this application has been fully completed by merchant applicant and that I have physically inspected the business premises of the merchant at this address and the information stated above is true and correct to the best of my knowledge and belief.

Verified and Inspected by (print name): _____

Representative Name: _____        Representative Signature: X _~~signature~~_        Date: 3/13/2

| Sales Rep Name: | Sales Rep Code: | Sales Rep Phone Number: ( ) - | Sales Rep Email Address: |

## American Express

By signing below, I represent that I have read and am authorized to sign and submit this application on behalf of the entity above and all information provided herein is true, complete, and accurate. I authorize American Express Travel Related Services Company, Inc. ("American Express") to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies. I authorize and direct American Express to inform me directly, or through the entity above, of reports about me that American Express has requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I understand that upon American Express' approval of the entity indicated above to accept the American Express Card, the terms and conditions for American Express® Card Acceptance ("Terms and Conditions") will be sent to such entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Terms and Conditions.

Merchant's Signature:        Name (printed):        Title:        Date:

X N/A

Merchant Initials: LL
Rev. 01/12 – TOP

## Hardware

Process Method: ☐ EDC  ☐ Touchtone  ☐ Paper

Platform: ☐ East  ☐ Central  ☐ Other _____

Imprinter: ☐ Own  ☐ Purchase

Purchase Price per Unit: $ _____

Purchase Quantity - Standard: _____

Purchase Quantity - Handheld: _____

Total Regular Plates Needed: _____

Total Amex Plates Needed: _____

Total Plastic Cards Needed: _____

Global to schedule download? ☐ YES  ☐ NO

Global to train? ☐ YES  ☐ NO

☐ Own/ Reprogram  ☐ Purchase  ☐ Lease  ☐ Rental

Terminal Type: _____

Pinpad Type: _____

Printer Type: _____

Check Reader: _____

Terminal Application / PC Software Type: _____

Number of TIDs: _____  Product: _____

Term type: _____  Third Party Settlement:
☐ Terminal ☐ Host

Global PC Software: ☐ Own  ☐ Purchase

If purchase, price: $ _____  # of payments: _____

| Item | Quantity | Individual Pricing | | Combination Pricing | |
|---|---|---|---|---|---|
| | | Amount | # Payments | Amount | # Payments |
| Terminal | | $ | | $ | |
| Printer | | $ | | $ | |
| Check Reader | | $ | | $ | |
| PIN Pad | | $ | | $ | |

Special Instructions:

~ Raul/Ben

## Cardholder Data Storage Compliance & Service Provider

***** PCI DSS and card association rules prohibit storage of track data under any circumstances. If you or your POS system pass, transmit, store or receive full cardholder's data, then the POS software must be PA DSS (Payment Application Data Security Standard) compliant or you (merchant) must validate PCI DSS compliance (see 1(b) below and questions 3 and 4 must be completed). If you use a payment gateway, they must be PCI DSS compliant.***

1. Have you ever experienced an Account Data Compromise "ADC"?  ☐ Yes  ☐ No  If yes, provide date of compromise: _____
   a) Have you validated PCI DSS (Payment Card Industry Data Security Standard) compliance? ☐ Yes  ☐ No
   If yes, go to 1(b); If no, go to #2
   b) Date of compliance, Report on Compliance "ROC" or Self Assessment Questionnaire "SAQ"? _____
   c) What is the name of your Qualified Security Assessor "QSA" _____ or Self Assessment Questionnaire (circle one "SAQ") A, B, C, or D
   d) Date of last scan _____  Approved Scanning Vendor's name: _____
2. Are you using a "dial-up" terminal or "TTC" Touch Tone Capture?  ☐ Yes  ☐ No
3. Do you or your Service Provider(s) receive, pass, transmit or store the Full Cardholder Number "FCN", electronically?  ☐ Yes  ☐ No
   a) If yes, where is card data stored? ☐ Merchant's location only  ☐ Merchant's Headquarters/Corp office only
   ☐ Primary Service Provider  ☐ Both Merchant & Service Provider(s)  ☐ Other Service Provider  ☐ All Apply
4. What Primary Service Provider/Software Developer did you purchase your point of sale "POS" application from (ie software, gateway)? _____
   a) What is the name of the Service Provider/Software Developer's software application? _____  Software Version #? _____
   b) Do your transactions process through any other Service Provider (ie web hosting companies, gateways, corporate office)?  ☐ Yes  ☐ No
   c) If yes, name the other Service Provider? _____

As required under the Payment Card Industry Data Security Standard (PCI DSS), Merchant declares and confirms the following:
-Merchant is in compliance with all PCI DSS requirements. ☐ Yes  ☐ No
-Merchant's point of sale software, system or application does not store sensitive authentication data after authorization. ☐ Yes  ☐ No
-Merchant will maintain full PCI DSS compliance at all times and will notify Global Payments when it changes its point of sale software, system or application. ☐ Yes  ☐ No
-None of Merchant's systems store any evidence of magnetic stripe data, or PIN data after transaction authorization is completed. ☐ Yes  ☐ No

Merchant Initials _____
Rev. 01/12 – TOP



LETTER OF ATTESTATION

Name of Company:

MID:

I hereby attest that I am a true and bona fide owner of the above referenced Company for which I am requesting a merchant account. I understand that I am fully and completely liable for any fees, losses, penalties or others charges related to any and all merchant accounts for which I am the signer. Understanding my liability and potential exposure, I attest that I have and will continue to have actual authority to make financial decisions, oversight of operations and management decisions for the company. I understand it is my financial responsibility to maintain the fees associated with the Gateway and merchant account for the ability to access information to dispute charge backs or any other necessary action. If my account is closed and the ISO / Processor is unable to contact me for a period of more than 90 days after making reasonable attempts utilizing the contact information contained on the application, I hereby give the ISO / Processor the authority to manage the account, including but not limited to; make debits and apply credits, pay fees or penalties from processing related activities, payout 3rd parties including customers, vendors and financial institutions.

