IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>_Plaintiff,_<br><br>v.<br><br>AMBROSIA WEB DESIGN LLC, an Arizona limited liability company, also d/b/a AWD, et. al.,<br><br>_Defendants._ | Case No. CV 12-2248-PHX-FJM<br><br>DECLARATION OF KURT SCHAEFFER |

1.     I, Kurt Schaeffer, am over eighteen years of age and am competent to give testimony in this Declaration. I have personal knowledge of all facts set forth herein.

2.     I am the Senior Vice President of Operations at Global Payments Inc. ("Global"), and have been employed by Global since 2003. I have worked in the payment processing industry since 1995.

3.     I have reviewed the "Response in Opposition to Plaintiff's Motion for Civil Contempt and Sanctions Against Non-Parties Trust One Payment Services Inc. and Global Payments Direct, Inc." (the "Response"), and the overview of "The Architecture of the Payment Processing Industry,"

1

contained on pages 3 and 4 of the Response, accurately describes the referenced architecture.

## RESERVE ACCOUNTS

4.      The "Reserve Account" described in Section 15 of Global's Card Services Agreement (the "CSA") is not a traditional depository account held in the name of any merchant with which Global does business. Rather, the Reserve Account is a "pooled" account established by Global, in its name, at its acquiring bank, HSBC. As such, the Reserve Account contains reserve funds that Global receives, not just from transactions associated with one merchant, but from the transactions it processes for thousands of different merchants, with accounting notations indicating, *e.g.*, the merchant with which those monies are associated and how much is "on account" associated with each.

5.      Individual merchants, like Western GPS, have no ability to access the funds in Global's Reserve Account and no opportunity to transfer, pledge, or use them for their own purposes. Rather, those funds belong to Global. And, by design, the Reserve Account serves to benefit only two groups: (i) consumers who initiate chargebacks, to ensure that they have a source of recovery; and (ii) Global and its acquiring bank, to ensure that each receives the sums to which it is entitled under the CSA.

6.     Under the CSA, the funds in the Reserve Account remain with Global
and its acquiring bank until (at a minimum) "the expiration of any potentially
applicable chargeback rights . . . under the rules and regulations of the card
associations or network organizations." As a general rule, the applicable
chargeback period runs from the date of any particular transaction through
about 180 days following the expected receipt of goods or services associated
with that transaction. Because the last transaction Global processed for
Western GPS was authorized on or about October 25, 2012, that chargeback
period extended through at least April 23, 2013. Because the duration of
certain chargeback rights depends on the reason code selected by the issuing
bank, however, there is a potential for certain "straggler" chargebacks to occur
even beyond that date. At least as it relates to Visa, a useful explanation of
those "reason codes" can be found in a Visa publication entitled, "Chargeback
Management Guidelines for Visa Merchants," which is available at:

http://usa.visa.com/download/merchants/chargeback-management-
guidelines-for-visa-merchants.pdf.

CHARGEBACKS

7.     Global, like all card processors, is legally obligated to honor
chargebacks initiated by cardholders and their issuing banks. Practically
speaking, Global cannot disallow them. Rather, those chargebacks are

3

effectively deducted by the payment networks (at the request of issuing banks) from the "net settlements" Global receives in connection with the transactions that it processes. For example (and ignoring fees taken by the payment networks), if Visa were to owe Global $100,000 on a given day associated with transactions Global processed for its merchants, but there were also $5,000 in chargebacks associated with those merchants, then Visa would provide Global with a "net settlement" of $95,000. The $5,000 would then effectively be "returned" to the issuing bank(s) whose cardholder(s) initiated the chargeback(s).

## MS. WILHELM'S DECLARATION

8.      I have reviewed the declaration of Lisa T. Wilhelm, which I understand the FTC filed in support of its motion against Global. I respectfully disagree with many of the assertions Ms. Wilhelm makes in her declaration. Some, but certainly not all, of my disagreements with Ms. Wilhelm's declaration are explained below.

9.      I understand that Ms. Wilhelm believes that "[t]here were a number of patently obvious potential fraud triggers" on Western GPS's processing application. I disagree with that statement. But because this merchant came to Global via Trust One Payment Services, Inc. ("Trust One"), an independent sales organization ("ISO"), Global did not receive the referenced application

as part of the boarding process. Rather, Trust One would have taken that application, and was responsible for prescreening and underwriting the merchant, as well ensuring that the merchant met Global's credit policy.

10.    That is not to suggest that Global does not do any due diligence on incoming merchants generated by ISOs. It does. But because prescreening and underwriting are the primary responsibilities of the ISO, Global's due diligence is more limited than it would be in a case where a merchant applied for processing directly with Global. For example, as part of that more limited due diligence, Global reviews the size of the merchant, its projected sales, its average ticket price, and its merchant category classification, and looks to see whether the merchant has a website (*e.g.*, to ensure that the merchant is not involved in the adult entertainment industry, for which Global declines to provide processing services). Even in this regard, however, Global largely has to rely upon the information being provided by its ISO, who is the primary contact with the merchant-applicant.

11.    As mentioned above, I disagree with Ms. Wilhelm regarding many of the alleged "red flags" she identifies on the merchant application. Without limitation, I disagree that the "merchant category classification" code of 7299, which includes "Miscellaneous Personal Services Not Elsewhere Classified," is grounds for suspicion.

12.    Ms. Wilhelm is also incorrect in her assumption that Global did not run Western GPS against the Visa and MasterCard MATCH file – the "black list" of merchants compiled by the payment networks. Global always runs a MATCH report, and Western GPS did not appear on that report.