I hereby attest that the Company is not violating any laws nor does it contemplate any illegal or unauthorized activities. I am fully responsible for ensuring that the company is engaged in legal activity and is in compliance with any and all applicable regulatory agencies/bodies.  Under no circumstances can I make any inference as to the legality or compliance status of my Company based upon the approval of a merchant account. If I have any questions or concerns, it is my responsibility to contact my attorney for legal advice.

Please send the funds to the bank account that is linked to the merchant account.

Name of Bank

Routing Number

Account Number

Tax ID #

Signature: _____

Date: 2-15-12

***Please send with a copy of your Drivers License

Review and Submit Merchant



For support please contact: Product Support
COPYRIGHT © 2001 - GLOBAL PAYMENTS

Report Results - This Form Produced by Equifax | User Reference: JONNAK

APP. 112

·Report Results - This Form Produced by Equifax | User Reference: JONNAK



3/28/2012

**APP. 113**



RECEIVED

FEB 2 2 2012

ARIZONA CORP... ...
CORPORA... ...TION

DO NOT WRITE ABOVE THIS LINE, FOR ACC USE ONLY

# ARTICLES OF ORGANIZATION

**DO NOT PUBLISH THIS SECTION**
NOTE: A professional limited liability company is an LLC organized for the purpose of rendering one or more categories of licensed professional service. Professional service is defined as a service that may be lawfully rendered only by a person licensed in this state to render the service.

1. The LLC name must contain the words "limited liability company" or "limited company" or the abbreviations "L.L.C.", "L.C.", "LLC", or "LC". The Professional LLC name must contain the words "professional limited liability company" or the abbreviations "P.L.L.C.", "P.L.C.", "PLLC", or "PLC."

2. Must be an Arizona address. DO NOT LEAVE THIS SECTION BLANK

3. See Section 3 of the instructions above. A statutory agent is a person you appoint that would receive lawsuit papers if the LLC is sued. A street or physical address is required even if the statutory agent has a P.O. Box.

The agent must sign the articles or provide written consent to the appointment.

**Select one. This form may be used for:**

☒ **ARIZONA LIMITED LIABILITY COMPANY** (A.R.S. §29-632)

☐ **ARIZONA PROFESSIONAL LIMITED LIABILITY COMPANY** (A.R.S. §29-841.01)

**1. The name of the organization:**

**A.** _____
LLC Name Reservation File Number (if one has been obtained – if not, leave this line blank).

**B.** WESTERN GPS LLC
Limited Liability Company Name

**2. Known place of business in Arizona** (If address is the same as the street address of the statutory agent, write "same as statutory agent". DO NOT LEAVE THIS SECTION BLANK):

Address  1935 E REDMON

City  TEMPE          State  AZ          Zip 85283

**3. The name and street address of the statutory agent in Arizona:**

Name  LEE CASTINE

Address  1935 E REDMON

City  TEMPE          State  AZ          Zip 85253

**Acceptance of Appointment by Statutory Agent:**

I  LEE CASTINE
(print name of the Statutory Agent) , having been designated to act as Statutory Agent, hereby consent to act in that capacity until removed or resignation is submitted in accordance with the Arizona Revised Statute.

Agent Signature: _____

_____
If the statutory agent is an entity, please print the company name here.

LL:0004
Rev: 03/2011

Page 3 of 4

Arizona Corporation Commission
Corporations Division

**APP. 115**

**DO NOT PUBLISH THIS SECTION**

**4.** Only required for professional limited liability company The professional services that the company is organized to perform must be described. Professional service is defined as a service that may be lawfully rendered only by a person licensed in this state to render the service.

**5.** Check only one box. If a dissolution date is stated, it should include the month, day and year. Perpetual means continuing forever or indefinitely.

**6.** Check A or B to show which management structure will be applicable to your company. Provide name, title and address for each person.

**6A.** If reserved to the members, check the Members box and provide the name and address of all members. NOTE: If reserved to the members you cannot list any manager.

**6B.** If vested in one or more managers check the Managers box and provide the name and address of each manager and of each member who owns a twenty percent (20%) or greater interest in the capital or profits of the LLC/ PLLC.

**7.** Signature. The person signing this document need not be a manager or member of the company.

---

**4. Professional LLCs only – Professional Services** - the Professional Limited Liability Company will provide the following professional services:

_____

_____

**5. Life Period of the Limited Liability Company:** check one:

☐ The LLC will dissolve on ___/___/_____ (Please enter month, day and four digit year)

☒ The Limited Liability Company life period is Perpetual.

**6. Management Structure:** (check one box only) A.R.S. §29-632(5)

**A.** ☒ **RESERVED TO THE MEMBERS**
IF RESERVED TO THE MEMBERS, DON'T CHECK ANY MANAGER BOXES.

**B.** ☐ **VESTED IN ONE OR MORE MANAGERS**
IF VESTED IN THE MANAGER(S), AT LEAST ONE NAME BELOW MUST HAVE THE MANAGER BOX CHECKED.

Name _LEE CASTLE_____   Name _____

☒ Member ☐ Manager (only if "B" is selected above)   ☐ Member ☐ Manager (only if "B" is selected above)

Address: _1935 E REDMON_____   Address:_____

City: _TEMPE_ State, _AZ_ Zip: _85283_   City, _____ State, _____ Zip: ____

Name _____   Name _____

☐ Member ☐ Manager (only if "B" is selected above)   ☐ Member ☐ Manager (only if "B" is selected above)

Address: _____   Address:_____

City, _____ State, _____ Zip: ____   City, _____ State, _____ Zip: ____

IF YOU NEED MORE SPACE FOR LISTING MEMBERS / MANAGERS PLEASE ATTACH THE ADDITIONAL PAGE TO THE ARTICLES OF ORGANIZATION.