13.    Also, the fact that

**REDACTED**

14.    Ms. Wilhelm also indicates that Global must have had suspicions about this merchant because "Trust One and Global Payments established

**REDACTED**

and "Trust One and Global Payments established

Those statements, however, incorrectly assume that *Global* "established" either value. It did not. Rather, Trust One, as an ISO, sets **REDACTED** Likewise, Trust One – not Global – sets                described in paragraph 23 of Ms. Wilhelm's declaration. And those can vary for any number of reasons, most of which have nothing to do with a perceived potential for fraud – including, *e.g.*, high perceived credit risk or the infancy of a merchant's business.

15.    I also understand that the FTC has linked Western GPS to other
merchants Global terminated in the past through communications involving

**REDACTED**

Contrary to what the
FTC has suggested, however,                                              is not an
"agent" of Global, and Global had no visibility into the communications
between and/or among the aforementioned persons and entities, which are
several steps removed from Global. Thus, I disagree with the assertion that
these communications presented a "glaringly obvious connection between
Western GPS and . . . merchant accounts" that had previously been
terminated by Global. With no visibility into the referenced communications,
such a connection was not "obvious" to Global at all.

16.    I understand that Ms. Wilhelm says that she "could not discern a valid
business reason for operating a second account" for Western GPS. In
practice, however, it is not at all uncommon for one merchant to have more
than one Merchant ID. In fact, that occurs often when a particular merchant
does business under more than one name, or would want its name to appear
in differing ways on a cardholders' monthly statement. For example, even
though a "big-box retailer" may be a single "merchant," it may have various
Merchant IDs for its locations, so that – when a transaction at any given

location appears on a cardholder's statement – it will appear in a manner familiar to the cardholder, thus decreasing the probability of an unnecessary chargeback. Further, having separate Merchant IDs may assist the merchant with reconciliation and accounting. In short, there is nothing unusual – much less suspicious – about Western GPS having more than one Merchant ID number.

17.    I have also reviewed that section of Ms. Wilhelm's declaration entitled, "Chargeback Analysis Findings," in which she criticizes Trust One and Global for the high volume of chargebacks associated with Western GPS. Although the chargeback ratios associated with Western GPS during its relatively short relationship with Global were high (especially when viewed with the benefit of hindsight), from my perspective, Ms. Wilhelm's analysis has several flaws. A few of those are outlined below.

18.    First, Ms. Wilhelm's categorization of certain chargeback reason codes as "fraud-related" is flawed. At the outset, it important to keep in mind that chargeback reason codes are selected by issuing banks – not based on any independent analysis by the payment networks. But even putting that aside, I disagree with Ms. Wilhelm's decision to lump both"Fraud or High Fraud Potential" *and"Defective Not as Described or Delivered"* chargeback codes within those codes she deems indicative of fraud. Chargeback codes for "Defective

Not as Described or Delivered" – which represent the overwhelming majority (73%) of Ms. Wilhelm's self-styled "fraud-related chargebacks" – usually have nothing to do with "fraud." Frequently, they suggest only that the cardholder did not receive the items or services she purchased within the timeframe she had initially anticipated. That can occur for several reasons, including supply chain issues, unanticipated sales volume, production difficulties, delivery errors, etc.

19.    Second, Ms. Wilhelm's suggestion that these chargeback ratios should have led Trust One and Global to terminate Western GPS earlier than they did seems to ignore the realities of the marketplace, as well as the directions that processors receive from Visa and MasterCard related to merchants with high chargeback ratios.

20.    Because chargebacks can occur for any number of reasons, most of which have nothing to do with "fraud," the payment networks encourage a *progressive* system of corrective action in response to higher-than-anticipated chargeback ratios. In fact, and as Ms. Wilhelm acknowledges in her declaration, "the card networks impose *progressive* formal reporting and action steps . . . for each successive month the merchant remains on a minimum or higher risk tier trigger report." And, as she also acknowledges, "the *final* step is

merchant termination, usually by no later than *10 months* after the merchant first appeared on the exception report[.]"

21.     Termination, for obvious reasons, is a last resort. And even when a processor deems it appropriate to terminate a merchant, it frequently will give the merchant several weeks (or longer) to find a new processor. That is not, as Ms. Wilhelm appears to suggest, a decision driven by a desire to obtain more fees from the merchant. In fact, allowing a merchant to continue processing in light of potential chargeback concerns poses a greater risk to the processor, *e.g.*, in the event that the reserves on hand will be insufficient to make it whole for chargebacks related to the merchant. Immediate termination, in fact, is the "easy way out." Providing the merchant time to transition its business is the harder choice for a processor to make.

"transition period,"


**REDACTED**

22.    The risk programs established by the payment networks reflect this progressive system for dealing with merchants with higher-than-expected chargeback ratios. By way of example, MasterCard has what is known as its

**REDACTED**

23.    Here, it is important to keep in mind that Western GPS processed with Global only from April 2012 through October 2012 – about six months. Western GPS was not identified by MasterCard as a Tier 3 merchant, however, until March of 2013 – approximately five months *after* Global stopped processing for Western GPS and *over a year* after Western GPS began processing payment cards.

24.    Finally, Ms. Wilhelm's suggestion that Global was not monitoring the Western GPS relationship during the six-month period described above is

incorrect. Global was carefully monitoring the account at least as early as June 2012 and began communicating with Trust One about the potential need to take corrective action, including possible termination, in light of Western GPS's high chargeback ratios. For all the reasons described above, however, termination is not undertaken lightly or without careful analysis and deliberation. Because of that progressive, deliberative approach (which is designed to ensure that legitimate merchants do not face the disastrous effects of termination without sound justification), the termination here did not become effective until November 2012. Unfortunately for all parties involved, that happened to be just a few weeks after the FTC shut down Western GPS through court filings.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of August, 2013.

Kurt Schaeffer
Senior Vice President, Operations
Global Payments Inc.