**7. SIGNATURE**

Signed on this date: _05 | 08 | 2012_____ (mm/dd/yyyy).

Signature: _____   Print Name _LEE CASTLE_____

If signing on behalf of a company, please print the company name here.

Phone Number: _800 · 530 · 1093_____   Fax Number: _(480) · 292 · 8195_

LL:0004
Rev: 03/2011

Arizona Corporation Commission
Corporations Division

**APP. 116**







Western GPS LLC

RECEIPT: SAMPLE

Date: SAMPLE

## PAID

TO:
SAMPLE

FROM:
Western GPS LLC
1935 E Redmon DR
Tempe, AZ 85283
Phone: 1-800-530-1093
Fax: 1-480-292-8195

| Purchase Order Number | | Process Date | Card Type | Card Number |
|---|---|---|---|---|
| SAMPLE | | SAMPLE | SAMPLE | SAMPLE |
| Quantity | Description | | Unit Price | Total |
| 1 | WESTERN GPS PROGRAM | | SAMPLE | SAMPLE |
| | Please Sign and return. Keep one copy for your records | | | |
| I understand I have previously given a verbal authorization to Western GPS to charge my account and my signature entitles me to a 90 day membership with Western GPS.  Customer will have 3 business days from the day they receive the product to request a refund by returning the unopened product to Western GPS and will be responsible for shipping costs plus a 10% restocking fee. Western GPS will not be responsible for lost or damage goods once the customer has received the products. | | | Total Due | SAMPLE |
| | | | Total Paid | SAMPLE |

Signature: _____

Date: _____

**Client Invoice**

## ATTACHMENT C

**TrustOne**
PAYMENT SERVICES

214 Maple Street
Villa Rica, GA 30180
(770) 947-6000 Office
(770) 947-6004 Fax
www.trustonepaymentservices.com

*TOP103330*

*23156*

Type of Account (Check one):
☐ Direct Account
☐ Agent Bank Account

Control Number: _____

Name of Bank: _____     Branch: _____

Rep Name: *Raul*

Rep Number: *229I-006*

### Merchant Application

#### Business Information

| | |
|---|---|
| Merchant's DBA Name/Outlet Name: | Merchant's Legal Name: Western GPS LLC |
| Physical Street Address (No P.O. Box): | Legal Address: 1935 E Redmon Dr |
| City, State, Zip: | City, State, Zip: Tempe, AZ 85283 |
| DBA Phone: ( ) ext.   Fax: ( ) - | Corp. Phone: (800) 530-1093 ext.   Fax: ( ) - |
| Contact Name at this Address: | Contact Name at this Address: Lee Castine |
| Email: | Email: westerngpsllc@gmail.com |
| Customer Service Phone # (Required for MOTO and Internet merchants only): (800) 530-1093 | Website Address (Required for Internet merchants): |

Is any owner, officer, director, employee, or agent a current or former official in the executive, legislative, administrative, military, or judicial branch of any government (elected or not); an official of a political party; an executive of a government-owned commercial enterprise; a family member of any of the foregoing officials; or a close personal or professional associate of any of the foregoing officials? ☐ Yes ☒ No If "yes," please attach details.

#### Merchant Profile / Visa/MasterCard/Discover Information

Type of Ownership: ☐ Sole Proprietor ☐ Partnership ☐ Corporation ☒ LLC
☐ Professional Assoc. ☐ Tax Exempt Org (501C) ☐ Other_____

Type of Goods or Services Sold: TABLET WITH ADDED SOFTWARE
SIC Code: 7299

Years in business under current ownership: 0
Federal Tax ID#: ▮▮▮▮▮

Do you currently accept Visa/ MasterCard/ Discover? ☐ YES ☒ NO

Does merchant accept transactions before the customer receives product or service? ☒ YES ☐ NO

How long does customer wait before product is received? 1 WEEK   % of sales in this category? 100

% of cost that is prepayment? 100   Duration of extended service or benefit (in weeks): 12

Does merchant offer warranties, dues, subscriptions, memberships or other extended services? ☐ YES ☒ NO

Annual Visa/MC/Discover Sales: $4,800,000   Average Ticket: $995.00   Total Visa/MC/Discover Sales (multiple locations): $_____

| Market Type: | | Sales Profile (Must equal 100%) | |
|---|---|---|---|
| ☐ Retail | ☐ Supermarket | | |
| ☐ Restaurant | ☐ Emerging Market | Card Swiped | % |
| ☐ Lodging | ☐ Public Sector | | |
| ☒ MO/TO | ☐ Auto Rental | Manually Keyed with Imprint | % |
| ☐ P-card | ☐ Cash Advance | | |
| ☒ E-commerce | ☐ Other: | Mail Order/ Telephone/Internet | 100% |
| | | Total = | 100% |

#### Member Bank (Acquirer) Information

HSBC Bank USA, National Association
Merchant Support Group  P. O. Box 3263
Buffalo, New York 14240
716-841-6360

| Important Member Bank (Acquirer) Responsibilities | Important Merchant Responsibilities |
|---|---|
| 1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant. | 1. Ensure compliance with cardholder data security and storage requirements. |
| 2. A Visa Member must be a principal (signer) to the Merchant Agreement. | 2. Maintain fraud and chargebacks below thresholds. |
| 3. The Visa Member is responsible for and must provide settlement funds to the merchant. | 3. Review and understand the terms of the Merchant Agreement. |
| 4. The Visa Member is responsible for all funds held in reserve that are derived from settlement. | 4. Comply with Visa International Operating Regulations. |
| 5. The Visa Member is responsible for educating merchants on pertinent Visa International Operating Regulations with which merchants must comply. | The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the Visa member (acquirer) is the ultimate authority should the merchant have any problems. |

Merchant's Signature: _____   Date 4-5-12

Merchant's Printed Name & Title: Lee Castine  Owner

For questions regarding Card Services, contact:   Trust One Payment Services Inc, 214 Maple Street, Villa Rica, GA 30180
or call: 1-770-947-6000
Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement and/or notice.

Merchant Initials *LC*
Rev. 01/12 – TOP

**APP. 120**

## Credit/Debit Card Services and Fee Schedule

| Plan Type | New | Existing | Existing Merchant No. | Discount Rate | Per Item | Additional Auth. Fees |
|---|---|---|---|---|---|---|
| ☐ PIN BASED DEBIT | ☐ | N/A | N/A | 1 % | $ | $ |
| ☐ VISA/MC SWIPE CHECK CD REGULATED | ☐ | N/A | N/A | | | $ |
| ☐ VISA/MC SWIPE CHECK CD NON REGULATED | ☐ | N/A | N/A | | | $ |
| ☐ VISA/MC/DISCOVER QUALIFIED | ☐ | N/A | N/A | | | $ |
| ☐ VISA/MC/DISCOVER MID-QUALIFIED | ☐ | N/A | N/A | | | $ |
| ☐ VISA/MC/DISCOVER NON-QUALIFIED | ☐ | N/A | N/A | | | $ |
| ☐ AMERICAN EXPRESS | ☐ | ☐ | | % | $ | |
| ☐ DINERS CLUB | ☐ | ☐ | | % | $ | |
| ☐ JCB | ☐ | ☐ | | % | $ | |
| ☐ OTHER | ☐ | ☐ | | % | $ | |
| ☐ COST PLUS | ☐ | ☐ | | % | $ | |

Merchant FNS#_____    Cash Benefits:  ☐ YES  ☐ NO    Daily Discount: ☒ YES ☐ NO

Surcharges:  _____ Non-Qualified Retail/Restaurant   _____ Non-Qualified Supermarket   _____ Non-Qualified Developing Market
_____ Non-Qualified Direct Market   _____ Non-Qualified Purchase Card   _____ Non-Qualified Lodging/Auto Rental
_____ Non-Qualified TouchTone Capture   _____ Qualified Visa/MC Rewards Card (Retail & Mail/Telephone Order)
_____ Other _____   _____ Discover Qualified Rewards

*The foregoing discount rate, per item and authorization fees are based upon Merchant's complying with all processing requirements as established by the applicable governing authority of the payment type which qualifies Merchant for the most favorable interchange rates available for such payment type. Transactions that do not qualify for the most favorable interchange rates will be subject to surcharges up to 2.99% & $.19 in addition to the rate quoted. See the Card Services Terms and Conditions for more information regarding non-qualifying surcharges. In addition to the per item fee, all Debit transactions include fees assessed by the applicable network organization.

**Other Fees:**

| | |
|---|---|
| $ ▓ Non-Refundable Application Fee (one-time fixed fee) | Replacement Shipping Fee (per occurrence) |
| $ AMEX Application Fee | POS Equipment Warranty Fee - Per Piece/Set (monthly) |
| $ Additional Location Fee | Non-Global Check Authorization Fee (per occurrence) |
| $ Virtual Site Survey Fee | Touchtone Capture Set-up Fee (one-time fixed fee) |
| $ Annual Membership Fee | Global Access @dvantage Set-up Fee |
| $ Monthly Statement Fee | Global Access @dvantage Monthly Fee |
| $ Minimum Monthly Discount | Wireless Services Fee (monthly) |
| $ Training Fee - On-Site (one-time fixed fee) | Wireless Activation Fee (one-time fixed fee) |
| $ Chargeback Fees (per occurrence) | Wireless Transaction Fee (per occurrence) |
| $ Retrieval Fee (per occurrence) | Installation/Programming Fee (one-time fixed fee) |
| $ Non-Sufficient Funds (per occurrence) | Reprogramming Fee (one-time fixed fee) |
| $ Help Desk Fee (monthly) | ▓nual Service Fee |
| $ EDC AVS Fee (per occurrence) | Voice AVS Fee (per occurrence) |
| $ Voice Authorization Fee (per occurrence) | Internet Per Item Fee (per occurrence) |
| $ Internet Access Fee (monthly) | ▓ Setup Fee (one-time fixed fee) |
| $ Batch/ACH Fee (per occurrence) | Minimum Monthly Debit |
| $ Monthly Regulatory Compliance Fee | Monthly PCI/DSS Compliance Fee |

## Acceptance of Merchant Application and Terms & Conditions / Merchant Authorization

Your Card Services Agreement is between Global Payments Direct, Inc. ("Global Direct"), the Merchant named above, and the Member named below ("Member"), as applicable based upon the services provided. Member is a member of Visa, USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"); Global Direct is a registered independent sales organization of Visa, a member service provider of MasterCard and a registered acquirer for Discover Financial Services, LLC. ("Discover").

A copy of the Card Services Terms and Conditions, revision number 01/12-TOP, has been provided to you. Please sign below to signify that you have received a copy of the Card Services Terms & Conditions and that you agree to all terms and conditions contained therein. If this Merchant Application is accepted for card services, Merchant agrees to comply with the Merchant Application and the Card Services Terms & Conditions as may be modified or amended in the future. If you disagree with any Card Services Terms & Conditions, do not accept service.
IF MERCHANT SUBMITS A TRANSACTION TO GLOBAL DIRECT HEREUNDER, MERCHANT WILL BE DEEMED TO HAVE ACCEPTED THE CARD SERVICES TERMS & CONDITIONS.
By your signature below on behalf of Merchant, you certify that all information provided in this Merchant Application is true and accurate and you authorize Global Direct, and Global Direct on Member's behalf, to initiate debit entries to Merchant's checking account(s) in accordance with the Card Services Terms and Conditions. In addition by your signature below on behalf of Merchant you authorize Global Direct and/or Trust One Payment Services, Inc. to order a consumer credit report on Merchant and you, Merchant and each of Merchant's officers, partners, and/or owners, as well as subsequent consumer credit reports, which may be required or used in conjunction with the maintenance, updating, renewal or extension of the services provided hereunder, or in conjunction with reviewing, taking collection action on, or other legitimate purposes associated with the Merchant account.

| | | |
|---|---|---|
| Merchant's Signature: X | Name (printed): Lee Castine | Title: Owner    Date: 3-13-12 |
| Merchant's Signature: X | Name (printed): | Title:    Date: |
| Signing for Global Payments Direct, Inc.: X | Name (printed): | Title:    Date: |
| Signing for Member: | Name (printed): | Name of Member (printed): HSBC Bank USA, NA    Date: |

Merchant Initials ___
Rev. 01/12 – TOP

**APP. 121**

## Personal Guaranty

I/We hereby guarantee to Global Direct and Member, their successors and assigns, the full, prompt, and complete performance of Merchant and all of Merchant's obligations under the Card Services Agreement, including but not limited to all monetary obligations arising out of Merchant's performance or non-performance under the Card Services Agreement, whether arising before or after termination of the Card Services Agreement. This guaranty shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit, or variation of terms of the Card Services Agreement made by or agreed to by Global Direct, Member, and/or Merchant. I/We hereby waive any notice of acceptance of this guaranty, notice of nonpayment or nonperformance of any provision of the Card Services Agreement by Merchant, and all other notices or demands regarding the Card Services Agreement. I/We agree to promptly provide to Global Direct and Member any information requested by any of them from time to time concerning my/our financial condition(s), business history, business relationships, and employment information. I/We agree that Global Direct (on behalf of Member) may order a consumer credit report on me, Merchant and each of Merchant's officers, partners, and/or owners, as well as subsequent consumer credit reports, which may be required or used in conjunction with the maintenance, updating, renewal or extension of the services provided hereunder, or in conjunction with reviewing, taking collection action on, or other legitimate purposes associated with the Merchant account.   I/We have read, understand, and agree to be bound by the Card Services Terms & Conditions provided to Merchant and those terms and conditions contained in this Merchant Application.

Signature of Guarantor (please sign below)                         Name (printed):

X _____ , an individual          Lee Castine

Signature of Guarantor (please sign below)                         Name (printed):

X _____ , an individual          _____

## Owner/Officer Information (Please complete for every person who ultimately owns or controls the operation or on whose behalf the transactions authorized under this agreement will be conducted.)

| Name: Lee Castine | Title: Owner | Date of Birth (mm/dd/yyyy): | Social Security #: | Home Phone #: |
| Home Address: | | City: | State: | Zip Code: | Years There: | Own/ Rent? |
| Former Address (if less than 1 year at current address): | | City: | State: | Zip Code: | Years There: | Own/ Rent? |
| Name: | Title: | Date of Birth (mm/dd/yyyy): | Social Security #: | Home Phone #: |
| Home Address: | | City: | State: | Zip Code: | Years There: | Own/ Rent? |
| Former Address (if less than 1 year at current address): | | City: | State: | Zip Code: | Years There: | Own/ Rent? |

## Bank Information (Attach Voided Check or Bank Letter)

| | Routing Number | DDA/Checking Account # | Deposit | Discount | Chargebacks | Equipment | Supplies | Misc. Fees |
|---|---|---|---|---|---|---|---|---|
| Bank 1 | | | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| Bank 2 | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Bank 3 | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Bank 4 | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

## Merchant Site Survey Report (To be Completed by Sales Representative)

Merchant Location:  ☐ Retail Location with Store Front   ☐ Office Building   ☒ Residence   ☐ Other: _____

Surrounding Area:  ☐ Commercial   ☐ Industrial   ☒ Residential

Does the amount of inventory and merchandise on shelves and floor appear consistent with the type of business?   ☐ YES   ☐ NO

If no, explain: _____

Does the Merchant use a Fulfillment House?   ☐ YES   ☒ NO       If yes, was the Fulfillment House Inspected?   ☐ YES   ☐ NO

The Merchant:  ☒ Owns   ☐ Leases the business premises

Further comments by Inspector (must complete): _____

I hereby verify that this application has been fully completed by merchant applicant and that I have physically inspected the business premises of the merchant at this address and the information stated above is true and correct to the best of my knowledge and belief.

Verified and Inspected by (print name): _____

Representative Name: _____          Representative Signature: X _____   Date: 3/13/1_

| Sales Rep Name: | Sales Rep Code: | Sales Rep Phone Number: ( ) | Sales Rep Email Address: |

## American Express

By signing below, I represent that I have read and am authorized to sign and submit this application on behalf of the entity above and all information I have provided herein is true, complete, and accurate. I authorize American Express Travel Related Services Company, Inc. ("American Express") to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies. I authorize and direct American Express to inform me directly, or through the entity above, of reports about me that American Express has requested from consumer reporting agencies.  Such information will include the name and address of the agency furnishing the report. I understand that upon American Express' approval of the entity indicated above to accept the American Express Card, the terms and conditions for American Express® Card Acceptance ("Terms and Conditions") will be sent to such entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Terms and Conditions.

Merchant's Signature:                         Name (printed):                         Title:                         Date:

X N/A

Merchant Initials   LL
Rev. 01/12 – TOP

**APP. 122**

## Hardware

Process Method: ☐ EDC  ☐ Touchtone  ☐ Paper

Platform: ☐ East  ☐ Central  ☐ Other _____

Imprinter: ☐ Own  ☐ Purchase

Purchase Price per Unit: $ _____

Purchase Quantity - Standard: _____

Purchase Quantity - Handheld: _____

Total Regular Plates Needed: _____

Total Amex Plates Needed: _____

Total Plastic Cards Needed: _____

Global to schedule download? ☐ YES  ☐ NO

Global to train? ☐ YES  ☐ NO

☐ Own/ Reprogram  ☐ Purchase  ☐ Lease  ☐ Rental

Terminal Type: _____

Pinpad Type: _____

Printer Type: _____

Check Reader: _____

Terminal Application / PC Software Type: _____

Number of TIDs: _____   Product: _____

Term type: _____   Third Party Settlement:
☐ Terminal ☐ Host

Global PC Software: ☐ Own  ☐ Purchase

If purchase, price: $ _____   # of payments: _____

| Item | Quantity | Individual Pricing | | Combination Pricing | |
|------|----------|--------|------------|--------|------------|
| | | Amount | # Payments | Amount | # Payments |
| Terminal | | $ | | $ | |
| Printer | | $ | | $ | |
| Check Reader | | $ | | $ | |
| PIN Pad | | $ | | $ | |

Special Instructions:

~ Raul/Ben

## Cardholder Data Storage Compliance & Service Provider

***** PCI DSS and card association rules prohibit storage of track data under any circumstances.  If you or your POS system pass, transmit, store or receive full cardholder's data, then the POS software must be PA DSS (Payment Application Data Security Standard) compliant or you (merchant) must validate PCI DSS compliance (see 1(b) below and questions 3 and 4 must be completed).  If you use a payment gateway, they must be PCI DSS compliant.***

1. Have you ever experienced an Account Data Compromise "ADC"?  ☐ Yes  ☑ No   If yes, provide date of compromise: _____
   a) Have you validated PCI DSS (Payment Card Industry Data Security Standard) compliance?  ☐ Yes  ☐ No
      If yes, go to 1(b); If no, go to #2
   b) Date of compliance, Report on Compliance "ROC" or Self Assessment Questionnaire "SAQ"? _____
   c) What is the name of your Qualified Security Assessor "QSA" _____ or Self Assessment Questionnaire  (circle one "SAQ") A, B, C, or D
   d) Date of last scan _____   Approved Scanning Vendor's name: _____
2. Are you using a "dial-up" terminal or "TTC" Touch Tone Capture?  ☐ Yes  ☑ No
3. Do you or your Service Provider(s) receive, pass, transmit or store the Full Cardholder Number "FCN", electronically?  ☐ Yes  ☑ No
   a) If yes, where is card data stored?  ☐ Merchant's location only   ☐ Merchant's Headquarters/Corp office only
      ☐ Primary Service Provider   ☐ Both Merchant & Service Provider(s)   ☐ Other Service Provider   ☐ All Apply
4. What Primary Service Provider/Software Developer did you purchase your point of sale "POS" application from (ie software, gateway)? _____
   a) What is the name of the Service Provider/Software Developer's software application? _____   Software Version #? _____
   b) Do your transactions process through any other Service Provider (ie web hosting companies, gateways, corporate office)?  ☐ Yes  ☑ No
   c) If yes, name the other Service Provider? _____

As required under the Payment Card Industry Data Security Standard (PCI DSS), Merchant declares and confirms the following:
-Merchant is in compliance with all PCI DSS requirements. ☐ Yes  ☐ No
-Merchant's point of sale software, system or application does not store sensitive authentication data after authorization. ☐ Yes  ☑ No
-Merchant will maintain full PCI DSS compliance at all times and will notify Global Payments when it changes its point of sale software, system or application. ☐ Yes  ☐ No
-None of Merchant's systems store any evidence of magnetic stripe data, or PIN data after transaction authorization is completed. ☐ Yes  ☑ No

Merchant Initials _____
Rev. 01/12 ~ TCP

**APP. 123**



LETTER OF ATTESTATION

Name of Company:

MID:

I hereby attest that I am a true and bona fide owner of the above referenced Company for which I am requesting a merchant account. I understand that I am fully and completely liable for any fees, losses, penalties or others charges related to any and all merchant accounts for which I am the signer. Understanding my liability and potential exposure, I attest that I have and will continue to have actual authority to make financial decisions, oversight of operations and management decisions for the company. I understand it is my financial responsibility to maintain the fees associated with the Gateway and merchant account for the ability to access information to dispute charge backs or any other necessary action. If my account is closed and the ISO / Processor is unable to contact me for a period of more than 90 days after making reasonable attempts utilizing the contact information contained on the application, I hereby give the ISO / Processor the authority to manage the account, including but not limited to; make debits and apply credits, pay fees or penalties from processing related activities, payout 3rd parties including customers, vendors and financial institutions.

I hereby attest that the Company is not violating any laws nor does it contemplate any illegal or unauthorized activities. I am fully responsible for ensuring that the company is engaged in legal activity and is in compliance with any and all applicable regulatory agencies/bodies. Under no circumstances can I make any inference as to the legality or compliance status of my Company based upon the approval of a merchant account. If I have any questions or concerns, it is my responsibility to contact my attorney for legal advice.

Please send the funds to the bank account that is linked to the merchant account.

| ███████████ | ███████████ | ███████████ |
|---|---|---|
| Name of Bank | Routing Number | Account Number |

███████████

Tax ID #

Signature: _____

Date: 2-15-12

***Please send with a copy of your Drivers License

**Moon, Jason C**

| | |
|---|---|
| **From:** | Raul <raul@impmerchantsolutions.com> |
| **Sent:** | Wednesday, November 09, 2011 5:58 PM |
| **To:** | David Whitely |
| **Cc:** | 'benjamin amar ' |
| **Subject:** | FW: AMBROSIA WEB DESIGN / ████████1538 |

**From:** benjamin amar [mailto:benjamin@advancedprocessingsolution.com]
**Sent:** Tuesday, November 08, 2011 10:26 AM
**To:** 'Raul'
**Subject:** RE: AMBROSIA WEB DESIGN / ███████1538

Hi raul
Here are the answers to their questions to the best of my ability. We need to get on a call with Ambrosia and get this issue clarified once and for all. We cant continue doing the back and forth with Trust One if they keep the account opened or not. They have provided us with all the info they have to support their case in the past and can provide recordings and contracts with signatures to support their sales. There will always be unsatisfied clients in the high risk world and more than in the brick and mortar, that is why it is high risk but to say its fraud is a different ball game. Merchant has proof to support his legitimacy in these accusations. Pls call me asap so we can get to the bottom of that Thank you

*Five questions:*

*1. Why does this merchant process authorizations under this merchant name and MCC 7273 (computer programming services)? This merchant's primary business is website development. He provides his clients with a website. The option of getting a debt reduction plan is completely free of charge. The only fee that they charge is for the web development side of the offer and it states it clearly in their contract.*

*2. Have you*
*visited the merchant address of 2906 S Revere Circle Mesa AZ which was included in the MasterCard settlement record prior to 9/16/11? I did not got to either of the addresses to verify them*

*3. Have you visited the merchant address of 209 E Baseline Road Tempe AZ which was included in the MasterCard settlement after 9/16/11? The supervisor I spoke to at 888-583-1956 today said "yes" when I asked if he was still working at the 209 E Baseline address.*

*4. Can you freeze any funds in the merchant account pending the outcome of our investigation? Why would we freeze any funds based on a request from a bank that is not in control of this mid. Let them do their investigation and based on the outcome then we take action on our merchant. Taking action prematurely can only tarnish the relationship with the merchant. What if their investigation doesn't stand ground? We will only create issues with our merchant and I can guarantee that any merchant that will undergo such ordeal will look elsewhere to process even after we release their funds. This can only create a negative impact to Trust One and its affiliates involved in this deal*

*5. Can we expect your assistance if we are able to open a law enforcement investigation?*

1

*Their lawyer have drawn up a letter stating that their services are 100% legitimate and that their package offering a debt reduction is handle under US laws regulating debt reduction programs.*

Advanced Processing Solution
Benjamin Amar
Office: (818)921-4971
Cell: (818)681-1710
skype: benjamin_amarbitton
www.advancedprocessingsolution.com



"This message and any attachments are solely for the intended recipient and may contain confidential and or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments."

B"H

**From:** Raul [mailto:raul@impmerchantsolutions.com]
**Sent:** November-08-11 9:15 AM
**To:** 'benjamin amar '
**Subject:** FW: AMBROSIA WEB DESIGN /          1538
**Importance:** High

Pls respond to the questions below.

**From:** David Whitely [mailto:DavidWhitely@trustoneps.com]
**Sent:** Tuesday, November 08, 2011 8:48 AM
**To:** Raul Orue
**Cc:** Chris Carr
**Subject:** FW: AMBROSIA WEB DESIGN /          1538
**Importance:** High

These are the same guys that Global was contacted by Chase about... We need some answers to these questions ASAP.

I have already placed them on 100% reserve and their account is going to be frozen.

We received the below email from Citi Cards in regards to a spike in the number of disputes coming from cardholder purchases at the above merchant.

2

APP. 127

Can you please look into the Five Questions posed by Citi Cards in regards to this merchant?  TOP would have information on whether or not the (2) locations have been visited and whether or not to hold more funds for the merchant as well.  Just a little side note, the account **AMBROSIA WEBSITE DESING (▮▮▮▮▮▮1538)** was set up to process 360K annually with an average ticket of $995.  This particular merchant account was opened in May 2011 and has already processed almost 3 million in sales along with (345) chargebacks totaling $418, 104.00.  We need to take a closer look at this merchant account and it's processing to determine what has caused this extreme spike in both processing and chargebacks.

Please have TOP look into this matter and please report back to me ASAP of their findings.

Please see below email message:

*It appears you are still processing for AWD 888-583-1956 AZ (Bank MC2135, Visa407105) and I wanted to alert you to the higher than normal dispute rate we are seeing on a large number of accounts (see summary below) used at this merchant with charges since 5/13/11 totaling $322,504.*

*Our security close rate on accounts used at this merchant is approaching 20% (see below) despite the fact that most of the charges from this merchant have been processed in Sept and Oct and many of our Customers have not yet had a chance to review their monthly statements for this more recent activity.  These fraud dispute rates can only grow over time.  Additionally, we have processed roughly as many "Customer Service" dispute chargebacks as "Fraud" dispute chargebacks indicating the total dispute rate for this merchant is likely to be twice the rate outlined below.*

*I also wanted to alert you to some recorded phone messages I listened to today where a person (sounds like a male disguising his voice to sound like a female) made multiple phone calls to our Customer Service department inquiring about a possible APR reduction.  The first attempt was declined due to a block on the account.  After the above caller removed the block from the account, this merchant resubmitted the charge which was approved (all 4 events occurring within a 30 minute window).  Our Customer denied making these calls to Citi Cards and denies authorizing the $1,998.00 charge from AMBROSIA WEB DESIGN.*

*Five questions:*

*1. Why does this merchant process authorizations under this merchant name and MCC 7273 (computer programming services)?*

*2. Have you visited the merchant address of 2906 S Revere Circle Mesa AZ which was included in the MasterCard settlement record prior to  9/16/11?*

*3. Have you visited the merchant address of 209 E Baseline Road Tempe AZ which was included in the MasterCard settlement after 9/16/11?  The supervisor I spoke to at 888-583-1956 today said "yes" when I asked if he was still working at the 209 E Baseline address.*

*4. Can you freeze any funds in the merchant account pending the outcome of our investigation?*

*5. Can we expect your assistance if we are able to open a law enforcement investigation?*

**Please copy all with your response to the above questions and contact me via email or phone if you have any questions.**

Thanks!

3

**APP. 128**

Jim Stavig, Fraud Policy Director
Citi Cards NA
605-331-7211
james.stavig@citi.com

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.1869 / Virus Database: 2092/4604 - Release Date: 11/08/11

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.1869 / Virus Database: 2092/4606 - Release Date: 11/09/11

**APP. 129**

**Moon, Jason C**

| | |
|---|---|
| **From:** | benjamin amar <benjamin@advancedprocessingsolution.com> |
| **Sent:** | Thursday, November 17, 2011 3:45 PM |
| **To:** | David Whitely |
| **Subject:** | RE: AMBROSIA WEB DESIGN / ███████1538 |

Can you pls ask him to provide us with the info about the client that was frauded and also if they have the recording it would help.


Advanced Processing Solution
Benjamin Amar
Office: (818)921-4971
Cell: (818)681-1710
skype: benjamin_amarbitton
www.advancedprocessingsolution.com



"This message and any attachments are solely for the intended recipient and may contain confidential and or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments."


B"H

**From:** David Whitely [mailto:DavidWhitely@trustoneps.com]
**Sent:** November-17-11 1:36 PM
**To:** james.stavig@citi.com
**Subject:** FW: AMBROSIA WEB DESIGN / ███████1538
**Importance:** High

Good Afternoon Jim,

Here is the documentation that we discussed.

We are closing this account down today, based on the info that you provided me.

Please let us know how we can be of further assistance to you or the FTC.

Thank you,

1

**APP. 130**

David Whitely
Trust One Payment Services
Risk Manager/Underwriter
214 Maple Street
Villa Rica, Georgia 30180
770-947-6000 Phone
770-947-6004 Fax
www.TrustOnePS.com



"This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify me by reply e-mail and immediately and permanently delete this message and any attachments."

**From:** Park, Michael # BALTIMORE [mailto:michael.park@globalpay.com]
**Sent:** Tuesday, November 15, 2011 10:36 AM
**To:** David Whitely; Mullins, Sharon # BALTIMORE
**Cc:** Rob Cason
**Subject:** RE: AMBROSIA WEB DESIGN / ▮▮▮▮▮1538

Sharon, I also responded to Kurt. Thanks

*Michael J. Park*

Sr. Relationship Manager
Third Party Acquiring
Global Payments, Inc.
*Office 443-394-1058*
*Fax 443-394-2145*
*Michael.Park@Globalpay.com*

**From:** David Whitely [mailto:DavidWhitely@trustoneps.com]
**Sent:** Tuesday, November 15, 2011 10:35 AM
**To:** Mullins, Sharon # BALTIMORE
**Cc:** Park, Michael # BALTIMORE; Rob Cason
**Subject:** RE: AMBROSIA WEB DESIGN / ▮▮▮▮▮▮▮▮1538
**Importance:** High

Hi Sharon,

Michael is sitting right in front of me and just responded to them but I have pasted my response sent to Michael 11/10/11 Thursday 1138am.

There were also documents attached, which I will send in a separate email.

Thanks,

Hi Michael,

**APP. 131**

We have placed this account on 100% reserve and have completely frozen their account.  The merchant is claiming that they were completely unaware of this and they are proactively seeking out whomever did this.  The owner has also made the employees sign an agreement, which are all signed and attached.  The sales rep went past both addresses and took photos, which are attached.

*1. Why does this merchant process authorizations under this merchant name and MCC 7273 (computer programming services)?*  Web design is their main business.  The merchant has cleared the following with their lawyer to insure that everything was being handled properly, which is also attached.  "They do not in any circumstances offer a credit card to clients.  Recently as you both know they were having issues with their chargebacks, so they implemented many different chargeback reduction methods and one of them is a 100% FREE offer with their website, for a financial aid package.  They saw that most of their merchants were undergoing financial stress so they added this as a loyalty program to aid in their chargeback reduction.  That being said, this package aids their clients and teaches them how to reduce their debt.  In NO CIRCUMSTANCES does the merchant call the banks on behalf of the clients.  They provide them with a physical package and telephone assistance and if necessary they will be on a call with the client as he calls the bank but never on their own.  Basically they wanted to create a way to attract more sales to their business and also make sure that their existing clientele have a commitment to them with this program.  As I mentioned this program is completely FREE and they make sure the client signs off on it knowing that the fees he is paying are for the web design and not the financial program.

If necessary, the merchant can get on a call to explain further this program they have.  They have seen an increase in their numbers since they added this program and also better feedback from their clients with their customer satisfaction."

*2. Have you visited the merchant address of 2906 S Revere Circle Mesa AZ which was included in the MasterCard settlement record prior to  9/16/11?*  Yes

*3. Have you visited the merchant address of 209 E Baseline Road Tempe AZ which was included in the MasterCard settlement after 9/16/11?*  The supervisor I spoke to at 888-583-1956 today said "yes" when I asked if he was still working at the 209 E Baseline address.  Yes

*4. Can you freeze any funds in the merchant account pending the outcome of our investigation?*  Yes

*5. Can we expect your assistance if we are able to open a law enforcement investigation?*  ABSOLUTELY

Please let us know if there are any further questions.

Thank you,

David Whitely
Trust One Payment Services
Risk Manager/Underwriter
214 Maple Street
Villa Rica, Georgia 30180
770-947-6000 Phone
770-947-6004 Fax
www.TrustOnePS.com



"This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information

3

**APP. 132**